# IN THE SUPREME COURT OF IOWA

No. 15–0574

Filed June 23, 2017

**TINA HASKENHOFF,**

Appellee,

vs.

**HOMELAND ENERGY SOLUTIONS, LLC,**

Appellant.

Appeal from the Iowa District Court for Chickasaw County, John J. Bauercamper, Judge.

Employer appeals judgment on jury verdict for plaintiff on claims for sexual harassment and retaliation. **DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

Kevin J. Visser and Lisa A. Stephenson of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellant.

Roxanne Barton Conlin of Roxanne Conlin & Associates, P.C., Des Moines, and Brooke Timmer and Paige Fiedler of Fiedler & Timmer, P.L.L.C., Johnston, for appellee.

**WATERMAN, Justice.**

In this appeal, we must decide whether the district court correctly denied an employer's motion for new trial following a $1.4 million jury verdict for the plaintiff on claims under the Iowa Civil Rights Act (ICRA) for employment discrimination based on sexual harassment by a direct supervisor and coemployees. The employer argues the district court erred by submitting a direct negligence claim instead of vicarious liability for supervisor harassment and misinstructed the jury on the elements of proof, the causation standard for retaliation, the definition of adverse employment action, and constructive discharge. The employer also argues a new trial is required for attorney misconduct, errors in allowing expert testimony on legal standards, and excessive damages, which included $1 million for future emotional distress. Finally, the employer argues the district court erred by awarding excessive attorney fees of $846,364, the full amount claimed.

For the reasons explained below, we hold that workers may bring a direct-liability negligence claim under the ICRA against the employer for supervisor harassment, but the plaintiff must prove the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action to end it. We conclude that prejudicial errors in four jury instructions require a new trial. We find no abuse of discretion in the admission of the expert testimony. We need not decide the remaining issues raised in the appeal.

## I. Background Facts and Proceedings.

The jury could find the following facts based on the record developed at trial. Homeland Energy Solutions, LLC (HES) operated an ethanol plant with forty-five employees in Lawler, Iowa. On February 16, 2009, HES hired Tina Haskenhoff as a lab manager at the plant. That

day, she was provided with a copy of the HES employee handbook, which included its policy on sexual harassment. The policy stated sexual harassment was prohibited and provided that "[a]n employee who believes he or she has been subject to harassment prohibited by this policy should report the incident immediately to their supervisor or a member of the Management Team." The policy stated any complaint of sexual harassment would be investigated and any employee may bring a complaint "without fear of reprisal."

Haskenhoff was repeatedly harassed by her immediate supervisor, Kevin Howes, HES's operations manager. Howes repeatedly made inappropriate comments in Haskenhoff's presence. For example, Howes talked about Haskenhoff's breasts on at least three occasions, referring to them as "them puppies" or "the twins." Howes discussed Haskenhoff's body and attire with other employees and speculated out loud about what it would be like to have sex with her. He insinuated to other male employees that they could get Tina into bed. He commented on the attractiveness or unattractiveness of female job applicants and employees. He spoke at work about strippers. On multiple occasions, he used objects or engaged in body motions in front of Haskenhoff to simulate sexual behavior.

Haskenhoff's coemployees also engaged in inappropriate conduct in her presence. One displayed a screen saver on his computer of two young girls touching tongues. Another photographed Haskenhoff's cleavage at a company outing and showed that photo to others. Haskenhoff received an unwanted pornographic video from yet another employee. The atmosphere Haskenhoff experienced at the HES plant was unseemly and unprofessional.

In November 2010, Haskenhoff told Howes she needed to leave work early for a mammogram. She remembered Howes responding, "[W]ell, you know, if you sat out in the parking lot you could probably make some money." She interpreted this to mean, "[I]f I sat in my car and put a sign up guys would pay to grope me." Howes's recollection differed; he recalled he told Haskenhoff she "could go around the corner and use the copying machine and save herself some money." He stated that he meant Haskenhoff could "[u]se the copying machine, make a photocopy [of her breast] versus going to the doctor." Howes acknowledged that his comment was inappropriate. Haskenhoff reported the incident to the plant manager, Chad Kuhlers. Kuhlers forwarded Haskenhoff's report to the head of human resources, Sarah Frein. The next day, Howes came to Haskenhoff's office and spoke with her. He apologized for his comment and expressed concern that Kuhlers wanted him fired because of it. Haskenhoff said Howes made her feel "very intimidated." Shortly after her interaction with Howes, Walter Wendland, the chief executive officer (CEO) of HES, asked Haskenhoff to come to his office. She recalled at this meeting,

> [Wendland] said—he was kind of, like, well, what's going on here, and he said you know Chad [Kuhlers] really wants me to fire Kevin over this, and I said I never asked Chad to fire him. And then Walt went on to say, well, come [on]. I thought we were like a family. You don't want to do this to your family.

On December 7, Frein called Haskenhoff into her office to discuss her complaint. Jeff Grober, the chief financial officer (CFO), was also present in Frein's office. At that meeting, Frein's notes indicate that she had planned "further discussion" about the complaint, but Haskenhoff stated she did not want the investigation to go further because she did not want Howes to be fired. Haskenhoff later testified about that meeting:

Q. And what happened in that meeting? A. They asked me about it. She said that Chad had notified her of something Kevin had said to me that I reported as making me uncomfortable, and I said he did. And I think I broke down at that point, and I said I don't want him to get fired over this, you know. I said to her I'm sure now that he knows, now that it has been pointed out to him, surely he will stop. Anybody would stop.

Q. Is that what you believed would happen? A. Yes.

Q. Did you tell 'em you wanted it dropped? A. I said if it were going to come to the point of Kevin getting fired, I didn't want to go—I didn't want to officially go further at all because I did not want him fired over that.

Q. Did you want them to do something about it? A. Yes.

At Haskenhoff's request, Frein took no further disciplinary action against Howes at that time.

Wendlend later removed Kuhlers as plant manager and promoted Howes to that position. For the next nine months, Haskenhoff made no complaints to management about Howes. Her performance review in January 2011 noted that she met or exceeded requirements in all areas. However, the review also noted that Haskenhoff had areas to work on and referenced an email dispute in which Haskenhoff had become argumentative with a subordinate over lab procedures. In May, she began seeking a position at John Deere.

On August 8, Haskenhoff walked by Howes's office and overheard him talking on his cell phone. Haskenhoff recently had told Howes she intended to marry her long-time boyfriend. Haskenhoff overheard Howes say, "Yep, she's getting married. And for a good reason (pause) for money." This comment upset Haskenhoff. She walked into the control room and told another employee, "Okay. Kevin is a [f&#%!@"g] asshole. I am leaving. I will be back tomorrow." Haskenhoff left work at 11:15 that morning.

Haskenhoff sent an email to Howes expressing her disgust at his comment. Howes replied that he had not meant to offend her and asked her to meet the next day in his office to discuss the issue. Later that night, Howes sent an email to the CEO, Wendland; the CFO, then David Finke; and the commodities manager, Steve Wubbena. In the email, Howes said he wanted to discipline Haskenhoff for calling him expletives in front of subordinate employees, for leaving the lab a mess, and for leaving work without permission for the day. He pointed out Haskenhoff had been the only lab person scheduled, lab samples had not been completed, they were in the middle of a lab trial, and she "blew off" a conference call by leaving. Howes also expressed frustration at Haskenhoff's attitude, her frequent smoke breaks, and her failure to arrange coverage for her shifts on her days off. Finke responded, "We claim that she does a lot of things poorly, do we have any of this documented and on file?"

The next day, Haskenhoff met with Howes and Wubbena in Howes's office. They discussed the conduct from the day before, and Howes apologized. Howes also used the term "insubordination" to refer to Haskenhoff's reaction to his comment. Haskenhoff replied using terms such as "sexual harassment" and "hostile work environment" to refer to Howes's conduct. She then told Howes about other conduct in the office, including about a coemployee having an inappropriate screen saver and inappropriate nicknames being used in the office. Howes responded after their meeting by directing the employees to cease using the nicknames and to remove the screen saver.

The following week, Frein emailed Haskenhoff asking for "facts, examples, and concerns [of inappropriate conduct] in writing so we can get them addressed appropriately." Haskenhoff responded by email to

Frein the same day, listing multiple incidents of inappropriate conduct and stating the list was long "but not all encompassing." Haskenhoff said the only reason she brought the issues up was that Howes had threatened to write her up for insubordination. Frein immediately forwarded this email to Finke, who responded, "I don't think we can discount anything that is mentioned below. Some of it may be embellished a bit, but we still cannot just take it with a grain of salt." Finke stated that the first step was to look at the employee handbook, the second step was a plant-wide training for sexual harassment, and the third step was devising a plan to address the issue with Howes.

The next day, Howes prepared a written warning for Haskenhoff's conduct leaving work early. He also provided Frein with a statement of what occurred during the August 9 meeting. Wubbena forwarded a statement to Frein as well. A day later, Finke emailed Frein recounting that he told Howes he needed to be "OVERLY" professional in "ALL" of his work-related endeavors moving forward. Finke's email also told Frein, "In the meantime, I want you to be thinking about forming a game plan for investigation [of] Tina's claims." Frein enlisted the help of outside counsel, James Gilliam, that day. Frein asked Gilliam questions about HES's next steps, including whether Haskenhoff could be disciplined for leaving work early without permission and for "plotting" against Howes.

HES investigated Haskenhoff's complaint by interviewing employees, including Haskenhoff and Howes. During Haskenhoff's interview on August 23, Wendlend and Frein were present and reviewed Haskenhoff's list of incidents. As to several incidents, Wendlend commented to Haskenhoff that the conduct did not violate the company's policy and crossed them off the list in her presence.

While the investigation was ongoing, Howes began drafting staff-counseling forms, or write-ups, for what he perceived as Haskenhoff's insubordination leaving the plant early on August 8. Howes indicated he wanted to terminate Haskenhoff and contacted other employees to gather more evidence of her insubordination. Howes also repeatedly reminded other employees to keep work professional and informed them of upcoming mandatory harassment training. Gilliam and Frein recommended that Haskenhoff not be disciplined for her conduct because "the timing was inappropriate." Finke told Howes by email that he did not feel comfortable terminating Haskenhoff, stating,

> I honestly feel that Walt and I are getting to the bottom of a very serious situation and that we are doing it in the proper manner. For me, the end goal is to make an informed proper conclusion per Homeland's policies and under the guidance of qualified legal counsel.

Nevertheless, Howes drafted two final staff-counseling forms regarding Haskenhoff, one entitled "#3" and the other "#4." He emailed these forms to Wendland and Finke. Form #3 discussed the investigation and listed the "numerous harassment/inappropriate behavior claims" as one of the reasons for disciplining Haskenhoff. Form #4 did not mention the investigation and focused on Haskenhoff's conduct on August 8 leaving work without permission. Howes said he liked #4 because "it does not come across as being retaliatory in nature." Both forms recommended giving Haskenhoff a written warning and ninety-day performance improvement plan.

On August 29, Wendland and Finke presented Howes with a written staff-counseling form, which determined that Howes had "made unprofessional and unacceptable comments in the workplace." It stated that HES expected Howes's conduct to improve and that if it did not, he

would be subject to disciplinary action, including possible discharge. Two days later, Wendlend and Finke met with Haskenhoff to discuss the results of the investigation. They assured her that she would not be retaliated against and directed her to report any perceived retaliation to Finke or Wendland. Then, while Wendlend and Finke were still present, Howes entered the room and presented Haskenhoff with a draft performance improvement plan addressing her conduct on August 8. Haskenhoff disagreed with many allegations in the plan. The men assured her the plan would be redrafted to reflect her concerns. The next day, Haskenhoff reported to HES for work. At around 11 a.m., she entered Finke's office and resigned, calling the previous day's events "bullshit."[1] Six weeks later, Haskenhoff began working at John Deere.

Haskenhoff filed an administrative complaint with the ICRA eight months later. After receiving an administrative release, Haskenhoff filed a civil action in Chickasaw County District Court, alleging sexual harassment and retaliation under the ICRA. The jury trial commenced on October 1, 2014, and spanned three weeks.

HES filed multiple motions in limine, several of which were granted by the district court. An order in limine prohibited Haskenhoff's counsel from making any reference to "rape," "sexual assault," or similarly inflammatory terms and expressly prohibited making any analogy between rape and the harassment complaint. Despite that ruling, Haskenhoff's counsel, during her examination of HES's CEO at the jury trial, asked this question:

---

[1]Haskenhoff posted on social media two days later to a friend, "[J]ust wanted to let you know that [I] quit Homeland yesterday without giving any notice, had enough of Kevin's bullshit vulgarity and juvenile behavior and favoritism . . . followed your lead LOL[.]"

> Q. I mean, don't you think it would be analogous, for instance, if someone had accused someone of rape and then the person they accused of rape was able to walk in and say that's defamation for saying I'm a rapist?
>
> MR. VISSER: Objection; this is argument, it's improper, and violates the terms of pretrial orders.
>
> THE COURT: Sustained as to argumentative.

Another order in limine forbade Haskenhoff's counsel from offering testimony about Howes's character or referring to him as "juvenile, immature, chauvinistic, vindictive, holding a grudge, or capable of retaliation," as such evidence was not probative of truthfulness. Counsel for Haskenhoff nevertheless asked the following questions in front of the jury:

> Q. [To Matthew Dutka, employee of HES] And based on knowing and observing [Howes], is he the kind of person that would be likely to use people to get what he wants?
>
> . . . .
>
> Q. [To Wade Heideman, employee of HES] Based on your observations about Kevin, would he be the kind of guy who would hold a grudge?
>
> . . . .
>
> Q. [To Sherri Hansen, employee of HES] From your time working with Mr. Howes, do you think he would have done everything in his power to get rid of Tina?

Counsel for HES objected over 574 times during the trial, according to Haskenhoff. The court sustained 353 defense objections, or sixty-one percent. By contrast, counsel for Haskenhoff objected fifty-nine times, thirty of which were sustained (fifty-one percent).

The district court denied HES's motion in limine to exclude the testimony of expert witness Dr. Louise Fitzgerald, professor emeritus of the University of Illinois at Urbana-Champaign, who taught Psychology and Gender and Women's Studies. HES argued her testimony included inadmissible legal conclusions. Dr. Fitzgerald testified over defense

objections about the standard of care in the human resources field for policies and procedures regarding sexual harassment and HES's alleged failure to meet that standard. She also testified about victims' typical reactions to sexual harassment and stated Haskenhoff displayed those reactions. HES argues the jury instructions were shaped to reflect Dr. Fitzgerald's testimony. At the close of evidence, the parties made a record on jury instructions.

**A. Direct Negligence Versus Vicarious Liability for Supervisor Harassment**. HES requested an instruction on sexual harassment that applied different standards of liability depending on the harasser's position within the company. For harassment by a coworker, HES's proposed instruction stated it would be liable if it "knew or should have known of the abusive or hostile conduct and failed to take prompt and corrective action to end the harassment." If the harasser was a supervisor, HES's proposed instruction did not require the plaintiff to prove HES knew or should have known of the harassment, but allowed HES to prove, as an affirmative defense, that it "exercised reasonable care to prevent and correct promptly any sexually harassing behavior" and that Haskenhoff "unreasonably failed to take advantage of any preventative or corrective opportunities provided by Homeland Energy Solutions or to avoid harm otherwise." This is commonly known as the *Faragher–Ellerth* defense to employer liability. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 807, 118 S. Ct. 2275, 2293 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998).

Haskenhoff argued for a single marshaling instruction on a direct negligence theory that encompassed harassment by a supervisor or coworker. The district court agreed and gave an instruction nearly

identical to Haskenhoff's proposed instruction. The court's marshaling instruction stated,

INSTRUCTION NO. 14

COUNT I – SEXUAL HARASSMENT CLAIM

In order to recover damages on her claim of sexual harassment, the plaintiff, Tina Haskenhoff, must prove all of the following elements of her claim:

1. The plaintiff, Tina Haskenhoff, was subjected to offensive conduct by employees, agents, or officers of Homeland Energy Solutions, L.L.C. while employed at its ethanol plant.

2. Such conduct was unwelcome.

3. Tina Haskenhoff's sex played a part in such conduct.

4. This conduct was sufficiently severe or pervasive that a reasonable person in Tina Haskenhoff's position would find her work environment was hostile or offensive.

5. At the time this conduct occurred and as a result of this conduct, Tina Haskenhoff believed that the work environment was hostile or abusive.

6. Homeland Energy Solutions, L.L.C., knew or should have known of the occurrence of one or more sexually harassing incidents.

7. Homeland Energy Solutions, L.L.C. acted negligently in creating or continuing a hostile work environment.

If you find that the plaintiff, Tina Haskenhoff, has failed to prove any of these propositions, the plaintiff is not entitled to damages on her claim of sexual harassment. If the plaintiff has proved all of these propositions, the plaintiff is entitled to damages in some amount.

HES objected to this marshaling instruction, citing *Farmland Foods, Inc. v. Dubuque Human Rights Commission,* on liability for sexual harassment and the applicability of the *Faragher–Ellerth* defense. 672 N.W.2d 733, 744 (Iowa 2003). HES also objected that the negligence standard had been incorrectly defined, stating, "Again, to the extent that there is co-worker harassment, the standard—the element is knew or

should have known and failed to take appropriate and prompt remedial action"—an element of proof was missing from the court's instruction.

**B. Retaliation Instruction—Causation.** HES objected to the court's marshaling instruction on Count II, retaliation. HES requested an instruction that required Haskenhoff to prove the protected activity was a "significant factor" motivating the adverse employment action. In contrast, Haskenhoff's proposed instruction, which the district court in large part adopted, provided that the protected activity need only have "played a part" in defendant's decision to take the adverse action. The court's marshaling instruction stated,

INSTRUCTION NO. 26

COUNT II – RETALIATION CLAIM

In order to recover damages on her claim of retaliation, the plaintiff, Tina Haskenhoff, must prove all of the following elements of her claim:

1. The plaintiff, Tina Haskenhoff, engaged in protected activity by complaining about sexual harassment.

2. The defendant, Homeland Energy Solutions, L.L.C., took adverse action against Tina Haskenhoff.

3. The protected activity played a part in Homeland Energy Solutions, L.L.C's decision to take the adverse action.

Instruction No. 28 elaborated,

INSTRUCTION NO. 28

FACTOR – DEFINED

The plaintiff's harassment complaints played a part in her treatment if those complaints were a factor in the defendant's employment actions toward her. However, her harassment complaints need not have been the only reason for the defendant's actions.

HES objected to these instructions, stating that the elements of a retaliation claim, as set forth in our decisions, "all provide that . . . causal connection is satisfied by a showing that the protected activity was a significant factor motivating the adverse employment action." HES

cited *City of Hampton v. Iowa Civil Rights Commission*, 554 N.W.2d 532, 535 (Iowa 1995), and *Hulme v. Barrett*, 480 N.W.2d 40, 42 (Iowa 1992).

**C. Adverse Action.** HES also objected to the court's instruction defining "adverse employment action." HES requested an instruction that defined an adverse employment action as

> an action that detrimentally affects the terms, conditions, or privileges of employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employee are not adverse employment actions. It includes, but is not limited to, employment actions such as termination of an employee, failure to promote, or any action that would discourage a reasonable employee from making a complaint of harassment. Giving an employee a performance improvement plan or negative employment review is not "adverse employment action" unless they are later used as a basis to alter the employee's terms or conditions of employment in a detrimental way. Both the action and its context must be examined.

The district court declined to give HES's proposed instruction and instead gave Haskenhoff's instruction, which listed more activities as examples of adverse action:

INSTRUCTION NO. 30

ADVERSE ACTION – DEFINED

"Adverse action" means any action which has material consequences to an employee. It is anything that might dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.

It includes but is not limited to, such employment actions as constructive discharge, reprimands or threats of reprimands, a change in opportunities, false accusations or complaints, being investigated, being placed on a performance improvement plan, being placed on probation, or other actions which adversely affect or undermine the position of the employee. It also includes an employer seeking out negative feedback on an employee, or condoning or encouraging other employees to complain about her. You should judge whether an action is sufficiently adverse from the point of view of a reasonable person in the plaintiff's position.

HES objected, stating the second paragraph was "misleading and an incomplete statement of the law" because it included reprimands and other matters never found to constitute adverse action. The court overruled the objection.

**D. Constructive Discharge.** HES objected to the court's instruction on constructive discharge, which was adopted verbatim from Haskenhoff's proposed instruction and stated,

INSTRUCTION NO. 33

CONSTRUCTIVE DISCHARGE – EXPLAINED

An employee is constructively discharged if the employer deliberately makes her working conditions intolerable so that the employee reasonably feels forced to quit. The work environment need not literally be unbearable to be intolerable under the law. The employer need not really want the employee to quit. It is sufficient that the employee's resignation was a reasonably foreseeable consequence of the working conditions created or permitted by the employer.

The employee must show that she was subjected to sexual harassment or retaliation [that] made her believe there was no chance for fair treatment at Homeland.

An employee does not need to stay as an employee if she reasonably believes there is no possibility the employer will treat her fairly. It is enough if the employee has no recourse within the employer's organization or reasonably believes there is no chance for fair treatment. The intolerable working conditions may be created by either the action or inaction of the employer.

HES objected that the instruction was an "incomplete and misleading statement of the law" because it injected a subjective standard. HES also specifically objected to

the court's failure to include language as suggested by the defendant in its constructive discharge claim, including but not limited to a statement that "the employee has an obligation to be reasonable, not assume the worst and not jump to conclusions; conditions will not be considered intolerable unless the employer has been given reasonable chance to resolve the problem."

**E. The Court's Ruling.** Following argument on each of the jury instructions, the court provided, "Court will overrule all of the objections and exceptions to the instructions. Court believes they're appropriate based on the factual record and the law as the court views it." The case proceeded to verdict.

On October 23, the jury returned a verdict for Haskenhoff on both counts and awarded damages in the amount of $1,400,000—$100,000 in backpay, $300,000 in past emotional distress, and $1,000,000 in future emotional distress.

HES moved for a new trial on grounds of (1) the instructional errors set forth above, (2) erroneous evidentiary rulings allowing Dr. Fitzgerald to testify as to legal conclusions, (3) misconduct by Haskenhoff's counsel, and (4) excessive damages. Haskenhoff filed a motion requesting attorney fees and expenses of $846,364 and equitable relief of frontpay of $240,000.

The district court denied HES's motion for new trial. Specifically, the court found, "Jury instructions were thoroughly briefed by counsel and discussed at length with the court both on and off the record." The court also noted that nearly all of HES's asserted evidentiary errors were based on issues already ruled upon by the court during HES's motion for summary judgment and motions in limine. The court found the attorneys' conduct to be merely a product of zealous representation and damages were not excessive. The court awarded frontpay and attorney fees in the full amount requested and entered judgment for Haskenhoff for a total of $2,486,364.

HES filed a timely notice of appeal based on the issues raised in its motion for new trial and excessive attorney fees. We retained the appeal.

## II. Standard of Review.

"We review alleged errors in jury instructions for correction of errors at law." *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 5 (Iowa 2009) (quoting *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006)). Similarly, we review the district court's refusal to give a requested jury instruction for correction of errors at law. *Alcala v. Marriott Int'l, Inc.*, 880 N.W.2d 699, 701 (Iowa 2016). "It is error for a court to refuse to give a requested instruction where it 'correctly states the law, has application to the case, and is not stated elsewhere in the instructions.' " *DeBoom*, 772 N.W.2d at 5 (quoting *Vaughan v. Must, Inc.*, 542 N.W.2d 533, 539 (Iowa 1996)). Instructional error "does not merit reversal unless it results in prejudice." *Id.* (quoting *Wells v. Enter. Rent-A-Car Midwest*, 690 N.W.2d 33, 36 (Iowa 2004)). Prejudicial error results when instructions materially misstate the law or have misled the jury. *Id.* Jury instructions must be considered "in their entirety" when assessing prejudice. *Id.* (quoting *Anderson v. Webster City Cmty. Sch. Dist.*, 620 N.W.2d 263, 265 (Iowa 2000)). "We assume prejudice unless the record affirmatively establishes that there was no prejudice." *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 903 (Iowa 2015).

"We review a trial court's decision to admit or exclude expert testimony for an abuse of discretion." *Ranes v. Adams Labs., Inc.*, 778 N.W.2d 677, 685 (Iowa 2010). We reverse district court rulings on the admissibility of expert opinion testimony "only when the record shows 'the court exercised [its] discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable.' " *Id.* (alteration in original) (quoting *State v. Maghee*, 573 N.W.2d 1, 5 (Iowa 1997)). Grounds are untenable when they are unsupported by substantial evidence or based on an erroneous application of the law. *Id.*

### III. Analysis.

The first question we must decide is whether Haskenhoff could recover from HES on a direct negligence theory for harassment by her supervisor, Howes. HES contends a supervisor-harassment action requires a vicarious liability theory and an affirmative-defense instruction, while only a coworker-harassment action can be brought under a direct-liability negligence (direct negligence) theory. Haskenhoff contends a plaintiff may sue the employer under a direct negligence theory for both supervisor and coworker harassment. We hold employers can be held liable for supervisor harassment under the ICRA on a direct negligence theory. However, the plaintiff must prove the employer failed to take prompt and appropriate remedial action to end the harassment, a fighting factual issue at trial. Because the district court's marshaling instruction omitted that element, a new trial is required.

We next address the three remaining instructional errors in turn. We conclude the jury was misinstructed on the causation element for retaliation, on the definition of adverse employment action, and on constructive discharge. These prejudicial instructional errors also require a new trial. Finally, because the issue is likely to recur on remand, we address the admissibility of Dr. Fitzgerald's testimony and conclude the district court did not abuse its discretion by allowing her testimony.

**A. Does the ICRA Allow a Plaintiff to Bring a Direct Negligence Claim Against the Employer for Supervisor Harassment?** The parties agree that a plaintiff may sue an employer under a vicarious liability theory for supervisor harassment and may bring a direct negligence claim against the employer for coworker harassment. The fighting issue is whether the direct negligence theory also may be used for supervisor

harassment. Because supervisors are employees and the caselaw has not limited recovery to vicarious liability, we conclude a plaintiff can elect to sue an employer for supervisor harassment under either theory.

We begin with the text of the statute. Iowa Code section 216.6(1) (2011) forbids the creation of a hostile working environment, stating,

> It shall be an unfair or discriminatory practice for any:
>
> *a.* Person to refuse to hire, accept, register, classify, or refer for employment, to discharge any employee, or to otherwise discriminate in employment against any applicant for employment or any employee because of the . . . sex . . . of such applicant or employee, unless based upon the nature of the occupation.

To establish a hostile-work-environment claim under the ICRA,

> the plaintiff must show: (1) he or she belongs to a protected group; (2) he or she was subjected to unwelcome harassment; (3) the harassment was based on a protected characteristic; and (4) the harassment affected a term, condition, or privilege of employment.

*Boyle*, 710 N.W.2d at 746 (quoting *Farmland Foods*, 672 N.W.2d at 744). Harassment affects a term, condition, or privilege of employment "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' . . . 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.' " *Farmland Foods*, 672 N.W.2d at 743 (alterations in original) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21, 114 S. Ct. 367, 370 (1993)). When harassment is perpetrated by a nonsupervisory employee, an employer will be liable if the plaintiff proves the employer "knew or should have known of the harassment and failed to take proper remedial action." *Id.* at 744 (quoting *Stuart v. Gen. Motors Corp.*, 217 F.3d 621, 631 (8th Cir. 2000)). However, when harassment is perpetrated by a supervisory employee, an employer may be subject to vicarious liability.

*Id.* The employer defending a vicarious liability claim may assert the *Faragher–Ellerth* affirmative defense

> by showing it: (1) "exercised reasonable care to prevent and correct promptly any . . . harassing behavior," and (2) "that the plaintiff employee unreasonably failed to take advantage of preventive or corrective opportunities provided by the employer or to avoid harm otherwise."

*Id.* at 744 n.2 (quoting *Faragher*, 524 U.S. at 807, 118 S. Ct. at 2293).

HES argues the jury should have been instructed on vicarious liability, including the *Faragher–Ellerth* defense, because vicarious liability replaced the negligence standard for supervisor harassment. Haskenhoff argues the vicarious liability standard did not replace, but rather supplemented, the direct negligence standard. Because the ICRA hostile-work-environment claim is modeled after its Title VII counterpart, we consider federal law instructive.[2] *Boyle*, 710 N.W.2d at 749–50 (recognizing that Title VII hostile-work-environment claim has the same elements as ICRA claim); *see also DeBoom*, 772 N.W.2d at 7 ("When interpreting discrimination claims under Iowa Code chapter 216, we turn

---

[2]It has been suggested that we should not rely on federal law because Iowa civil rights statutes were enacted before Title VII. The Iowa legislature, however, did not expressly include a hostile-work-environment provision in the ICRA. *See* Iowa Code § 216.6(1). Rather, the claim has been developed through our caselaw, beginning in 1990, based expressly on Title VII precedent. We first recognized a hostile-work-environment claim for sex discrimination in *Lynch v. City of Des Moines*, 454 N.W.2d 827, 833 (Iowa 1990), relying on *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Commission*, 394 N.W.2d 375, 378 (Iowa 1986). *Chauffeurs*, in turn, delineated the elements of a racial hostile-work-environment harassment claim, relying on *Henson v. City of Dundee*, 682 F.2d 897, 909 (11th Cir. 1982), a Federal Title VII case, for the appropriate framework under the ICRA. *Chauffeurs*, 394 N.W.2d at 378, 381 (holding union liable when members harassed African-American man with racial epithets and threatening actions). In *Meritor Savings Bank, FSB v. Vinson*, the Supreme Court also relied on *Henson* to adopt the framework for a Title VII hostile-work-environment claim for sex discrimination. 477 U.S. 57, 66–67, S. Ct. 2399, 2405 (1986). *Henson* states that to hold an employer responsible for "creating or condoning [a hostile] environment at the workplace," the plaintiff must prove, among other things, "the employer knew or should have known of the harassment in question and failed to take prompt remedial action." 682 F.2d at 901, 905.

to federal law, including Title VII of the United States Civil Rights Act . . . ."). Accordingly, we will review the development of these liability theories under federal caselaw and the interplay of those decisions with our court's precedents.

The United States Supreme Court first recognized hostile-work-environment sexual harassment as actionable discrimination in *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 66, 106 S. Ct. 2399, 2405 (1986), notably a supervisor-harassment case. Although the Court declined to adopt a definitive rule for sexual-harassment liability, it expressly rejected the notion that "employers are always automatically liable for sexual harassment by their supervisors." *Id.* at 72, 106 S. Ct. at 2408. Instead, the Court looked to "agency principles for guidance" in setting liability standards. *Id.* at 72, 106 S. Ct. at 2408. A four-justice concurrence noted the predominant standard at the time for coworker-harassment liability: that an employer will be liable when it "knows or should have known of the conduct, unless it can show that it took immediate and appropriate corrective action." *Id.* at 74, 106 S. Ct. at 2409 (Marshall, J., concurring) (quoting 29 C.F.R. § 1604.11(c), (d) (1985)).

Four years later, in *Lynch v. City of Des Moines*, we held that "maintenance of a sexually hostile work environment through sexual harassment is a form of illegal sex discrimination under [the ICRA]." 454 N.W.2d 827, 833 (Iowa 1990). We determined the plaintiff was required to prove "the employer knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Id.* Although *Lynch* was a coworker-harassment case, subsequent decisions recognized this standard applied to both supervisor and coworker harassment under the ICRA. *See Greenland v. Fairtron Corp.*, 500

N.W.2d 36, 38 (Iowa 1993) (citing same standard for supervisor harassment); *Vaughn v. Ag Processing, Inc.*, 459 N.W.2d 627, 634 (Iowa 1990) (en banc) (applying same standard to supervisor harassment); *Edmunds v. Mercy Hosp.*, 503 N.W.2d 877, 879 (Iowa Ct. App. 1993) (noting same standard for supervisor harassment).

In 1998, the United States Supreme Court recognized employer vicarious liability for supervisor harassment. *Ellerth*, 524 U.S. at 759, 118 S. Ct. at 2267. The Court relied on the Restatement (Second) of Agency, which states,

> (2) A master is not subject to liability for the torts of his servants acting outside the scope of their employment, unless:
>
> . . . .
>
> (b) the master was negligent or reckless, or
>
> . . . .
>
> (d) the servant purported to act or speak on behalf of the principal and there was reliance upon apparent authority, or he was aided in accomplishing the tort by the existence of the agency relation.

*Id.* at 758, 118 S. Ct. at 2267 (quoting Restatement (Second) of Agency § 219(2) (1957)). The Court reasoned harassment committed by a supervisor was "aided by the agency relation" within the scope of section (d) when a supervisor takes a tangible employment action against the employee because "the injury could not have been inflicted absent the agency relation. . . . A tangible employment decision requires an official act of the enterprise, a company act." *Id.* at 761–62, 763, 118 S. Ct. at 2269; *see also Faragher*, 524 U.S. at 802, 118 S. Ct. at 2290 ("[I]n implementing Title VII it makes sense to hold an employer vicariously liable for some tortious conduct of a supervisor made possible by abuse of his supervisory authority, and that the aided-by-agency-relation principle embodied in § 219(2)(d) of the Restatement provides an

appropriate starting point for determining liability . . . ."). In addition, even when no tangible employment action results, the Court observed that "a supervisor's power and authority invests his or her harassing conduct with a particular threatening character, and in this sense, a supervisor is always aided by the agency relation." *Ellerth*, 524 U.S. at 763, 118 S. Ct. at 2269. Thus, the Court held that the employer would be vicariously liable unless it could show

> (a) that [it] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

*Id.* at 765, 118 S. Ct. at 2270. The Court echoed this vicarious liability standard for supervisor liability in *Faragher*, another supervisor-harassment case decided on the same day. 524 U.S. at 807, 118 S. Ct. at 2292–93.

Iowa adopted the vicarious liability standard of *Ellerth* and *Faragher* in *Farmland Foods*, a hostile-work-environment claim under the ICRA. 672 N.W.2d at 744. Since then, employees bringing harassment claims under the ICRA have used the vicarious liability standard to hold employers liable for supervisor harassment. *See, e.g.*, *Reed v. Cedar County*, 474 F. Supp. 2d 1045, 1061–62 (N.D. Iowa 2007); *Krambeck v. Children & Families of Iowa, Inc.*, 451 F. Supp. 2d 1037, 1041 (S.D. Iowa 2006); *Lopez v. Aramark Unif. & Career Apparel, Inc.*, 426 F. Supp. 2d 914, 949 (N.D. Iowa 2006); *Fisher v. Elec. Data Sys.*, 278 F. Supp. 2d 980, 986–87 (S.D. Iowa 2003).

Merely because vicarious liability is available in cases of supervisor harassment does not mean the negligence standard in place before *Ellerth*, *Faragher*, and *Farmland Foods* has been abrogated. To the

contrary, *Ellerth* expressly states that the direct negligence standard, set forth in subsection (b) of the Restatement of Agency, remains an alternative ground for establishing employer liability for supervisor harassment:

> Subsections (b) and (d) are possible grounds for imposing employer liability *on account of a supervisor's acts* and must be considered. Under subsection (b), an employer is liable when the tort is attributable to the employer's own negligence. Thus, although a supervisor's sexual harassment is outside the scope of employment because the conduct was for personal motives, *an employer can be liable, nonetheless, where its own negligence is a cause of the harassment.* An employer is negligent with respect to sexual harassment if it knew or should have known about the conduct and failed to stop it. Negligence sets a minimum standard for employer liability under Title VII; but Ellerth seeks to invoke the more stringent standard of vicarious liability.

*Ellerth*, 524 U.S. at 758–59, 118 S. Ct. at 2267 (emphasis added) (citation omitted). We conclude the vicarious liability theory was intended to supplement, not replace, the direct negligence theory for supervisor harassment.

The Supreme Court's decision in *Vance v. Ball State University*, 570 U.S. \_\_\_, 133 S. Ct. 2434 (2013), is not to the contrary. At issue in *Vance* was whether a certain employee was merely a coworker, for which the employer could only be held liable under the negligence standard, or a supervisor, for which the employer could also face vicarious liability. *See id.* at \_\_\_, 133 S. Ct. at 2443. The Court stated that "*Ellerth* and *Faragher* identified two situations in which the aided-in-the-accomplishment rule warrants employer liability *even in the absence of negligence.*" *Id.* at \_\_\_, 133 S. Ct. at 2441 (emphasis added). That sentence simply confirms a nonnegligent employer can be vicariously liable for its supervisor's harassment. *See id.* at \_\_\_, 133 S. Ct. at 2439

("[A]n employer's liability for such harassment *may* depend on the status of the harasser." (Emphasis added.)). We read nothing in *Vance* that precludes allowing a direct negligence theory. While *Vance* notes that "[i]n cases in which the harasser is a 'supervisor' . . . different rules apply," that simply reiterates that vicarious liability is imposed only for supervisor harassment, not for harassment by a nonsupervisory coemployee. *Id.* at ___, 133 S. Ct. at 2439.

Several federal circuit courts of appeals after *Ellerth* and *Faragher* have held that suits for supervisor harassment can be brought under either vicarious liability *or* direct negligence theories. In *Sharp v. City of Houston,* the United States Court of Appeals for the Fifth Circuit recognized that a claim for supervisor harassment could proceed on a negligence "knew or should have known" theory because the negligence standard for supervisor harassment was "not disturbed by *Faragher* or [*Ellerth*]." 164 F.3d 923, 929 (5th Cir. 1999). The court noted that although the negligence standard was typically applied to coworker harassment, "[t]he concept of negligence thus imposes a 'minimum standard' for employer liability—direct liability—under title VII, a standard that is supplemented by the agency-based standards for vicarious liability as articulated in *Faragher* and [*Ellerth*]." *Id.* (citation omitted); *see also Debord v. Mercy Health Sys. of Kan., Inc.,* 737 F.3d 642, 650–53 (10th Cir. 2013) (analyzing employer liability for supervisor harassment under both negligence and vicarious liability standards); *Dees v. Johnson Controls World Servs., Inc.,* 168 F.3d 417, 421 (11th Cir. 1999) ("[A]n employer can be held *directly* liable for a supervisor's harassment when the employer either intended, or negligently permitted, the tortious conduct to occur."); *Wilson v. Tulsa Junior Coll.,* 164 F.3d 534, 540 n.4 (10th Cir. 1998) (recognizing the "continuing validity of

negligence as a separate basis for employer liability" in action in which employee alleged supervisor harassment). HES cites no decision that holds a plaintiff cannot bring a direct negligence claim against an employer for supervisor harassment, and we have found none.

That employers are directly liable for their own negligence is not a new proposition. The Restatement (Second) of Employment Law, section 4.02, at 134 (2015), entitled "Employer's Direct Liability to Employees for Its Own Conduct," provides that "an employer is subject to liability in tort to an employee for harm caused in the course of employment *by the tortious conduct of the employer* or the controlling owner." (Emphasis added.) Similarly, the Restatement (Third) of Agency, section 7.03, at 151 (2006), provides that a principal is liable for its own negligence in "selecting, supervising, or otherwise controlling the agent" in addition to any vicarious liability that may be imposed via the agent's actions.

We hold that plaintiffs under the ICRA may proceed against the employer on either a direct negligence or vicarious liability theory for supervisor harassment in a hostile-work-environment case. The *Faragher–Ellerth* affirmative defense, with the burden of proof on the employer, applies only to claims of vicarious liability. *Ellerth,* 524 U.S. at 764, 118 S. Ct. at 2270 (adopting affirmative defense "in order to accommodate the agency principle of *vicarious liability* for harm caused by misuse of supervisory authority" (emphasis added)); *accord Faragher,* 524 U.S. at 807, 118 S. Ct. at 2292; *see also Johnson v. Shinseki,* 811 F. Supp. 2d 336, 348 n.2 (D.D.C. 2011) (holding because the court applied the negligence standard, "the *Faragher* defense is inapplicable"); *Swinton v. Potomac Corp.,* 270 F.3d 794, 803 (9th Cir. 2001) (stating defense did not apply to negligence standard); *Lintz v. Am. Gen. Fin., Inc.,* 50 F. Supp. 2d 1074, 1081 (D. Kan. 1999) (rejecting *Faragher–Ellerth*

defense in direct negligence action). By contrast, on a direct negligence claim, the *plaintiff* must prove "the employer . . . failed to take prompt and appropriate remedial action." *Lynch*, 454 N.W.2d at 833.

**B. Whether the District Court Correctly Instructed the Jury on the Direct Negligence Theory.** We next address whether the jury was correctly instructed on the direct negligence theory. The district court essentially adopted Haskenhoff's proposed marshaling instruction, which omitted an element she was required to prove—that HES "failed to take prompt and appropriate remedial action." *Id.* HES objected to the omission of that element, and we conclude the district court prejudicially erred by overruling the objection and giving Instruction No. 14 without that language. Whether HES in fact took "prompt and appropriate action" was a fighting issue at trial and a jury question. Haskenhoff did not establish as a matter of law that HES failed to take prompt and appropriate action.

The standard requiring a plaintiff to prove the employer's failure to take prompt remedial action "places a reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it." *Vaughn*, 459 N.W.2d at 634. Whether the employer met this duty is a question of fact and turns on "the gravity of the harm, the nature of the work environment, and the resources available to the employer." *Id.*

The first time Haskenhoff complained to management about Howes's harassment, senior management promptly met with her and Howes. Howes was verbally confronted in a manner that led him and others to believe he faced termination. Howes apologized to Haskenhoff, and Haskenhoff, believing the harassment issue was resolved, asked that no further action be taken at that time. *See Nurse "BE" v. Columbia*

*Palms W. Hosp. Ltd. P'ship*, 490 F.3d 1302, 1310 (11th Cir. 2007) (holding that if employee "did not want [the harassing behavior] reported or acted upon, then [the employer] would not have been placed on proper notice of the harassment" (alterations in original) (quoting *Olson v. Lowe's Home Ctrs., Inc.*, 130 F. App'x 380, 391 n.21 (11th Cir. 2005))). Haskenhoff made no further complaints to management during the next nine months. HES management could reasonably assume its prior remedial efforts were adequate. *See An v. Regents of Univ. of Cal.*, 94 F. App'x 667, 676 (10th Cir. 2004) (determining employer not liable when initial complaint limited to one comment that made employee feel uncomfortable, then employee made no further complaint and assured management that things were "okay" until second complaint).

When Haskenhoff next complained of harassment in August of 2011, HES took immediate remedial action. A formal investigation was launched with outside counsel. Witnesses were interviewed. HES management admonished coemployees to conduct themselves professionally and take down the offensive screen saver. Sexual harassment training was scheduled. Howes was disciplined and apologized. *See Wilson*, 164 F.3d at 540 (jury may consider availability and effectiveness of employer's complaint procedure). HES was entitled to have the jury decide whether Haskenhoff proved that it had failed to take prompt and appropriate action.

Haskenhoff argues *Vance* imposes liability when an employer is negligent in allowing harassment to occur, regardless of notice or subsequent corrective action. We disagree. Haskenhoff relies on this sentence in *Vance*: "As an initial matter, an employer will always be liable when its negligence leads to the creation or continuation of a hostile

work environment." 570 U.S. at ___, 133 S. Ct. at 2452.[3] However, the *Vance* Court, two paragraphs later, reiterates the relevance of the

[3]It has been suggested that *Vance* created two types of negligence liability, negligence in failing to prevent the harassment and negligence in failing to remedy it. But the standard for both negligent failure to prevent and negligent failure to remedy is the same: an employer is only liable if he knows or should have known of the harassment *and failed to take prompt measures to rectify it.  See, e.g.*, *Ocheltree v. Scollon Prods., Inc.*, 335 F.3d 325, 333–34 (4th Cir. 2003) ("[T]he employer may be liable in negligence if it knew or should have known about the harassment *and failed to take effective action to stop it.*"  (Emphasis added.)); *Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999) ("An employer may be liable for sexual harassment if it 'knew or should have known of the harassment in question and failed to take prompt remedial action.'" (quoting *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998)); *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1037 (7th Cir. 1998) ("[E]mployers are liable for a co-employee's harassment only 'when they have been negligent either in discovering or remedying the harassment.'  An employer's legal duty in co-employee harassment cases will be discharged if it takes 'reasonable steps to discover and rectify acts of sexual harassment by its employees.'" (citation omitted) (quoting *Perry v. Harris Chernin, Inc.*, 126 F.3d 1010, 1013 (7th Cir. 1997))); *Spicer v. Commw. of Va., Dep't of Corr.*, 66 F.3d 705, 710 (4th Cir. 1995) ("On the fourth element for establishing employer liability, we have repeatedly held that an employer cannot be held liable for isolated remarks of its employees unless the employer 'knew or should have known of the harassment, and took *no* effectual action to correct the situation.'" (quoting *Katz v. Dole*, 709 F.2d 251, 256 (4th Cir. 1983)); *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 677 (10th Cir. 1990) (stating it was an "essential element for employer liability" that the plaintiff establish the employer "inadequately responded to incidents of harassment of which it knew or should have known"); *Paroline v. Unisys Corp.*, 879 F.2d 100, 106 (4th Cir. 1989) ("In a hostile environment claim such as we have here, an employer is liable for one employee's sexual harassment of another worker if the employer had 'actual or constructive knowledge of the existence of a sexually hostile working environment *and took no prompt and adequate remedial action.*'" (quoting *Swentek v. USAIR, Inc.*, 830 F.2d 552, 558 (4th Cir. 1987) (emphasis added))), *vacated in part on other grounds*, 900 F.2d 27 (4th Cir. 1990).

The employer's knowledge and response are key: if the employer did not have notice of the harassment, either actual or constructive, the employer is not liable.  If an employer is negligent in failing to discover workplace harassment, the employee proceeds under a should-have-known framework, but the employer's responsive actions are still relevant.  *See, e.g.*, *Sharp*, 164 F.3d at 930 (analyzing employer's constructive knowledge of conduct and concluding it could be liable because it should have known of harassment and tolerated it); *Adler*, 144 F.3d at 673, 676–77; *Paroline*, 879 F.2d at 107 (stating that employee must prove the employer should have reasonably anticipated harassment because of its pervasiveness and that the employer "failed to take action reasonably calculated to *prevent* such harassment").  Here, however, it is undisputed that HES had actual knowledge of the harassment—Haskenhoff complained twice.  Thus, the jury should have been instructed that HES was liable only if it failed to take prompt responsive action.

employer's remedial efforts under a negligence theory: "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be relevant." *Id.* at ___, 133 S. Ct. at 2453. Removing the requirement for the plaintiff to prove the employer neglected to take corrective action would impose strict or automatic liability on an employer whenever supervisor harassment occurred without a tangible adverse employment action, a position our court has never adopted and the Supreme Court has expressly declined to adopt. *See Faragher*, 524 U.S. at 804–05, 118 S. Ct. at 2291–92. Haskenhoff cites cases that she contends establish that an employer can be liable regardless of whether it took remedial action. Yet each of those decisions indicates the employer's remedial action or lack thereof is relevant to whether it acted negligently.[4]

It has been suggested that the jury need not be instructed regarding the employer's remedial efforts if management, negligently unaware of harassment, took no action. That is not this case.

---

[4]*See Rock v. Blaine*, No. 8:14-CV-1421 MAD/CHF, 2015 WL 3795886, at *1, *5 (N.D.N.Y. June 17, 2015) (noting employer is liable when negligence "perpetuates" a hostile environment, and despite plaintiff's several complaints to supervisors, harasser's conduct "was not remedied"); *Killis v. Cabela's Retail II, Inc.*, No. 13 C 6532, 2015 WL 128098, at *13 (N.D. Ill. Jan. 8, 2015) (determining that under negligence theory for supervisor liability, employer's comprehensive and immediate response to plaintiff's complaint was a "fundamental obstacle" to her recovery (quoting *Muhammad v. Caterpillar, Inc.*, 767 F.3d 694, 698 (7th Cir. 2014)); *Schmidlin v. Uncle Ed's Oil Shoppes, Inc.*, No. 2:13-CV-10552, 2014 WL 3809415, at *11 (E.D. Mich. Aug. 1, 2014) ("To establish notice of and negligent failure to address harassment, an employee must show that 'the employer, through its agents or supervisory personnel, knew or should have known of the charged sexual harassment *and failed to implement prompt and appropriate corrective action.*'" (Emphasis added.) (quoting *Kauffman v. Allied Signal, Inc.*, 970 F.2d 178, 183 (6th Cir. 1992))); *O'Connell v. Peppino's Catering Co., LLC*, No. 1:13-CV-384, 2014 WL 794657, at *8 (W.D. Mich. Feb. 27, 2014) (noting under state standard employer could be liable "only if the employer had reasonable notice of the harassment and failed to take appropriate corrective action" (quoting *Elezovic v. Ford Motor Co.*, 697 N.W.2d 851, 861 (Mich. 2005))); *Ríos DaSilva v. One, Inc.*, 980 F. Supp. 2d 148, 163 n.1 (D.P.R. 2013) (stating *Vance* serves to remind practitioners "the employer is always liable if he was negligent *in not taking action*" (emphasis added)).

Haskenhoff on two occasions complained to management about Howes's harassment. On both occasions, management took action to stop the harassment. It was for the jury to determine, under proper instructions, whether HES's responses were adequate—that is, whether it "failed to take prompt and appropriate remedial action." *Lynch*, 454 N.W.2d at 833.

We decline to interpret the ICRA to impose employer liability for supervisor harassment under a direct negligence theory despite the employer's prompt and appropriate action to end the harassment. Notably, the Equal Employment Opportunity Commission (EEOC) in interpreting Title VII does not go so far. *See* 29 C.F.R. § 1604.11(d) (2016) ("[A]n employer is responsible for acts of sexual harassment in the workplace where the employer (or its agents or supervisory employees) knows or should have known of the conduct, *unless it can show that it took immediate and appropriate corrective action.*" (Emphasis added.)). Indeed, most federal circuit model jury marshaling instructions for sexual harassment under Title VII require the plaintiff to prove the defendant failed to take prompt and appropriate remedial action.[5] None

---

[5]*See* Pattern Jury Instruction for Cases of Emp't Discrimination for the Dist. Cts. of the U.S. Ct. of Appeals for the First Circuit 2.3 (2011) (requiring plaintiff to prove six elements, including "Fifth, [defendant; management level employees of defendant] either knew or should have known of the harassment; *and* Sixth, [defendant; management level employees of defendant] *failed to take prompt and appropriate remedial action*" (emphasis added) (footnote omitted)); Third Circuit Model Civil Jury Instruction 5.1.5 (2016) ("You must find for [defendant] if you find that [defendant] has proved both of the following elements by a preponderance of the evidence: First, [Defendant] exercised reasonable care to prevent harassment in the workplace on the basis of [protected status], *and also exercised reasonable care to promptly correct any harassing behavior that does occur.*" (Emphasis added.)); Fifth Circuit Pattern Civil Jury Instruction 11.4 (2014) ("Plaintiff [name] must prove that: a. the harassment was known by or communicated to a person who had the authority to receive, address, or report the complaint, . . . or the harassment was so open and obvious that Defendant [name] should have known of it; *and b. Defendant [name] failed to take prompt remedial action designed to stop the harassment.*" (Emphasis added.)); Fed. Civil Jury Instruction of the

of the federal circuits hold an employer liable merely for "negligently creating or continuing a hostile work environment"—as the jury was instructed in this case. Rather, a party must not only show the employer knew of the harassment, but also that it unreasonably failed to take remedial action. *See, e.g., Swinton*, 270 F.3d at 803 ("[I]t was Swinton's burden . . . to prove that management knew or should have known of the harassment and 'failed to take reasonably prompt, corrective action.' "). Under the instruction as given, the jury could have found HES liable even if the jury found the employer had in fact taken prompt and appropriate remedial action.

Employers would lose a key incentive to take corrective action if they were automatically liable for harassment whether or not they put a stop to it. As the Fifth Circuit observed, "Imposing vicarious liability on an employer for a supervisor's 'hostile environment' actions despite its swift and appropriate remedial response to the victim's complaint would . . . undermine not only *Meritor* but Title VII's deterrent policy." *Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 266 (5th Cir. 1999). Employers are better deterred from allowing harassment to continue if their prompt corrective action will avoid liability. *See Ellerth*, 524 U.S. at 745, 118 S. Ct. at 2261 ("Limiting employer liability is also consistent with Title

_____

Seventh Circuit 3.04 (2015) (stating plaintiff must prove "seven things by a preponderance of the evidence: . . . 7. *Defendant did not take reasonable steps to [correct the situation]/[prevent harassment from recurring]*" (emphasis added)); Model Civil Jury Instruction for the Dist. Cts. of the Eighth Circuit 8.42 (2017) (requiring plaintiff to show seven elements, including "*Seventh*, the defendant failed to take prompt and appropriate corrective action to end the harassment"); Model Civil Jury Instructions for the Dist. Cts. of the Ninth Circuit 10.7 (2017) ("The plaintiff has the burden of proving both of the following elements by a preponderance of the evidence: . . . 2. the defendant or a member of the defendant's management knew or should have known of the harassment and *failed to take prompt, effective remedial action reasonably calculated to end the harassment*." (Emphasis added.)).

VII's purpose to the extent it would encourage the creation and use of antiharassment policies and grievance procedures.").

Finally, allowing one marshaling instruction on direct negligence—requiring the plaintiff to prove the employer knew or should have known of the harassment *and* failed to take prompt and appropriate remedial action—for both coemployee and supervisor harassment avoids confusing jury instructions with differing standards. It also avoids issues over whether a particular employee is a supervisor. Mixing different authority levels of employees "presents no problem for the negligence standard." *Vance*, 570 U.S. at ___, 133 S. Ct. at 2452.

Haskenhoff is the master of her own pleadings. But by deciding to pursue a direct negligence theory for supervisor harassment, rather than vicarious liability, she assumed the burden of proving not only that HES knew or should have known of Howes's harassment, but also that it failed to take prompt remedial action to stop it. *Lynch*, 454 N.W.2d at 833–34.

> While the reasonableness of an employer's response to sexual harassment is at issue under both standards, the plaintiff must clear a higher hurdle under the negligence standard, where she bears the burden of establishing her employer's negligence, than under the vicarious liability standard, where the burden shifts to the employer to prove its own reasonableness and the plaintiff's negligence.

*Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999); *see also Swinton*, 270 F.3d at 804 ("It might reasonably be argued, in fact, that employers are 'better off' in the negligence context, where the plaintiff is required to prove both the employer's knowledge of the harassment (or that it should have known) and that it failed to take reasonable corrective action."). The district court erred by omitting that element of proof from Instruction No. 14. This error was not harmless.

Reversal is required when jury instructions contain a "material misstatement of the law" or are misleading or confusing. *Rivera*, 865 N.W.2d at 902. When an instruction fails to convey a central principle of liability, this warrants a new trial. *See Benn v. Thomas*, 512 N.W.2d 537, 539–40 (Iowa 1994) (remanding for new trial when jury instruction on proximate cause "failed to adequately convey the existing law"); *Law v. Hemmingsen*, 249 Iowa 820, 825–26, 89 N.W.2d 386, 390–91 (1958) (determining refusal to instruct on well-settled principle of negligence "at the very heart of the case" was error). The instruction omitted a central element of the plaintiff's claim—to show the failure of the employer to take prompt and appropriate remedial action. Omission of this element was a material misstatement of the law and entitles HES to a new trial. *See State v. Pearson*, 804 N.W.2d 260, 265 n.1 (Iowa 2011) (holding omission in the jury instruction of element of offense "requires a new trial"); *Law*, 249 Iowa at 825–26, 89 N.W.2d at 390–91 (reversing because it was error for court to refuse to instruct on combined negligence).

"We assume prejudice unless the record affirmatively establishes that there was no prejudice." *Rivera*, 865 N.W.2d at 903. No prejudice results when "one instruction arguably omits a legal requirement that is included in subsequent instructions on the ground that the instructions are to be read as a whole." *Id.* "When, however, an inadequate instruction relating to the right of recovery goes to 'the very heart of the case,' it is not rescued by abstract instructions elsewhere." *Id.* (quoting *Law*, 249 Iowa at 825, 89 N.W.2d at 390). That is what we have here.

The district court gave a separate instruction, No. 24, on remedial action, which stated,

> Once an employer knows or should have known of sexual harassment, it must take prompt remedial action reasonably calculated to end the conduct. The employer has the duty to take this remedial action even if an employee asks the employer not to do anything.

(Emphasis omitted.) This instruction was not cross-referenced in the marshaling instruction or any other instruction and does not cure the flaw in the marshaling instruction when the instructions are read as a whole. The jury was nowhere told Haskenhoff had the burden to prove HES failed to take prompt and appropriate remedial action to end the harassment.[6]

Haskenhoff cites no case holding the fatal omission in the marshaling instruction could be cured by counsel during summation.[7]

---

[6]Nor is the plaintiff's burden of proof addressed in Instruction No. 22, entitled "Existence of Official Policies—Explained," which told the jury that they could "consider whether the defendant exercised reasonable care to"

[a] Monitor the workplace;

[b] Provide a system for making complaints;

[c] Encourage employees who believe they are being harassed to complain

*[d] Conduct prompt, thorough and impartial investigations into any potential sexual harassment they become aware of, whether it is through a complaint or observation or hearsay;*

[e] Reasonably assure that any person who reports sexual harassment will not suffer retaliation;

[f] Communicate their harassment policy to employees so employees will understand what they may and may not do in the workplace;

[g] Educate the workforce, especially members of management, with appropriate training to avoid committing sexual harassment . . . .

(Emphasis added.) This instruction allowed the jury to find for Haskenhoff if HES was negligent in any of the above respects, *even if* the jury found the employer in fact took prompt and appropriate remedial action to end the harassment.

[7]*Hillrichs v. Avco Corp.* is not to the contrary. 478 N.W.2d 70 (Iowa 1991), *overruled on other grounds by Reed v. Chrysler Corp.*, 494 N.W.2d 224, 230 (Iowa 1992), *overruled by Jahn v. Hyundai Motor Corp.*, 773 N.W.2d 550, 558–60 (Iowa 2009)). There, we determined a uniform jury instruction on ordinary care adequately conveyed the proper legal concept to the jury because it referred to care that "a reasonably careful person would use *under similar circumstances.*" *Id.* at 74. We noted that the words "under similar circumstances" allowed the standard to "adjust[] to both the status of

To the contrary, Haskenhoff's counsel took advantage of the flawed jury instruction in her closing argument. She did not say it was plaintiff's burden to prove HES failed to take prompt remedial action, but instead argued

> Number 24 talks about remedial action. Once an employer knows or should know about the sexual harassment, it must take prompt remedial action reasonably calculated to end the conduct. *The employer has a duty* to take this remedial action even if an employee asks the employer to do nothing.

(Emphasis added.) This is not a case like *State v. Thorndike* in which counsel's closing argument effectively cured the instructional error by conceding the improper instruction did not apply under the evidence. 860 N.W.2d 316, 322–23 (Iowa 2015).

There was no instruction given by the court that allowed HES to argue plaintiff could not recover without proving it failed to take prompt remedial action. Closing arguments were lengthy, extending from the morning until 2:30 p.m. and encompassing 130 pages of the trial transcript. Closing arguments "generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384, 110 S. Ct. 1190, 1200 (1990). "The former are usually billed in advance to the jury as matters of argument, not evidence, and are likely viewed as the statements of advocates; the latter . . . are viewed as definitive and binding statements of the law." *Id.* (citation omitted).

---

the actor and the circumstances that the actor faces." *Id.* We continued, "These are matters that may be adequately conveyed to the jury by the evidence and by argument of counsel under the instruction that the court gave." *Id.* *Hillrichs* did not involve the omission of an element of proof from the marshaling instruction.

We therefore determine HES is entitled to a new trial.[8] *Rivera*, 865 N.W.2d at 892 ("Prejudice occurs and reversal is required if jury instructions have misled the jury, or if the district court materially misstates the law.").

**C. Whether the District Court Erred in Instructing on a "Motivating Factor" Standard for Retaliatory Discharge.** HES argues the district court erroneously adopted the lower "motivating factor" causation standard used in discriminatory discharge claims (Iowa Code section 216.6(1)(*a*)), rather than the higher "significant factor" causation standard used in retaliatory discharge claims (Iowa Code section

---

[8]Because it may arise on remand, we clarify Haskenhoff cannot prove that HES "knew or should have known" and failed to take remedial action by showing only that Howes "knew what he was doing" when he behaved inappropriately toward Haskenhoff. For example, the following exchange took place between Wendland and Haskenhoff's counsel regarding the alleged harassment:

> Q. So regardless of whether somebody complains, if men are commenting on another female's breasts in the workplace, that would be a violation of Homeland's policy? A. Absolutely. If it was brought to my attention and I knew about it or anybody in the company knew about it, we would address it immediately.
>
> Q. Including the plant manager? A. Including the plant manager.
>
> Q. And obviously if your plant manager is making the comments about a woman's breast, he knows he's doing that; yes?

It is not sufficient that the perpetrator himself knows what he is doing, even if he is a supervisor. Rather, to be placed on actual notice, someone "with authority to address the problem" must be notified. *Sharp*, 164 F.3d at 930 (quoting *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401, 404 (5th Cir. 1993); *see also Sandoval v. Am. Bldg. Maint. Indus., Inc.*, 578 F.3d 787, 801 (8th Cir. 2009) ("An employer has actual notice of harassment when sufficient information either comes to the attention of someone who has the power to terminate the harassment, or it comes to someone who can reasonably be expected to report or refer a complaint to someone who can put an end to it."). The inquiry must focus on whether someone with authority to discipline Howes and to take remedial action knew of and failed to address the conduct. *Sharp*, 164 F.3d at 930 ("In the context of sexual harassment, such persons are those with remedial power over the harasser."). Alternatively, Haskenhoff may prove constructive knowledge by showing harassment was so open and pervasive that, in the exercise of reasonable care, it should have been discovered by management-level employees. *See Alvarez v. Des Moines Bolt Supply, Inc.*, 626 F.3d 410, 422 (8th Cir. 2010).

216.11(2)). Haskenhoff argues that (1) under *DeBoom*, 772 N.W.2d at 12–13, the correct causation standard for all ICRA claims is the motivating-factor test, and (2) unlike federal law, a lower causation standard for retaliation should be used because the ICRA is a unified statute and should be read broadly to effectuate its broad remedial goals. *See* Iowa Code § 216.18(1). We note *DeBoom* was not a retaliation case and apply our retaliation decisions that require the higher causation standard. 772 N.W.2d at 13.

Our analysis begins with the text of the statute. The ICRA, Iowa Code section 216.11(2), makes it an unfair or discriminatory practice for

> [a]ny person to . . . retaliate against another person in any of the rights protected against discrimination by this chapter because such person has lawfully opposed any practice forbidden under this chapter, obeys the provisions of this chapter, or has filed a complaint, testified, or assisted in any proceeding under this chapter.

In order to recover for retaliatory discharge, the plaintiff must prove

> (1) he or she was engaged in statutorily protected activity, (2) the employer took adverse employment action against him or her, and (3) there was a causal connection between his or her participation in the protected activity and the adverse employment action taken.

*Boyle*, 710 N.W.2d at 750. The causation standard in retaliatory discharge cases has been characterized as "a high one." *City of Hampton*, 554 N.W.2d at 535 (quoting *Hulme*, 480 N.W.2d at 42). The causal connection "must be a 'significant factor' motivating the adverse employment decision." *Id.* (quoting *Hulme*, 480 N.W.2d at 42). A factor is significant if the reason " 'tips the scales decisively one way or the other,' even if it is not the predominate reason behind the employer's decision." *Teachout v. Forest City Cmty. Sch. Dist.,* 584 N.W.2d 296, 302

(Iowa 1998) (quoting *Smith v. Smithway Motor Xpress, Inc.*, 464 N.W.2d 682, 686 (Iowa 1990)).

A separate provision, Iowa Code section 216.6(1)(*a*), forbids discriminatory discharge, i.e., discharge because of discrimination based *on a protected characteristic.* Retaliatory discharge is different; it prohibits discharge or discrimination *based on the employee's engaging in a protected activity. See id.* § 216.11(2). Though the two concepts are related, they are not the same; one prohibits status-based discriminatory discharge, while the other prohibits discharge based on a protected activity in which an employee chooses to engage. *See Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. ___, ___, 133 S. Ct. 2517, 2532 (2013) (explaining the difference between status-based claims and retaliation claims). Under the discriminatory discharge statute, an employee must show discrimination based on a characteristic—not engaging in a protected activity—constituted a "motivating factor" in the adverse action of the employer. *DeBoom*, 772 N.W.2d at 12–13. Discrimination is a "motivating factor" in an adverse action if an employee's status as a member of a protected class "played a part" in the employer's decision. *Id.* at 12 (emphasis omitted). This is a lower causation standard than the significant-factor standard applied in retaliatory discharge cases under the ICRA and the common law.[9]

*DeBoom* clarified that the motivating-factor test applied to *discriminatory* discharge cases. *See DeBoom*, 772 N.W.2d at 13. But it did not alter—or even reference by name or Code section—*retaliatory*

---

[9]This standard does not require retaliation to be the sole cause; the retaliatory motive may combine with other factors to produce the result so long as "the other factors alone would not have done so—if, so to speak, it was the straw that broke the camel's back." *Burrage v. United States*, 571 U.S. ___, 134 S. Ct. 881, 888 (2014).

discharge claims. *Id.* Rather, in *DeBoom*, we were careful to note the difference between the discriminatory discharge causation standard and the "higher" causation standard of claims such as tortious discharge. *Id.* We have frequently compared tortious discharge under common law and retaliatory discharge under the ICRA, as the two have traditionally possessed similar elements and causation standards. *See Teachout*, 584 N.W.2d at 301–02 (stating high causation standard for tortious discharge and comparing to *Hulme*, a retaliatory discharge case under the ICRA); *see also Brown v. Farmland Foods, Inc.*, 178 F. Supp. 2d 961, 979 (N.D. Iowa 2001) ("[T]he Iowa Supreme Court has consistently sought guidance in its common-law retaliatory discharge cases from its decisions involving claims of statutory retaliation, which further demonstrates that the Iowa Supreme Court would analyze these distinct causes of action in a similar manner."); *cf.* Scott Rosenberg & Jeffrey Lipman, *Developing a Consistent Standard for Evaluating a Retaliation Case Under Federal and State Civil Rights Statutes and State Common Law Claims: An Iowa Model for the Nation*, 53 Drake L. Rev. 359, 414–15 (2005) ("The federal courts have used the same approach in defining actionable employment conduct in both statutory and common law cases."). We noted in *DeBoom* that the lower motivating-factor standard did not apply to tortious discharge, nor was it intended to alter the higher significant-factor causation standard used in ICRA retaliatory discharge claims. 772 N.W.2d at 13.

Because Count II alleged retaliatory discharge under Iowa Code section 216.11 and not discriminatory discharge under section 216.6(1)(*a*), the jury should have been instructed on the correct causation standard—requiring Haskenhoff to prove her protected conduct was a significant factor. *See, e.g., French v. Cummins Filtration, Inc.*, No. C11-3024-MWB, 2012 WL 3498566, at *3 (N.D. Iowa Aug. 15,

2012) ("[Under ICRA] [a]s to the causal connection element, the standard is high: '[T]he "causal connection" must be a *"significant factor" motivating* the adverse employment decision.' " (alteration in original) (quoting *City of Hampton,* 554 N.W.2d at 535)); *Gilster v. Primebank*, 884 F. Supp. 2d 811, 831 n.4 (N.D. Iowa 2012) (analyzing both Title VII and ICRA together using determinative-factor approach)*, overruled on other grounds*, 747 F.3d 1007 (8th Cir. 2014); *Van Horn v. Best Buy Stores, L.P.*, 526 F.3d 1144, 1148 (8th Cir. 2008) (applying same higher causation to ICRA and federal claim).

Haskenhoff notes the ICRA discriminatory discharge and retaliatory discharge provisions use "similar" language. *Compare* Iowa Code § 216.6(1)(*a*) (stating it is a "discriminatory practice for any . . . [p]erson to . . . discharge any employee . . . *because of*" a protected characteristic (emphasis added)), *with id.* § 216.11 (stating it is a "discriminatory practice for . . . [a]ny person to discriminate or retaliate against another person in any of the rights protected against discrimination by this chapter *because* such person has lawfully opposed any practice forbidden under this chapter" (emphasis added)).[10]  But, as we previously noted in *Estate of Harris v. Papa John's Pizza*, the

---

[10]The phrase "because of" does not require a motivating-factor standard of causation.  As the Supreme Court noted in *Nassar*, the default rule in interpreting causation in tort is that "[i]n the usual course, this standard requires plaintiff to show 'that the harm would not have occurred' in the absence of—that is, but for—the defendant's conduct."  570 U.S. ___, 133 S. Ct. at 2525 (quoting Restatement of Torts § 431 cmt. *a* (1934) (negligence)).  Additionally, "the ordinary meaning of 'because of' is 'by reason of' or 'on account of.' "  *Id.* at ___, 133 S. Ct. at 2527 (quoting *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176, 129 S. Ct. 2343, 2350 (2009)).  Thus, the *Nassar* Court concluded that when interpreting "because of," it must mean that the retaliatory intent was " 'the "reason" that the employer decided to act,' or, in other words, that '[retaliation] was the "but-for" cause of the employer's adverse decision.' "  *Id.* at ___, 133 S. Ct. at 2527 (quoting *Gross*, 557 U.S. at 176, 129 S. Ct. at 2350).

retaliation provision of the ICRA *mirrors almost exactly* the retaliation provision of Title VII, which states,

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

679 N.W.2d 673, 677 (Iowa 2004) (quoting 42 U.S.C.A. § 2000e–3 (2004)). "Title VII was designed to ensure equal opportunity in employment for all, regardless of sex.  The ICRA was modeled after Title VII, and therefore we have consistently employed federal analysis when interpreting the ICRA."  *Id.* at 677–78 (citation omitted).  Finally, the ICRA's elements for establishing a prima facie case of retaliation were derived "from federal decisions involving comparable provisions of Title VII of the Civil Rights Act of 1964."  *Hulme*, 480 N.W.2d at 42 (citing 42 U.S.C. §§ 2000e–2000e-3).

Title VII provides a higher causation standard for retaliation claims than discriminatory discharge actions.  *See Nassar*, 570 U.S. at ___, 133 S. Ct. at 2534.  In *Nassar*, a retaliation case brought under Title VII, the Supreme Court explained that in codifying the 1991 Amendment to the Civil Rights Act, Congress did not intend to lower the causation standard for retaliatory discharge cases, although it unquestionably did so for discriminatory discharge.  *Id.* at ___, 133 S. Ct. at 2528–30.  The Court reasoned that the two provisions used different language and were found in different sections of the Act and that Congress had inserted the amendment into only one part.  *Id.*  The Court also pointed out the increasing number of retaliation claims being filed.  *Id.* at ___, 133 S. Ct.

at 2531. Lowering the causation standard, the Court explained, could increase the number of unfounded claims:

> In addition lessening the causation standard could also contribute to the filing of frivolous claims, which would siphon resources from efforts by employer[s], administrative agencies, and courts to combat workplace harassment. Consider in this regard the case of an employee who knows that he or she is about to be fired for poor performance, given a lower pay grade, or even just transferred to a different assignment or location. To forestall that lawful action, he or she might be tempted to make an unfounded charge of racial, sexual, or religious discrimination; then, when the unrelated employment action comes, the employee could allege that it is retaliation. . . . Even if the employer could escape judgment after trial, the lessened causation standard would make it far more difficult to dismiss dubious claims at the summary judgment stage. It would be inconsistent with the structure and operation of Title VII to so raise the costs, both financial and reputational, on an employer whose actions were not in fact the result of any discriminatory or retaliatory intent. Yet there would be a significant risk of that consequence if respondent's position were adopted here.

*Id.* at ___, 133 S. Ct. at 2531–32 (citations omitted).

Turning to the ICRA, the retaliatory discharge and discriminatory discharge provisions are codified at different sections of the Act, as they are in Title VII, which supports the same conclusion reached in *Nassar* that different causation standards apply. *See id.* at ___, 133 S. Ct. at 2530–31. *Compare* Iowa Code § 216.6 (discriminatory discharge), *with id.* § 216.11 (retaliatory discharge). Moreover, as the *Nassar* Court concluded under Title VII, we have emphasized that the ICRA's retaliation protections cannot be so low as to "immunize the complainant from discharge for past or present inadequacies, unsatisfactory performance, or insubordination." *City of Hampton*, 554 N.W.2d at 535–36 (quoting *Hulme*, 480 N.W.2d at 43).

We reject Haskenhoff's contention that we are "blindly" following federal law. First, we are following our own precedent: our cases have

made clear that the correct causation standard for a retaliatory discharge claim brought under section 216.11(2) of the ICRA is the significant-factor standard. *See id.* at 535; *Hulme*, 480 N.W.2d at 42. We are adhering to our consistent prior interpretations of the Act since 1992—interpretations that have not been disturbed by the legislature—and the doctrine of stare decisis. *Ackelson v. Manley Toy Direct, L.L.C.,* 832 N.W.2d 678, 688 (Iowa 2013) (relying on stare decisis and legislative acquiescence to adhere to interpretation of the ICRA disallowing punitive damages); *see also In re Estate of Vajgrt*, 801 N.W.2d 570, 574 (Iowa 2011) ("The rule of stare decisis 'is especially applicable where the construction placed on a statute by previous decisions has been long acquiesced in by the legislature . . . .' " (quoting *Iowa Dep't of Transp. v. Soward*, 650 N.W.2d 569, 574 (Iowa 2002)).

Predictability and stability are especially important in employment law. Employers must comply with both state and federal law. Human resources personnel and supervisors must apply myriad rules and regulations in complex situations. Employers and prospective employers should be able to rely on our precedents. We would generate significant uncertainty if we overrule our own long-standing precedent to diverge from settled federal interpretations. Uncertainty invites more litigation and increasing costs for all parties. An uncertain or costly litigation environment inhibits job creation.

The legislative history of the ICRA does not support the view that we should depart from our long-standing practice of looking to federal decisions to interpret the same or equivalent statutory language. While it

is true some provisions of the ICRA predated Title VII,[11] the ICRA's retaliation provision was enacted *after* Title VII and closely tracked the federal provision.[12]   Accordingly, we appropriately look to federal decisions for guidance.   Moreover, other states follow the federal causation standard when interpreting their own state antiretaliation statutes.[13]  Congruity between state and federal requirements makes it easier for employers and the bench and bar to apply and follow the law.

---

[11]Iowa had a statute predating Title VII, a criminal provision, which stated,

> 1. Every person in this state is entitled to the opportunity for employment on equal terms with every other person.  It shall be unlawful for any person or employer to discriminate in the employment of individuals because of race, religion, color, national origin or ancestry.  However, as to employment such individuals must be qualified to perform the services or work required.
>
> . . . .
>
> 3. Any person, employer, labor union or officer of a labor union or organization convicted of a violation of subsections one (1) or two (2) of this Act shall be punished by a fine not to exceed one hundred dollars or imprisonment in the county jail not to exceed thirty days.

1963 Iowa Acts ch. 330, § 1 (codified at Iowa Code § 735.6 (1966), subsequently transferred to section 729.4 (1979)).  This statute makes no mention of retaliation.

[12]*See* 1965 Iowa Acts ch. 121, § 8 (codified at Iowa Code § 105A.8 (1966)).  The Iowa provision used the language in Title VII of the Civil Rights Act of 1964.  *Compare id.* § 8(2) (prohibiting retaliation "because such person has lawfully opposed any practice forbidden under this Act, obeys the provisions of this Act, or has filed a complaint, testified, or assisted in any proceeding under this Act"), *with* Civil Rights Act of 1964, Pub. L. No. 88–352, § 704(*a*), 78 Stat. 241, 258 (codified as amended at 42 U.S.C. § 2000e-3(a) (prohibiting retaliation "because he has opposed any practice made an unlawful employment practice by this title, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this title").

[13]For example, in *Wholf v. Tremco, Inc.*, the Ohio Court of Appeals applied a higher causation standard to a retaliation claim under its own civil rights statute.  26 N.E.3d 902, 908–09 (Ohio Ct. App. 2015).  The *Wholf* court noted,

> [T]he [Ohio] General Assembly separated status-based discrimination claims from retaliation claims in separate subsections of R.C. 4112.02.  And, despite Wholf's argument to the contrary, Ohio's anti-retaliation provision is nearly identical to Title VII's anti-retaliation provision.

*Id.* at 908.  The court also pointed out that "the 'but-for' standard articulated in *Nassar* is not a new standard; it is a clarification of the standard that has been applied in

We conclude the district court's instruction applying the motivating-factor causation standard was erroneous. In the marshaling instruction for Count II, retaliatory discharge, the district court should have instructed the jury that Haskenhoff must prove the protected activity was a significant factor motivating the adverse action, consistent with our precedent.

**D. Whether the District Court's Jury Instruction Improperly Defined "Adverse Employment Action."** Next, we address whether the court's instruction defining an adverse employment action was erroneous. HES argues the instruction reflected an inaccurate statement of the law because it listed the following as examples of adverse action:

> reprimands or threats of reprimands, . . . false accusations or complaints, being investigated, being placed on a performance improvement plan, being placed on probation, or other actions which adversely affect or undermine the

retaliation cases since the Supreme Court decided *Price Waterhouse* [*v. Hopkins*, 490 U.S. 228, 109 S. Ct. 1775 (1989),] in 1989." *Id.* at 912; *see also Asbury Univ. v. Powell*, 486 S.W.3d 246, 255 (Ky. 2016) (noting that previous cases aligned with *Nassar* by employing a substantial-factor test, in which the improper reason must be an "essential ingredient" in the discharge (quoting *First Prop. Mgmt. Corp. v. Zarebidaki*, 867 S.W.2d 185, 187 (Ky. 1994))); *Goree v. United Parcel Serv., Inc.*, 490 S.W.3d 413, 439 (Tenn. Ct. App. 2015) (stating that Tennessee Act did not require sole causation, but required but-for causation, following *Nassar*); *Navy v. Coll. of the Mainland*, 407 S.W.3d 893, 901 (Tex. Ct. App. 2013) (stating that unlike discrimination claims, retaliation claims require higher standard of causation under Texas Act).

Other courts recognize that a higher standard of causation is necessary for retaliation claims, though they define the standard in varying ways. *See Hensley v. Botsford Gen. Hosp.*, No. 323805, 2016 WL 146355, at *6 n.1 (Mich. Ct. App. Jan. 12, 2016) (per curiam) (suggesting that under a significant-factor or but-for test, the result would be the same); *Thompson v. Dep't of Corr.*, No. 319668, 2015 WL 1261539, at *5 (Mich. Ct. App. March 19, 2015) (per curiam) ("While there is authority that states an employer is liable if discrimination is a motivating factor, retaliation cases continue to require a showing that retaliation must be a significant factor." (Citation omitted.)); *Lacasse v. Owen*, 373 P.3d 1178, 1183 (Or. Ct. App. 2016) ("[P]laintiff must prove that defendant's unlawful motive was a substantial factor in his termination, or, in other words, that he would have been treated differently in the absence of the unlawful motive."); *Allison v. Hous. Auth.*, 821 P.2d 34, 94–95 (Wash. 1995) (en banc) (declining to adopt a standard imposing liability if retaliation affected motive "to any degree").

position of the employee[,] . . . an employer seeking out negative feedback on an employee, or condoning or encouraging other employees to complain about her.

HES points out that no Iowa court has held these actions are "materially adverse actions" for purposes of a retaliation claim under the ICRA.

In order to prove retaliation, a plaintiff must show "the employer took adverse employment action against him or her." *Boyle*, 710 N.W.2d at 750. We previously held that an adverse employment action is "an action that detrimentally affects the terms, conditions, or privileges of employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employees are not adverse employment actions." *Channon v. United Parcel Serv., Inc.*, 629 N.W.2d 835, 862 (2001). "[A] wide variety of actions, some blatant and some subtle, can qualify" as adverse employment actions. *Id.* at 863 (quoting *Bryson v. Chi. State Univ.*, 96 F.3d 912, 916 (7th Cir. 1996)). Adverse action may include "disciplinary demotion, termination, unjustified evaluations and reports, loss of normal work assignments, and extension of probationary period." *Id.* (quoting *McKenzie v. Atl. Richfield Co.*, 906 F. Supp. 572, 575 (D. Colo. 1995)). We have also concluded that losing a prestigious title or opportunity for advancement, physically punching an employee, and reducing an employee from full- to part-time can qualify as adverse employment actions. *See id.* at 865 (constructive demotion); *see also Estate of Harris*, 679 N.W.2d at 678 (punching employee in chest); *City of Hampton*, 554 N.W.2d at 536 (reduction of hours). Whether an adverse employment action occurred "normally depend[ed] on the facts of each situation." *Channon*, 629 N.W.2d at 862 (quoting *Bryson*, 96 F.3d at 916); *see also Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 71, 126 S. Ct. 2405, 2417 (2006) ("[M]aterially adverse depends upon the circumstances of the particular case, and 'should be

judged from the perspective of a reasonable person in the plaintiff's position, considering "all the circumstances." ' " (quoting *Oncale v. Sundowner Offshore Servs., Inc.,* 523 U.S. 75, 81, 118 S. Ct. 998, 1003 (1998))).

The Supreme Court in *Burlington Northern* provided further guidance on what qualifies as an adverse employment action in a retaliation claim. A female employee, Sheila White, was assigned to operate a forklift, a desirable position because it was less arduous and cleaner than other tasks. 548 U.S. at 57–58, 126 S. Ct. at 2409. After White complained about a male employee harassing her, she was moved off forklift duty and reassigned to a more physically demanding position. *Id.* at 58, 126 S. Ct. at 2409. White filed an EEOC complaint. *Id.* Shortly thereafter, her supervisor alleged she was insubordinate, and the company suspended her without pay for thirty-seven days. *Id.* After determining the complaint was unfounded, the company reinstated her with backpay. *Id.*

Deciding whether White had suffered an adverse employment action, the Court declined to limit a retaliatory adverse action to only those that "affect the terms and conditions of employment." *Id.* at 64, 126 S. Ct. at 2412–13. This differed from the Court's interpretation of adverse action under the antidiscrimination provision, which only prohibited "employment-related" adverse action. *Id.* at 63, 126 S. Ct. at 2412. This was because the antidiscrimination provision was intended to promote equality in employment opportunities, and therefore, the purpose would be achieved "were all employment-related discrimination miraculously eliminated." *Id.* But the Court recognized the retaliation provision's objective could not likewise be achieved by only prohibiting employment-related harms because "[a]n employer can effectively

retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace." *Id.*

Thus, the Court took a broader approach, allowing a plaintiff alleging an adverse action was "materially adverse" to prove the action would have "dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S. Ct. at 2415 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). The Court elaborated,

> We speak of *material* adversity because we believe it is important to separate significant from trivial harms. Title VII, we have said, does not set forth "a general civility code for the American workplace." An employee's decision to report discriminatory behavior cannot immunize the employee from those petty slights or minor annoyances that often take place at work and that all employees experience. The antiretaliation provision seeks to prevent employer interference with "unfettered access" to Title VII's remedial mechanisms. It does so by prohibiting employer actions that are likely "to deter victims of discrimination from complaining to the EEOC," the courts, and their employers. And normally petty slights, minor annoyances, and simple lack of good manners will not create such deterrence.

*Id.* (citations omitted) (first quoting *Oncale*, 523 U.S. at 80, 118 S. Ct. at 1002; and then quoting *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346, 117 S. Ct. 843, 848 (1997)).

The Court stressed that the "significance of any given act of retaliation will often depend on the particular circumstances." *Id.* at 69, 126 S. Ct. at 2415. Under this standard, the Court held that reassignment to a less desirable job and suspension was an adverse employment action. *Id.* at 71, 126 S. Ct. at 2417. The Court noted,

> Common sense suggests that one good way to discourage an employee such as White from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or more agreeable.

*Id.* at 70–71, 126 S. Ct. at 2416. Still, the Court took pains to recognize that "reassignment of job duties is not automatically actionable" and will "depend[] upon the circumstances of the particular case." *Id.* at 71, 126 S. Ct. at 2417. The Court also concluded that although White had received backpay for the time of her suspension, it was still adverse action because "White and her family had to live for 37 days without income. . . . Many reasonable employees would find a month without a paycheck to be a serious hardship." *Id.* at 72, 126 S. Ct. at 2417. We find *Burlington Northern* persuasive and adopt it as the appropriate inquiry for evaluating an adverse employment action under the ICRA.

*Burlington Northern,* however, does not rescue the jury instruction here. Even before *Burlington Northern,* we recognized that adverse employment actions can occur in a variety of situations and "will normally depend on the facts of each situation." *Channon,* 629 N.W.2d at 862 (quoting *Bryson,* 96 F.3d at 916). To the extent that *Burlington Northern* broadened the inquiry to situations that do not directly affect the terms or conditions of employment, the jury instruction captured this sentiment, defining adverse action as "anything that might dissuade a reasonable person from making or supporting an allegation of discrimination or harassment." But the instruction went too far when it effectively told the jury that reprimands or performance improvement plans constituted adverse action as a matter of law. Cases both before and after *Burlington Northern* have consistently held that "a negative performance review on its own does not constitute an 'adverse employment action' . . . unless the review was relied on in making promotion decisions about the employee." *Rebouche v. Deere & Co.,* 786 F.3d 1083, 1088 (8th Cir. 2015).

Prior to *Burlington Northern*, in *Farmland Foods*, when an employer criticized an employee because of the slow pace of his work, we determined that "occasional complaints voiced by an employer about employee performance standards" did not constitute "substantial evidence of a materially adverse employment action." 672 N.W.2d at 742. We explained that the employee's internal transfer also did not qualify as an adverse action because "minor changes in working conditions that only amount to an inconvenience cannot support discrimination." *Id.* We added, "An employment action is not adverse merely because the employee does not like it or disagrees with it." *Id.*

Similarly, in *Powell v. Yellow Book USA, Inc.*, although an employee received three written reprimands after filing a complaint with the ICRC, "she [could] point to no cut in her pay, no reduction in her hours, nor any other significant change to the conditions of her employment." 445 F.3d 1074, 1079 (8th Cir. 2006). The Eighth Circuit concluded that "formal criticisms or reprimands that do not lead to a change in compensation, responsibilities, or other benefits do not constitute an adverse employment action under Title VII." *Id.* In addition, "placing [an employee] on a 'performance improvement plan,' without more, [does] not constitute an adverse employment action." *Givens v. Cingular Wireless*, 396 F.3d 998, 998 (8th Cir. 2005) (per curiam).

A majority of circuits addressing the question have held that a reprimand or performance improvement plan, without more, cannot be considered an adverse employment action under *Burlington Northern. See Rebouche*, 786 F.3d at 1088; *see also Jensen-Graf v. Chesapeake Emp. Ins.*, 616 F. App'x 596, 598 (4th Cir. 2015) (per curiam) (concluding denial of professional development course because employee was on performance improvement plan was not adverse action under *Burlington*

*Northern*); *Barnett v. Athens Reg'l Med. Ctr. Inc.*, 550 F. App'x 711, 715 (11th Cir 2013) (per curiam) ("[T]he negative performance evaluation would not, by itself, have deterred a reasonable person from making a charge of discrimination, especially in this case, where such an evaluation, by itself, would not impact his salary or job status."); *Fox v. Nicholson*, 304 F. App'x 728, 733 (10th Cir. 2008) (per curiam) (applying *Burlington Northern* under Americans with Disabilities Act and finding that when employee had lower scores and negative comments on reviews but was still in satisfactory range, no adverse employment action); *Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 348 (6th Cir. 2008) (stating lower performance reviews may only be adverse actions if they "significantly impact an employee's wages or professional advancement"); *James v. Metro. Gov't of Nashville*, 243 F. App'x 74, 79 (6th Cir. 2007) (concluding poor evaluations not adverse action unless "markedly worse than earlier ones" and impacted "professional advancement" because they would not have dissuaded a reasonable employee from filing a Title VII claim).

Under the facts of this case, the performance improvement plan, alone, did not cause Haskenhoff material harm either within the workplace or outside of it. Haskenhoff was never suspended, with or without pay. *See Burlington N.*, 548 U.S. at 72, 126 S. Ct. at 2417. Her work hours were not reduced, nor was her pay cut. The performance improvement plan did not affect her professional advancement. *See id.* at 69, 126 S. Ct. at 2416. Her duties and status remained unchanged, both within the workplace and outside of it. Under her performance improvement plan, Haskenhoff was only required to abide by rules applicable to others in her position. *See Fischer v. Andersen Corp.*, 483 F.3d 553, 556–58 (8th Cir. 2007) (holding that placement on

performance improvement plan was not a constructive discharge when employee acknowledged that plan requirements "were largely fair and in conformance with what one would expect from an engineer").[14] Moreover, Finke and Wendland assured Haskenhoff that if she wanted any revisions, the plan would be changed to reflect her concerns. The timing of the plan and allegations giving rise to it were suspect, but these factors were for the jury to weigh under a correct instruction. The district court erred by instructing the jury the performance improvement plan was an adverse employment action as a matter of law.

"We have on a number of occasions found instructions that unduly emphasized certain evidence were flawed and required reversal." *Alcala*, 880 N.W.2d at 710 (quoting *Burkhalter v. Burkhalter*, 841 N.W.2d 93, 106 (Iowa 2013)). Jury instructions should not comment on specific evidence or erroneously advise the jury "that certain facts are undisputed when there is conflicting evidence on the question." *Locksley v. Anesthesiologists of Cedar Rapids, P.C.*, 333 N.W.2d 451, 455 (Iowa 1983); *see also* 89 C.J.S. *Trial* § 581, at 36 (2012) ("[I]mpermissible comments in jury instructions include those where the court assumes the truth of a material controverted fact or . . . withdraws some pertinent evidence from the jury's consideration."). For example, in *Locksley*, we upheld a district court's refusal to give a jury instruction that defendant was competent as a matter of law because his competence was disputed,

---

[14]The performance improvement plan stated Haskenhoff must abide by the following: (1) not "walk[] off the job and abandon [her] job responsibilities"; (2) not "us[e] vulgar language towards another"; (3) not "send[] hostile, disrespectful, or inappropriate emails to employees"; (4) not "post[] comments about the company or other employees on a social network"; (5) go through the chain of command rather than "address[ing] the problem [her]self"; (6) attend work during the "core work hours of 8AM to 4PM" and "approv[e] ahead of time" coming in or leaving early; (7) not leave the plant "during the work day for non-work related reasons"; and (8) approve paid time off "ahead of time."

and the proposed instruction would have taken a factual determination from the jury. 333 N.W.2d at 455.

Instruction No. 30 provided that certain activities constituted adverse employment actions as a matter of law. The list included matters that no court in Iowa—or the Iowa Civil Rights Commission or EEOC, for that matter—has concluded constitute an adverse employment action as a matter of law. *See* EEOC Enforcement Guidance on Retaliation and Related Issues (Aug. 25, 2016), https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm#_ftnref113. By stating certain instances of conduct that occurred in this case were examples of adverse employment actions (and thus adverse action as a matter of law), the instruction took that factual determination away from the jury and relieved Haskenhoff of her burden of proof on that element of the retaliation claim. *See Anderson*, 620 N.W.2d at 267 (providing examples of breaches of duty of care in negligence action takes determination away from the jury because jury must be the one to apply the legal standard to the facts). We conclude the adverse-action instruction misstated the law and unduly emphasized certain evidence. This prejudicial error requires a new trial.

**E. Whether the Constructive Discharge Instruction Misstated the Law.** We next address the district court's instruction on constructive discharge. "Constructive discharge exists when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Van Meter Indus. v. Mason City Human Rights Comm'n,* 675 N.W.2d 503, 511 (Iowa 2004) (quoting *First Judicial Dist. Dep't of Corr. Servs. v. Iowa Civil Rights Comm'n,* 315 N.W.2d 83, 87 (Iowa 1982)). The policy behind constructive discharge is simple: an employer "should not be able to accomplish

indirectly what the law prohibits directly." 1 Barbara T. Lindemann et al., *Employment Discrimination Law* 21-33 (5th ed. 2012) [hereinafter Lindemann].

> In an attempt to avoid liability, an employer may refrain from actually firing an employee, preferring instead to engage in conduct causing him or her to quit. The doctrine of constructive discharge addresses such employer-attempted "end runs" around wrongful discharge and other claims requiring employer-initiated terminations of employment.

*Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000) (quoting *Turner v. Anheuser-Busch, Inc.*, 876 P.2d 1022, 1025 (Cal. 1994) (en banc)). Employees often allege discriminatory constructive discharge because it allows recovery of backpay. *Van Meter Indus.*, 675 N.W.2d at 510–11. "[T]rivial or isolated acts of the employer are not sufficient to support a constructive discharge claim." *Id.* at 511. "Rather, the 'working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable.'" *Id.* (quoting *Haberer v. Woodbury County*, 560 N.W.2d 571, 576 (Iowa 1997)). Constructive discharge is not its own cause of action, but must be asserted under a common law or statutory framework, such as the Iowa Civil Rights Act. *See Balmer*, 604 N.W.2d at 642 (outlining that constructive discharge can be a form of wrongful discharge or asserted under statute allowing recovery). As such, it can either be alleged under a discrimination claim ("The employer made my working conditions intolerable by discriminating on the basis of an unfair characteristic."), or as an adverse action under a retaliation theory ("The employer retaliated against me by making my working conditions intolerable."). As is the case here, "[c]onstructive discharge, like any other discharge, is an adverse employment action that will support an action for unlawful

retaliation." *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 497 (8th Cir. 1995).

HES asserts three errors in the constructive discharge instruction. First, HES contends that it was error to instruct the jury, "The employer need not really want the employee to quit." Second, HES argues the district court erred by inserting a subjective standard into the definition of constructive discharge. Third, HES assigns error to the district court's refusal to allow an instruction stating "conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem."

1. *Employer need not want the employee to quit.* We conclude there was no error in the district court's instruction on the principle that "[t]he employer need not really want the employee to quit." In *Van Meter Industries*, Jane Sires quit her job with Van Meter Industries after being passed over for a promotion and "relegated to the operations side of the business where there was no reasonable likelihood of advancement into a manager position" because of her sex. 675 N.W.2d at 511. Sires conceded she did not think Van Meter Industries "really wanted her to quit." *Id.* at 512. We stated,

> Although it may be undisputed that VMI wanted Sires to stay on the job, this fact does not preclude a finding that the company deliberately rendered Sires' working conditions so intolerable that a reasonable employee in Sires' position would resign.

*Id.* It is enough "that the employee's resignation was a reasonably foreseeable consequence of the insufferable working conditions created by the employer." *Id.* We reversed the district court's finding there was not substantial evidence Sires was constructively discharged. *Id.* at 513. Pursuant to *Van Meter Industries*, the jury was correctly instructed the

employer need not really want the employee to quit to claim constructive discharge.

2. *Objective standard for constructive discharge.* HES next asserts error because the constructive discharge instruction wrongly directed the jury to consider a subjective standard. The instruction stated, "The employee must show that she was subjected to sexual harassment or retaliation [that] made *her believe* there was no chance for fair treatment at Homeland." (Emphasis added.) We conclude it should have said, "made her *reasonably* believe."

The test for constructive discharge is objective, evaluating whether a *reasonable person* in the employee's position would have been compelled to resign and whether an employee *reasonably believed* there was no possibility that an employer would respond fairly. *Id.* at 511. "The issue thus is not how plaintiff felt but whether a reasonable person in his position would have felt the same way." *Reihmann v. Foerstner*, 375 N.W.2d 677, 683 (Iowa 1985).

"[W]orking conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable." *Van Meter Indus.* 675 N.W.2d at 511 (quoting *Haberer*, 560 N.W.2d at 576)*.* In *Haberer*, a police officer resigned after he was placed on a paid, eighteen-month suspension followed by an unpaid thirty-day suspension pending a criminal investigation against him. 560 N.W.2d at 573. When the officer returned to duty, he was reassigned to office work. *Id.* After receiving notice his wages would be garnished for unpaid child support, the officer resigned. *Id.* We held, as a matter of law, no constructive discharge had occurred. *Id.* at 578. Haberer's reassignment to office work was not "(1) a change in grade, (2) inconsistent with or outside the scope of his job description, (3) a decrease in pay or prestige, (4)

impossible to do, or (5) anything beyond a mere 'difficulty' because of a lack of 'experience.' " *Id.* at 577. We noted,

> Under the cases, an employee cannot simply "quit and sue," claiming he or she was constructively discharged. The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. . . .
>
> . . . Every job has its frustrations, challenges, . . . and disappointments; these inhere in the nature of work. [An employee is not] guaranteed a working environment free of stress.

*Id.* at 575–76 (alteration in original) (quoting *Turner*, 876 P.2d at 1026–27).

The first paragraph of the constructive discharge instruction focused on whether the conditions were "intolerable so that the employee reasonably feels forced to quit." But the second paragraph implied that "intolerable" conditions equated to the employee's subjective belief there was "no chance for fair treatment at Homeland." This was not a correct statement of law. *See Van Meter Indus.*, 675 N.W.2d at 511–12 (stating that constructive discharge results when "employee has no recourse within the employer's organization or '*reasonably* believes there is no chance for fair treatment' " (emphasis added) (citation omitted) (quoting *Kimzey v. Wal-Mart Stores, Inc.*, 107 F.3d 568, 574 (8th Cir. 1997))).

Nevertheless, omitting "reasonably" in one sentence of the constructive discharge instruction was harmless when the instructions are read as a whole. "[W]e look to the instructions as a whole and do not require perfection." *Rivera*, 865 N.W.2d at 902. Another instruction stated,

INSTRUCTION NO. 34

INTOLERABLE WORKING CONDITIONS – DEFINED

Working conditions are intolerable if a reasonable person in the plaintiff's situation would have deemed resignation the only reasonable alternative.

The conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.

The adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable. A single, trivial or isolated act is insufficient to support a constructive discharge claim.

The instructions on constructive discharge mentioned the standard of "reasonable belief" or "reasonable employee" no less than five times. In addition, the sentence immediately following the offending statement in the marshaling instruction clarified the objective standard, elaborating that the employee must "reasonably believe" there is no possibility of fair treatment. Reading the instructions together "leads to the inevitable conclusion the jury could not have misapprehended the issue" on the constructive discharge objective standard. *Moser v. Stallings*, 387 N.W.2d 599, 605 (Iowa 1986).

3. *Reasonable chance to resolve the problem.* HES raises a final point that the district court should have given its requested instruction stating that "conditions cannot be considered intolerable unless the employer has been given a reasonable chance to resolve the problem." We conclude HES's requested instruction was a correct statement of the law and was not adequately embodied in other instructions. Therefore, on this record, it was reversible error for the district court to refuse to give that instruction.

In *Van Meter Industries*, we squarely decided that an employee must give an employer "a reasonable chance to resolve the problem."

675 N.W.2d at 511. Sires reported to one of her superiors and to the director of human resources before resigning that she felt she " 'had reached [the] highest level [she] was going to be allowed to go' and that she was considering resigning." *Id.* at 508 (alterations in original). Her superior asked her to "wait," and the human resources director told her to "hang in there." *Id.* A week passed with no response. *Id.* Sires then received a phone call in which she was given "vague reassurance[s]" and informed that if the individual who made the promotion decision "had it to do over again, he would still promote [the male employee] over her." *Id.* Sires resigned two days later, and Van Meter Industries accepted her resignation without protest. *Id.* The commission found that Sires had been constructively discharged. *Id.* at 509. The district court reversed, believing "Sires had not given VMI 'any opportunity to work on the problem before she quit,' " among other reasons.[15] *Id.* at 510.

On review, we began by noting that "conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem." *Id.* at 511. We then tempered this statement: "On the other hand, an employee need not stay if he or she reasonably believes there is no possibility the employer will respond fairly." *Id.* Examining Sires' constructive discharge claim, we observed she gave Van Meter Industries a reasonable opportunity to remedy the discrimination. *Id.* at 513. Although she waited only one month before

---

[15]It has been suggested our decision in *Van Meter Industries* was not precedential on this point. However, whether Sires could recover without giving the employer a "reasonable opportunity to resolve the problem" was a fighting issue. That was the basis for the district court's reversal of the commission's decision. *See Van Meter Indus.*, 675 N.W.2d at 510. We recognized the defendant employer "claim[ed] Sires failed to give the company an adequate opportunity to address her grievances and so cannot rely on the constructive discharge doctrine." *Id.* at 513. We addressed that claim, spending almost a full page on the discussion. *Id.*; *see also Ackelson*, 832 N.W.2d at 688 ("We are slow to depart from stare decisis and only do so under the most cogent circumstances.").

quitting, Sires had a reasonable belief her employer would not resolve the problem:

> In the weeks between Meyers' promotion and Sires' resignation the company not only took no action to investigate Sires' complaints, it gave no indication that it intended to conduct an inquiry. The company's indifference was further demonstrated by the fact Sires was referred to the individual who made the discriminatory promotion decision to seek a resolution of her grievance. This individual, rather than assuring Sires that appropriate and prompt remedial action would be taken, informed her that he would make the same decision again if he had it to do over and reaffirmed that the company saw her future in operations.

*Id.* (citation omitted). Because Sires demonstrated a reasonable belief her employer would not resolve the problem, we concluded,

> [W]e cannot say under the specific circumstances of this particular case that she acted precipitously. A review of the evidence shows this case is not one where the company did not have sufficient time to rectify its wrong. . . . Rather, this case presents a situation where the company, when given the opportunity, chose to perpetuate its discriminatory practices.

*Id.*

We supported our decision by citing Iowa precedent and precedent from the Eighth Circuit. *See id.* at 511 (citing *Breeding v. Arthur J. Gallagher & Co.*, 164 F.3d 1151, 1159 (8th Cir. 1999), *abrogated in part on other grounds by Torgerson v. City of Rochester*, 643 F.3d 1031, 1043 (8th Cir. 2011); *First Judicial Dist. Dep't of Corr. Servs.*, 315 N.W.2d at 89). In *First Judicial District Department of Correctional Services*, we denied recovery on a race and disability constructive discharge claim when the department of corrections issued an order restricting an African-American blind counselor's access to the jail due to a security risk. 315 N.W.2d at 85. The employee quit one day later. *Id.* We held the employee "was precipitous; she overreacted." *Id.* at 89. She "failed to

make a good faith effort to determine whether the restriction from the jail would render her employment as onerous as she now contends," and the record contained nothing showing the restriction was permanent. *Id.* Her "immediate resignation . . . deprived [the employer] of the opportunity to investigate and remedy the situation." *Id.*; *see also Haberer*, 560 N.W.2d at 577 (denying recovery based in part on employee's "rash and intemperate" act of resigning); *cf. Johnson v. Dollar Gen.*, 880 F. Supp. 2d 967, 998 n.6 (N.D. Iowa 2012) ("[T]he Iowa Supreme Court has observed that 'conditions will not be considered intolerable [so as to constitute constructive discharge] unless the employer has been given a reasonable chance to resolve the problem,' and Johnson gave Dollar General and Williams no such opportunity before resigning." (alteration in original) (citation omitted) (quoting *Van Meter Indus.*, 675 N.W.2d at 511)), *aff'd*, 508 F. App'x 587 (8th Cir. 2013).

The Eighth Circuit has held that to demonstrate constructive discharge, an employee must show that a "reasonable person would find the working conditions intolerable." *Phillips v. Taco Bell Corp.*, 156 F.3d 884, 890 (8th Cir. 1998). "Such intolerability . . . is judged by an objective standard, not the plaintiff's subjective feelings." *Id.* "To act reasonably, an employee has an obligation not to assume the worst and not to jump to conclusions too quickly." *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996). Thus, "[a]n employee who quits without giving [the] employer a reasonable chance to work out a problem has not been constructively discharged." *Id.* Indeed, "passivity in the face of working conditions alleged to be intolerable is often inconsistent with the allegation." *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir. 1998). But "[i]f an employee quits because she reasonably believes

there is no chance for fair treatment, there has been a constructive discharge." *Kimzey*, 107 F.3d at 574.

Peggy Kimzey, an employee at Wal-Mart, complained to management several times about repeated harassment by her supervisor. *Id.* at 571. Management told her they were aware of the problem but took no action to investigate or follow up on the complaint. *Id.* Even after Kimzey resigned because of her supervisor's continued conduct, her manager "did not indicate that he would investigate her complaints or take any other action required by Wal-Mart's open door policy." *Id.* at 572. The Eighth Circuit held that "[a] reasonable jury could find that the continuing harassment and management's indifference rendered Kimzey's working conditions intolerable and forced her to quit." *Id.* at 574–75. It highlighted the evidence that members of Wal-Mart knew Kimzey was being harassed, but "generally ignored those complaints." *Id.* at 574. Because Kimzey demonstrated a reasonable belief there was no chance of fair treatment at Wal-Mart, the Eighth Circuit found no error in submitting the constructive discharge claim to the jury. *Id.* at 575; *see also Sanders v. Lee Cty. Sch. Dist. No. 1*, 669 F.3d 888, 894 (8th Cir. 2012) (finding discriminatory constructive discharge claim supported when employee reasonably believed no chance for fair treatment because employer failed to respond to repeated requests for information about reassignment); *Henderson v. Simmons Foods, Inc.*, 217 F.3d 612, 617 (8th Cir. 2000) (affirming constructive discharge claim when employee "essentially is left with no choice other than the termination of her employment" due to employer's failure to investigate or respond to knowledge of harassment).

By contrast, in *Alvarez v. Des Moines Bolt Supply, Inc.*, the Eighth Circuit held the district court properly granted summary judgment on a

constructive discharge claim when an employee failed to notify the employer of retaliatory harassment. 626 F.3d 410, 418 (8th Cir. 2010). Veronica Alvarez notified her employer of inappropriate sexual conduct by her coworker. *Id.* at 413–14. Her employer investigated the claims and suspended the harassing coworker. *Id.* at 415. Other coworkers then began to harass her in retaliation for her complaint. *Id.* However, Alvarez failed to notify the employer about the postsuspension harassment before she resigned. *Id.* The Eighth Circuit concluded Alvarez had given her employer "no reasonable opportunity to remedy the problem." *Id.* at 419. Alvarez argued she should be excused from the notice requirement because her prior complaint showed she "had no chance for fair treatment if she complained again about harassment." *Id.* But "[p]art of an employee's obligation to be reasonable," the court held, "is an obligation not to assume the worst, and not to jump to conclusions too fast." *Id.* (quoting *Smith v. Goodyear Tire & Rubber Co.*, 895 F.2d 467, 473 (8th Cir. 1990)). Thus, her prior complaint "did not excuse Alvarez from at least notifying DMB about the continued misconduct to see how the company would respond." *Id.*

Other cases have similarly held, unless the employee demonstrates a reasonable belief there is no chance for fair treatment, he or she must give the employer a chance to respond before resigning due to retaliatory conduct.[16]  *See Phillips*, 156 F.3d at 891 (determining employee not

---

[16]It has been suggested giving the employer a reasonable chance to resolve the problem "is another effort to transplant" the *Faragher–Ellerth* defense. However, this assertion overlooks that the *Faragher–Ellerth* defense has *already* been held to apply to certain instances of constructive discharge. *See Pa. State Police v. Suders*, 542 U.S. 129, 141, 124 S. Ct. 2342, 2351 (2004) (stating absent a "tangible employment action," the defense "is available to the employer whose supervisors are charged with harassment" resulting in constructive discharge); *see also id.* at 150–51 & n.10, 124 S. Ct. at 2356 & n.10 (noting Eighth Circuit and other caselaw analyzing whether "employee's decision to resign was reasonable under the circumstances" specifically

constructively discharged when manager retaliated against her by speaking to her in "nasty" tone because she "fail[ed] to give Taco Bell a fair opportunity to demonstrate that it had remedied the situation"); *Coffman v. Tracker Marine, L.P.,* 141 F.3d 1241, 1247–48 (8th Cir. 1998) (holding employee was not constructively discharged when she complained about retaliation but failed to give the employer's method for solving the problem a chance); *Tidwell,* 93 F.3d at 496 (concluding employee who quit the day after seeing allegedly retaliatory schedule change not constructively discharged because he failed to give employer "an opportunity to explain the situation or remedy it"). Such a rule recognizes that "a reasonable waiting period is inversely related to the severity of the situation," *Watson v. Heartland Health Labs., Inc.,* 790 F.3d 856, 864 (8th Cir. 2015), and there may be cases of severe harassment or retaliation when it is reasonable for the employee to resign immediately. It also acknowledges there may be times when the

---

consider whether the employer was given "a chance to respond" (first quoting *Suders v. Easton,* 325 F.3d 432, 462 (3d Cir. 2003); and then quoting *Jaros v. LodgeNet, Entm't Corp.,* 294 F.3d 960, 965 (8th Cir. 2002))).

Principles of deterrence and avoidance undergird theories of employment liability. *See* Sara Kagay, *Applying the* Ellerth *Defense to Constructive Discharge: An Affirmative Answer,* 85 Iowa L. Rev. 1035, 1061 (2000) ("The purpose of Title VII is to encourage anti-harassment policies, promote conciliation, and prevent harassment."). These principles are evident in both the doctrine of constructive discharge *and* the *Faragher–Ellerth* defense. *See* Shari M. Goldsmith, *The Supreme Court's* Suders *Problem: Wrong Question, Wrong Facts Determining Whether Constructive Discharge Is a Tangible Employment Action,* 6 U. Pa. J. Lab. & Emp. L. 817, 837–37 (2004) ("By emphasizing the employee's obligation to seek redress and the employer's duty to avoid harm, the dominant approach to constructive discharge goes to the heart of the Court's *Ellerth/Faragher* motivations and purpose.").

> If the victim could have avoided harm, no liability should be found against the employer who had taken reasonable care, and if damages could reasonably have been mitigated no award against a liable employer should reward a plaintiff for what her own efforts could have avoided.

*Faragher,* 524 U.S. at 807, 118 S. Ct. at 2292.

employee can demonstrate a complaint would be fruitless, such as when the prescribed method of recourse is through the alleged harasser or when an employer has failed to respond to previous instances of harassment. *See, e.g., Van Meter Indus.*, 675 N.W.2d at 513 ("Sires was referred to the individual who made the discriminatory promotion decision to seek a resolution of her grievance.").

"[A]ntidiscrimination policies are better served when the employee and employer attack discrimination within their existing employment relationship, rather than when the employee walks away and then later litigates whether his employment situation was intolerable." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). We empathize with the fact that in many cases coming forward with allegations of retaliation may seem difficult. *See* Cathy Shuck, *That's It, I Quit: Returning to First Principles in Constructive Discharge Doctrine*, 23 Berkeley J. Emp. & Lab. L. 401, 429–30 (2002) ("The most frequently cited reason for failing to report harassment is fear of negative outcomes—fear that the employee will lose her job, not be believed, or 'simply because it will not help [her] situation[].'" (alterations in original) (quoting Theresa M. Beiner, *Sex, Science and Social Knowledge: The Implications of Social Science Research on Imputing Liability to Employers for Sexual Harassment*, 7 Wm. & Mary J. Women & L. 273, 317 (2001))). But countervailing policy considerations counsel us the burden placed on the employee is reasonable. A preeminent treatise on employment law explains,

> Courts generally require that the employee must give higher levels of management the opportunity to correct an adverse situation before quitting and claiming constructive discharge. The evident purpose of the requirement is to allow the employer *as an entity*—as opposed to, for example, an individual (and perhaps aberrational) supervisor—to redress the problem. However, to avoid a finding of constructive discharge, the employer's response must be

adequate; the employee need not suffer prolonged harassment or discrimination.

Lindemann, at 21-44 to 21-45 (footnotes omitted). Moreover, an employee can escape the requirement of coming forward by alleging there would have been no "chance for fair treatment" in the face of a complaint. *Kimzey*, 107 F.3d at 574.

Courts have consistently required "something more" for constructive discharge claims than for ordinary discrimination or retaliation. *Pa. State Police v. Suders*, 542 U.S. 129, 147, 124 S. Ct. 2342, 2354 (2004). Constructive discharge occurs when the working conditions deteriorate, as a result of discrimination or retaliation, "to the point that they become 'sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer.'" *Brooks v. City of San Mateo*, 229 F.3d 917, 930 (9th Cir. 2000) (quoting *Turner*, 876 P.2d at 1026). These discriminatory or retaliatory actions are best handled within the employment relationship. *Poland*, 494 F.3d at 1184. The employee can recover for any additional acts of harassment suffered until he resigns. *See Green v. Brennan*, 578 U.S. ___, ___, 136 S. Ct. 1769, 1782 (2016) (holding the claim of constructive discharge does not accrue until an employee resigns).

The First, Fifth, Seventh, Eighth, Tenth, and Eleventh Circuits consider whether the employee reasonably gave the employer an opportunity to respond before claiming constructive discharge. *See, e.g.*, *EEOC v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (holding employee failed to meet "reasonable person" element when her "choice to resign was 'grossly premature, as it was based entirely on [her] own worst-case-scenario assumption'" (alteration in original));

*Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 461 (8th Cir. 2011) ("We have consistently recognized that an employee is not constructively discharged if she 'quits without giving [her] employer a reasonable chance to work out a problem.'" (alteration in original) (quoting *Brenneman v. Famous Dave's of Am., Inc.*, 507 F.3d 1139, 1144 (8th Cir. 2007)); *Aryain v. Wal-Mart Store Texas LP*, 534 F.3d 473, 482 (5th Cir. 2008) (concluding employee could not recover because she "assumed the worst and made no effort to allow Wal-Mart the opportunity to remedy the problems she identified"); *Barker v. YMCA of Racine*, 18 F. App'x 394, 399 (7th Cir. 2001) ("Employees who quit without giving their employer a reasonable chance to resolve a problem have not been constructively discharged. Here, Ms. Barker did not try to resolve her work problems— she merely walked away from her job without notice . . . ." (Citation omitted.)); *Yearous v. Niobrara Cty. Mem'l Hosp.*, 128 F.3d 1351, 1357 (10th Cir. 1997) (holding no constructive discharge when plaintiffs only waited brief time before resigning and "unreasonably refused to explore any option short of resignation"); *Kilgore v. Thompson & Brock Mgmt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996) ("A constructive discharge will generally not be found if the employer is not given sufficient time to remedy the situation."); *Bozé v. Branstetter*, 912 F.2d 801, 804–05 (5th Cir. 1990) (per curiam) (concluding employee was not constructively discharged when he failed to pursue internal grievance procedures); *see also DeWalt v. Davidson Serv./Air, Inc.*, 398 S.W.3d 491, 501 (Mo. Ct. App. 2013) ("Reasonableness requires an employee not to assume the

worst, and not to jump to conclusions too quickly.").[17]  As Lindemann states,

> The general rule is that a reasonable employee must remain and fight discrimination on the job.  Indeed, even when the employee is faced with what he *anticipates* will be an intolerable job environment, courts generally hold that the employee should not quit precipitously, but rather should remain to see whether those fears in fact do materialize.  Moreover, an employee cannot simply speculate that intolerable conditions will develop, that an impending discharge will occur, or that management will ignore the problem.

Lindemann, at 21-41 to 21-42 (footnotes omitted).

Haskenhoff failed to establish as a matter of law that it would have been fruitless to give HES management more time to respond.  To contrary, HES was actively engaged in responding to her complaint when she quit.  It was for the jury to decide, under proper instructions, whether she jumped the gun, or rather, was constructively discharged.  A reasonable employee has "an obligation not to assume the worst and not to jump to conclusions too quickly."  *Brenneman*, 507 F.3d at 1144 (quoting *Duncan v. Gen. Motors Corp.*, 300 F.3d 928, 935 (8th Cir. 2002)).

---

[17]In Missouri, a previous case held an employee did not have to allow a reasonable opportunity to respond before claiming constructive discharge.  *See Pollock v. Wetterau Food Distribution Grp.*, 11 S.W.3d 754, 761, 765–66 (Mo. Ct. App. 1999).  That case has been undermined by later cases holding a constructive discharge does not occur "without giving the employer a reasonable chance to resolve the problem." *DeWalt*, 398 S.W.3d at 501; *see also Gamber v. Mo. Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 479 (Mo. Ct. App. 2007).  Other states considering whether an employee gave the employer a reasonable opportunity to respond include West Virginia, Nebraska, and Minnesota.  *Waldron v. Lyman Lumber Co.*, No. A10–997, 2011 WL 206175, at *3 (Minn. Ct. App. Jan. 25, 2011); *Gavin v. Rogers Tech. Servs., Inc.*, 755 N.W.2d 47, 56 (Neb. 2008); *Anderson v. First Century Fed. Credit Union*, 738 N.W.2d 40, 50–51 (S.D. 2007); *Ford Motor Credit Co. v. W. Va. Human Rights Comm'n*, 696 S.E.2d 282, 296 (W. Va. 2010) (per curiam); *see also Charles v. Regents of N.M. State Univ.*, No. 28,825, 2010 WL 4703506, at *1 (N.M. Ct. App. Nov. 4, 2010) (noting that New Mexico courts consider "whether an employer had an opportunity to or attempted to resolve the problem" as a factor when evaluating constructive discharge).

"The proper focus is on whether the resignation was coerced, not whether it was simply one rational option for the employee." *Haberer*, 560 N.W.2d at 575 (quoting *Turner*, 876 P.2d at 1026).

Instruction No. 33 omitted language requested by HES and required under our precedent stating the employee must give the employer "a reasonable chance to resolve the problem." *Van Meter Indus.*, 675 N.W.2d at 511. That omission constituted prejudicial error.

**F. Whether the Expert Testimony of Dr. Fitzgerald Should Have Been Excluded.** Because the issue is likely to arise on remand, we will discuss whether the district court abused its discretion by allowing the testimony of Dr. Fitzgerald. Iowa Rule of Evidence 5.702 (2014)[18] provides,

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

HES argues expert testimony by Dr. Fitzgerald should not have been admitted because it "invade[s] the province of the court to determine the applicable law and to instruct the jury as to that law." *In re Det. of Palmer*, 691 N.W.2d 413, 419 (Iowa 2005) (quoting *Torres v. County of Oakland*, 758 F.2d 147, 150 (6th Cir. 1985)), *overruled on other grounds by Alcala*, 880 N.W.2d at 708 n.3. HES specifically objects to Dr. Fitzgerald's testifying to "the requirements and standards for an

---

[18]Iowa Rule of Evidence 5.702 has since been amended and now reads,

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue.

Iowa R. Evid. 5.702 (2017).

effective sexual harassment program and whether [HES]'s harassment prevention and remediation program was consistent with those standards." HES also objects to Dr. Fitzgerald's testimony about what a reasonable company would do. Haskenhoff states that Dr. Fitzgerald's testimony provided helpful insight based on reasonable industry standards and did not delve into instruction upon the law.

HES's challenge to Dr. Fitzgerald's testimony focused on the linkage to erroneous jury instructions. Because we are reversing and ordering a new trial based on the instructional errors, the admissibility of her testimony will be in a somewhat different context on remand. We review the general parameters of expert testimony.

"An opinion is not objectionable just because it embraces an ultimate issue." Iowa R. Evid. 5.704 (2017). We favor a "liberal view on the admissibility of expert testimony." *Ranes*, 778 N.W.2d at 685. Whether an opinion should be excluded on the basis that it is couched in legal terms "depends on 'whether the terms used by the witness have a separate, distinct and specialized meaning in the law different from that present in the vernacular.' " *In re Det. of Palmer*, 691 N.W.2d at 420 (quoting *Torres*, 758 F.2d at 151). If so, the testimony should be excluded. *Id.* For example, questions such as whether a defendant was negligent or not negligent are improper because "[e]xperts are not to state opinions as to legal standards." Iowa R. Evid. [5.]704 committee cmt. (1983).

The district court allowed Dr. Fitzgerald's testimony, finding she was "qualified as an expert on the subjects presented, as provided by Iowa Rule of Evidence 5.702." Dr. Fitzgerald testified she was hired for two reasons: (1) to speak with Haskenhoff and evaluate whether she displayed typical victim behavior in response to harassment, and (2) to

examine HES's policies and procedures on sexual harassment and opine whether they met accepted standards in the field of human resources. She opined that Haskenhoff suffered from major depressive disorder and posttraumatic stress disorder, described these conditions for the jury, and stated why they may be caused by harassing behavior. She testified about whether this was common for victims of harassment. She also testified about what a "reasonable" company should do to prevent sexual harassment according to human resources standards and whether HES conformed to those standards. She skirted close to the line prohibiting testimony on legal conclusions:

> A. . . . [T]here's a distinction between—that I should make here—between violation of a company's policy and violation of the law.
>
> Because they're not—although there's a great deal of overlap, they're not always exactly the same. So there are things that can violate a company's policy and not violate the law. . . .
>
> . . . .
>
> Q. Okay. "The standard of professional practice says an investigation," and then you set out steps a competent investigator would take in order to conduct a real investigation into this or any other matter. And what are those steps? A. Well, I probably should have said "should" instead of must, because it's not the law or anything. But the common practice recommendation . . . .
>
> . . . .
>
> Q. And your testimony doesn't purport to tell the jurors what the law is proscribing sex harassment, does it? A. No, I do not speak to legal issues.

Testimony that particular conduct violated the ICRA clearly would be an inadmissible legal conclusion.

Expert testimony on the standard of care or standard of practice is generally permitted in negligence actions. *See Alcala*, 880 N.W.2d at 709 (collecting cases requiring evidence of an employer's standard of care and

its breach to recover under a negligent-training theory); *Oswald v. LeGrand*, 453 N.W.2d 634, 635 (Iowa 1990) (noting that in a professional negligence action, "[o]rdinarily, evidence of the applicable standard of care—and its breach—must be furnished by an expert"); *Brandt v. Richter*, 159 N.W.2d 471, 474 (Iowa 1968) (allowing testimony of farm safety expert and discussing precedent rejecting argument such testimony improperly altered the standard of care). But expert testimony as to a legal conclusion is inadmissible in an ordinary negligence action. *See, e.g.*, *Bell v. Cmty. Ambulance Serv. Agency*, 579 N.W.2d 330, 338 (Iowa 1998) (affirming exclusion of opinion testimony of law enforcement trainer that ambulance driver's "actions were highly dangerous and likely to cause injury"); *Terrell v. Reinecker*, 482 N.W.2d 428, 430 (Iowa 1992) (holding it was reversible error to allow investigating police officer to testify to the legal conclusion that plaintiff "failed to yield the right-of-way"). We have not previously decided where the line is drawn in a hostile-work-environment case. We conclude the district court did not abuse its discretion in allowing Dr. Fitzgerald's testimony on the record made at the first trial.

**IV. Disposition.**

For those reasons, we reverse the district court's ruling denying HES's motion for new trial, vacate the judgments for plaintiff, and remand the case for a new trial consistent with this opinion.

**DISTRICT COURT JUDGMENT REVERSED AND CASE REMANDED FOR NEW TRIAL.**

Mansfield and Zager, JJ., join this opinion. Cady, C.J., files a concurrence in part and dissent in part. Appel, J. files a separate concurrence in part and dissent in part in which Wiggins and Hecht, JJ., join and Cady, C.J., joins in part.

**CADY, Chief Justice (concurring in part and dissenting in part).**

I concur in the result reached in the opinion authored by Justice Waterman. I agree the jury verdict must be reversed and a new trial must be granted. I write separately because I do not agree with the result or reasoning on all the issues addressed in the opinion by Justice Waterman. As to those issues with which I disagree, I join in the opinion by Justice Appel.

### I. Direct Negligence Claim.

The two opinions in this case both hold that a plaintiff may pursue a hostile-work-environment claim against an employer under the Iowa Civil Rights Act based on supervisor harassment under a legal theory of either vicarious liability or negligence. I concur. The two opinions also hold an employer cannot assert the affirmative defense recognized for vicarious liability claims in *Faragher v. City of Boca Raton,* 524 U.S. 775, 807–08, 118 S. Ct. 2275, 2292–93 (1998), and *Burlington Industries, Inc. v. Ellerth,* 524 U.S. 742, 764–65, 118 S. Ct. 2257, 2270 (1998), when defending a negligence action. To this, I also concur. The dispute, however, is whether the district court erred in failing to instruct the jury that the employee must prove the employer failed to take prompt and appropriate remedial action to end the harassment. I conclude the district court erred in failing to integrate this concept into its marshaling instruction.

It is a general rule of law that an employer is liable for negligently creating or continuing a hostile work environment. *See Vance v. Ball State Univ.*, 570 U.S ___, ___, 133 S. Ct. 2434, 2452 (2013). This is a correct statement of law, but far too general to be used as a marshaling instruction for a claim of employer negligence based on sexual

harassment by a supervisor. Negligence in continuing a hostile work environment is required to be analyzed within the context of whether or not the employer failed to take reasonable remedial action within a reasonable period of time. *Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 747–48 (Iowa 2006). This was the essence of Haskenhoff's claim based on supervisor harassment. When the plaintiff asserts a vicarious liability claim, the essential analysis is presented as an affirmative defense. *See Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744 n.2 (Iowa 2003). When the plaintiff asserts a negligence claim, the analysis comes within the reasonable care standard of negligence. *Lynch v. City of Des Moines*, 454 N.W.2d 827, 833 (Iowa 1990). The employee must establish that a reasonable employer knew or should have known of the harassment and failed to take reasonable action to stop it within a reasonable period of time. *Id.* The instruction in this case totally failed to inform the jury of this essential analysis. As a result, I would conclude the instruction materially misstated the law to the detriment of the employer.

## II. Retaliatory Discharge: Causation.

The two opinions disagree on the proper causation standard for retaliatory discharge. I agree the causation standard under the Iowa Civil Rights Act is the same for discrimination claims under Iowa Code section 216.6(1)(*a*) (2011) as it is for retaliation claims under section 216.11(2). I also agree the standard is "a motivating factor." Nevertheless, the district court instruction modified this standard to only require that the discrimination "played a part." This change in the standard was not justified.

In *DeBoom v. Raining Rose, Inc.*, we explained that a motivating factor must only have "played a part" and "need not have been the only

reason." 772 N.W.2d 1, 13 (Iowa 2009). Yet, this was only done to aid the jury in applying the standard, not to eliminate the central concept of the standard that the protected activity be a motivating factor in the employer's decision. *See id.* A motivating factor is one that helped compel the decision, and the "played a part" language exists only to clarify that the motivating factor need not be the only factor. *See id.*; *see also Hasan v. U.S. Dep't of Labor*, 400 F.3d 1001, 1006 (7th Cir. 2005) ("A motivating factor is a factor that weighs in the defendant's decision to take the action complained of—in other words, it is a consideration present to his mind that favors, that pushes him toward, the action. It is a, not necessarily the, reason that he takes the action. Its precise weight in his decision is not important." (Citations omitted.)). Therefore, I concur in the opinion of Justice Appel to adopt the motivating factor causation standard. However, I would find that the jury instruction in this case failed to capture this standard.

### III. Retaliatory Discharge: Adverse Employment Action.

Both opinions agree an adverse employment action is one that "well might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'" *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 2415 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). Both opinions also agree the district court erred in defining an "adverse employment action" by including examples of actions that would be adverse as a matter of law. I concur on both of these issues. As *Burlington Northern* instructs, and as reason dictates, an adverse action "depend[s] upon the particular circumstances." 548 U.S. at 69, 126 S. Ct. at 2415. The dispute, therefore, is whether the error was harmless. It was not.

The court instructed the jury that one example of an adverse action is a constructive discharge. A constructive discharge occurs "when the employer deliberately makes an employee's working conditions so intolerable that the employee is forced into an involuntary resignation." *Van Meter Indus. v. Mason City Human Rights Comm'n*, 675 N.W.2d 503, 511 (Iowa 2004) (quoting *First Judicial Dist. Dep't of Corr. Servs. v. Iowa Civil Rights Comm'n*, 315 N.W.2d 83, 87 (Iowa 1982)). We recognize constructive discharge to discourage "employers' 'end runs' around the law"—employers know they cannot retaliate by formally terminating the employee, so they may attempt to force the employee to quit. *Balmer v. Hawkeye Steel*, 604 N.W.2d 639, 641 (Iowa 2000). Whether a discharge is formal or compelled, if it was motivated by the employee's engaging in a protected activity, it is still prohibited retaliation.

But constructive discharge can also be a separate claim, recognized in extreme cases of hostile work environments. In this type of constructive discharge claim, the employee must show the environment was so bad he or she had no choice but to quit. *See Pa. State Police v. Suders*, 542 U.S. 129, 147–48, 124 S. Ct. 2342, 2354 (2004) ("A hostile-environment constructive discharge claim entails something more: A plaintiff who advances such a compound claim must show working conditions so intolerable that a reasonable person would have felt compelled to resign."). An employee may want to prove constructive discharge in a hostile-work-environment claim "because, as a general rule, employees are entitled to back pay only when they have been actually or constructively discharged." *Van Meter*, 675 N.W.2d at 510–11. In a hostile-environment constructive discharge claim, the employer's motivation for the constructive discharge is irrelevant. *See id.*

at 512. In a retaliatory discharge claim, the employee must show the employer constructively discharged the employee "because" the employee engaged in a protected activity. Iowa Code § 216.11(2). These two uses of constructive discharge are related, but distinct.

Here, the jury was instructed Haskenhoff must show "she was subjected to *sexual harassment or retaliation*[,] which[] made her believe there was no chance for fair treatment at Homeland." (Emphasis added.) It is possible the jury was confused by these alternatives. Under these instructions, a jury could find the sexual harassment was so severe and pervasive that Haskenhoff had no choice but to quit. But, Haskenhoff did not advance constructive discharge based on an extreme case of hostile work environment. She used constructive discharge as an example of retaliation. Even if the jury appropriately found constructive discharge based on the severity of the hostile work environment, it does not mean Homeland retaliated against Haskenhoff for reporting the harassment. Therefore, the erroneous instruction on adverse action was not harmless, and Homeland is entitled to reversal and a new trial.

## IV. Constructive Discharge Instruction.

Both opinions agree that the district court did not err in the constructive discharge instruction by explaining that an employer does not need to want the employee to quit. Both opinions also agree the district court erred by using a subjective standard in the constructive discharge instruction. I concur on both of these issues. *See Van Meter*, 675 N.W.2d at 511–12. The dispute is whether the district court erred in refusing to instruct the jury that the employee must give the employer a reasonable chance to resolve the problem before it may find the working conditions were so intolerable a reasonable employee would have been forced into resignation. I conclude the district court did not err in

refusing to give this instruction because it would not be a correct statement of the law.

Constructive discharge is a concept of reasonableness. At times, it would not be reasonable for an employee to quit without giving the employer a chance to resolve the problem. *See id.* at 511. But, at other times, it would not be reasonable to require an employee to remain in intolerable working conditions. *See id.* Evidence indicates employees often choose not to report discrimination in the workplace at the time it occurs. *See* Brief of Amici Curiae NAACP Legal Defense & Educational Fund, Inc. & The National Women's Law Center in Support of Petitioner, *Green v. Brennan*, 578 U.S. ___, 136 S. Ct. 1769 (2016) (No. 14–613), 2015 WL 4237675, at *14–15 & nn.10–11 (compiling studies). If the unreported discrimination then turns the workplace intolerable, no employee should reasonably be expected to remain on the job merely to give the employer a chance to fix it. Consequently, I concur in the opinion of Justice Appel that the district court did not err in refusing to instruct the jury that an employer must have a reasonable time to fix the problem.

## V. Conclusion.

First, an employee may bring a direct-negligence action against an employer based on a supervisor's harassment. The employer does not have the benefit of an affirmative defense when defending such a claim. The employee must, however, show the employer knew or should have known of the harassment and failed to take reasonable action to stop it within a reasonable period of time. Second, in a claim for retaliatory discharge, the employee must show the employee's engaging in a protected activity was a motivating factor in the employer's decision to take an adverse employment action. An adverse-employment action is

one that would have deterred a reasonable employee from filing a complaint. Actions are not ordinarily adverse as a matter of law, but depend on the circumstances. An employer taking such an action need not really want the employee to quit, but the employee's decision to quit must be objectively reasonable. A constructive discharge may occur if a reasonable employee would find the working conditions intolerable, even if that employee did not give the employer an opportunity to correct the problem.

Because the jury instructions in this case did not accurately state the above legal principles, I concur in part and with the result of the opinion authored by Justice Waterman. I would remand for retrial on both counts. I dissent in part from that opinion and join in part the opinion authored by Justice Appel for the reasons expressed above.

#15–0574, *Haskenhoff v. Homeland Energy Solutions, LLC*

**APPEL, Justice (concurring in part and dissenting in part).**

I respectfully concur in part and dissent in part from the majority/plurality opinion. In my view, only the instruction related to material adverse action in connection with plaintiff's retaliation claim is flawed. I find the district court properly instructed the jury on all other issues in this case.

## I. Factual and Procedural Background.

Homeland Energy Solutions, LLC (HES) is an ethanol processing facility in Lawler, Iowa, where it opened in February 2009. Tina Haskenhoff began work at HES as a lab manager immediately upon its opening.

Kevin Howes was Haskenhoff's supervisor. Howes, along with several of Haskenhoff's coworkers, repeatedly made demeaning sexual comments to Haskenhoff and engaged in other offensive behavior. This included Howes frequently commenting on Haskenhoff's breasts in front of Haskenhoff and with other HES employees.

In November 2010, Haskenhoff informed Howes that she would be absent from a meeting for a medical appointment. Howes asked about the reason for the appointment and, upon learning that it was for a mammogram, told Haskenhoff that she should have the breast exam in the parking lot in order to earn some money.

Later that week, Haskenhoff told Chad Kuhlers about the offensive behavior. Kuhlers was on the board of directors for HES. Kuhlers immediately reported this information to HES's president and CEO Walter Wendland and to human resource manager Sarah Frein.

Howes learned that Haskenhoff had complained about him, and he met with Haskenhoff to ask that she drop the complaint. Howes said

that he was worried he was going to be fired. Wendland also met with Haskenhoff about the complaint, stating the employees of HES were "like family." Haskenhoff reported later that she found Howes's and Wendland's behaviors intimidating, and she feared the consequences to her employment if she continued with the complaint. Haskenhoff agreed to drop the complaint on the assumption that Howes's behavior would change.

The sexually offensive behavior, however, continued. Finally, on August 8, 2011, Haskenhoff overheard Howes tell another employee that Haskenhoff was marrying her fiancé for the money. This comment upset Haskenhoff who told a coworker that Howes was "a fucking asshole." Haskenhoff left work in the middle of the day and sent an email to Howes complaining about his comment.

On August 17, Haskenhoff filed a sexual-harassment complaint against Howes with Frein. Several meetings occurred between the participants thereafter. Finally, on August 30, Haskenhoff was asked to meet with Wendland, David Finke—the CFO and head of human resources—and Howes. At this meeting, Haskenhoff's sexual-harassment complaint was discussed. Additionally, Howes presented Haskenhoff with a ninety-day "performance improvement plan" for using vulgar language when referring to Howes and walking off the job on August 8. The plan noted, "Failure to adhere to these expectations/conditions will result in further disciplinary action up to termination."

Haskenhoff later said that after the August 30 meeting, she realized HES would take no effective action against Howes and that if she continued to complain about the harassment she would be fired. On August 31, Haskenhoff confronted Finke and accused him of letting

Howes get away with the harassment and permitting Howes to retaliate against her.  Haskenhoff resigned.

On May 21, 2012, Haskenhoff brought charges of employment discrimination at the Iowa Civil Rights Commission.  The commission gave Haskenhoff a release to bring suit, after which she brought suit in district court for sexual harassment and retaliation under the Iowa Civil Rights Act (ICRA).  The jury found in favor of Haskenhoff and awarded her damages.  HES appealed, and we retained the appeal.

**II. Relationship Between State and Federal Civil Rights Statutes.**

**A. Introduction.**  Before analyzing the substantive issues in this case, it is important to stress that the ICRA is not simply a knockoff of the Federal Civil Rights Act.  We have sometimes loosely said that the ICRA was "modeled after" or mirrors Title VII.  *See, e.g.*, *Estate of Harris v. Papa John's Pizza*, 679 N.W.2d 673, 677–78 (Iowa 2004); *Pecenka v. Fareway Stores, Inc.*, 672 N.W.2d 800, 803 (Iowa 2003).  These observations have validity only in the most general sense, can be materially misleading, and in any case do not provide meaningful guidance in the resolution of any concrete controversy under the ICRA.

First, the modeled-after or mirror theory generally overlooks the fact that the ICRA, as well as Title VII, were preceded by more than twenty state statutes.  *See* Andrea Catania, *State Employment Discrimination Remedies and Pendent Jurisdiction Under Title VII: Access to Federal Courts*, 32 Am. U. L. Rev. 777, 782 n.24 (1983) [hereinafter Catania].  Beginning in the 1940s, states passed civil rights statutes that included many of the features now embraced in Title VII.  Alex Elson & Leonard Schanfield, *Local Regulation of Discriminatory Employment Practices*, 56 Yale L.J. 431, 434 (1947).  There is a rich body of

commentary on these state laws that seems to have been overlooked in our cases suggesting that the ICRA mirrors or is modeled after Title VII.[19]

In fact, both the ICRA and Title VII drew from this preexisting body of state law. *See Pippen v. State*, 854 N.W.2d 1, 30 (Iowa 2014). In an article that appeared in the *Iowa Law Review* in the year that the ICRA was passed, Professor Arthur Bonfield, a leading proponent of the legislation, cited the experience in other states in support of the legislation. Arthur Earl Bonfield, *State Civil Rights Statutes: Some Proposals*, 49 Iowa L. Rev. 1067, 1082 & n.65 (1964).

Thus, the ICRA and Title VII *both* mirrored and were modeled after preexisting state law in the same general sense that the ICRA is modeled after or mirrors federal law. For example, the "because of" causation language in the ICRA and Title VII, which is at the heart of one of the issues in this litigation, was used in state civil rights statutes that predate them.[20] Similarly, retaliation provisions in state civil rights laws

---

[19]*See, e.g.*, Arthur E. Bonfield, *The Substance of American Fair Employment Practices Legislation I: Employers*, 61 Nw. U. L. Rev. 907, 909–10 & n.6 (1967); Elmer A. Carter, *Practical Considerations of Anti-Discrimination Legislation—Experience Under the New York Law Against Discrimination*, 40 Cornell L.Q. 40, 40 (1954); Richard B. Dyson & Elizabeth D. Dyson, *Commission Enforcement of State Laws Against Discrimination: A Comparative Analysis of the Kansas Act*, 14 U. Kan. L. Rev. 29, 29–31 (1965); Herbert Hill, *Twenty Years of State Fair Employment Practice Commissions: A Critical Analysis with Recommendations*, 14 Buff. L. Rev. 22, 22 (1964); Robert G. Meiners, *Fair Employment Practices Legislation*, 62 Dick. L. Rev. 31, 31 & n.1, 33 (1957); Arnold H. Sutin, *The Experience of State Fair Employment Commissions: A Comparative Study*, 18 Vand. L. Rev. 965, 965 & n.1 (1965).

[20]The because-of causation language in Title VII's discrimination and retaliation provisions is also found in earlier state antidiscrimination statutes. *See, e.g.*, Wash. Rev. Code § 49.60.030 (1957) ("The right to be free from discrimination because of race, creed, color, or national origin is recognized as and declared to be a civil right."); *Int'l Bhd. of Elec. Workers Local 35 v. Comm'n on Civil Rights*, 102 A.2d 366, 367 n.1 (Conn. 1953) (quoting the 1949 Connecticut Fair Employment Practices Act that "[i]t shall be an unfair employment practice . . . (c) for a labor organization, because of the race, color, religious creed, national origin or ancestry of any individual to exclude from full membership rights or to expel from its membership such individual or to discriminate in any way against any of its members").

predated the retaliation provision in the ICRA and Title VII. *See, e.g.,* Wash. Rev. Code § 49.60.200 (1957); Wis. Stat. § 111.32(5)(b)(3) (1961); Morroe Berger, *New York State Law Against Discrimination: Operation and Administration,* 35 Cornell L. Rev. 747, 751 (1950) (describing the contents of New York's 1945 law). In this case, the relevant provisions of the ICRA and Title VII are, as a matter of historical fact, modeled after or mirror preexisting state law. Alex Long, *State Anti-Discrimination Law as Model for Amending the Americans with Disabilities Act,* 65 U. Pitt. L. Rev. 597, 600 (2004) (stating "Congress modeled Title VII . . . on existing state anti-discrimination laws").

Second, the modeled-after or mirrors theory particularly overlooks the fact that Iowa had a preexisting civil rights statute before Title VII was enacted. Iowa's first civil rights act was enacted in 1883 shortly after the United States Supreme Court, in an appalling decision corrected only decades later, held that a key portion of the Federal Civil Rights Act of 1871—prohibiting discrimination by private persons—was unconstitutional. *See United States v. Harris,* 106 U.S. 629, 644, 1 S. Ct. 601, 613 (1883), *abrogated by Griffin v. Breckenridge,* 403 U.S. 88, 104, 91 S. Ct. 1790, 1799 (1971). Then, in 1963, fully a year prior to the enactment of Title VII, Iowa joined twenty-six states in enacting a statute prohibiting discrimination in employment. That statute declared it unlawful "for any person or employer to discriminate in the employment of individuals because of race, religion, color, national origin, or ancestry." 1963 Iowa Acts ch. 330, § 1 (codified at Iowa Code § 105A.7 (1966)). Thus, the because-of causation language that later appeared in the ICRA was based on language in an Iowa statute that predated Title VII which was modeled after civil rights legislation in other states. It is simply wrong to suggest that the because-of language in the ICRA was

modeled after Title VII. A more accurate statement would be that the because-of language in Title VII was modeled after state law precedents, including the ICRA of 1963.

Third, while the texts of the two statutes are sometimes similar, they are often quite dissimilar. There are material differences between the two statutes in scope, structure, and remedy. Thus, a generalized statement that the ICRA is modeled on, similar to, or mirrors Title VII even from a textual viewpoint is often not true.[21] Further, as will be shown below, the legislative history behind Title VII is often quite distinctive and plainly inapplicable to any construction of the ICRA. Instead of employing a generalized and often inaccurate slogan, in interpreting the ICRA we must engage in serious, provision-by-provision analysis, recognizing similarities when they appear, but also honoring the differences.

**B. Legislative Direction that the ICRA "Shall Be Construed Broadly to Meet Its Purposes."** As all judges, lawyers, and litigants know, the ICRA has many ambiguities and gaps which courts are called upon to resolve and fill in the context of adversarial litigation. While the Iowa legislature has advanced a statute with ambiguities and gaps, it has provided courts with an instruction on how to approach it. Specifically, the legislature has directed that the ICRA "shall be construed broadly to

---

[21]The same historical mistake is often made with respect to the Iowa Constitution, which some claim is modeled after the United States Constitution. In fact, the United States Constitution, and every provision of its Bill of Rights, was derived from provisions of state constitutions that existed before 1789, especially the Virginia Declaration of Rights and the Massachusetts Constitution. The documents published in Paris by Benjamin Franklin, hailed to be the first written constitutions, were state constitutions, not the later and largely derivative United States Constitution. *See* Daniel J. Hulsebosch, *The Revolutionary Portfolio: Constitution-Making and the Wider World in the American Revolution*, 47 Suffolk U. L. Rev. 759, 802 & n.222 (2014).

effectuate its purposes." Iowa Code § 216.18(1) (2011). As we pointed out in *Pippen,* there is no comparable language in the federal statute. 854 N.W.2d at 28. Iowa Code section 216.18(1) is an example of a provision of the ICRA that is not modeled after and does not mirror Title VII.

Our better reasoned cases show that this marked textual difference is consequential. In *Pippen,* we pointed out that a number of other state supreme courts have construed similar statutory language in civil rights acts to require the "widest constitutional application." *Id.* (quoting *Fair Emp't Practices Comm'n v. Rush-Presbyterian-St. Luke's Med. Ctr.,* 354 N.E.2d 596, 600 (Ill. App. Ct. 1976) (holding that a wide application was required given the legislative intent for the remedial provisions of the act)); *see also Wondzell v. Alaska Wood Prods., Inc.,* 601 P.2d 584, 585 (Alaska 1979) (finding Alaska civil rights act not simply modeled after federal law, but "intended to be more broadly interpreted than federal law to further the goal of eradication of discrimination . . . [as shown by the] legislature's intent 'to put as many "teeth" into the statute as possible' " (quoting *McLean v. State,* 583 P.2d 867, 869 (Alaska 1978) (citations omitted))); *Marquis v. City of Spokane,* 922 P.2d 43, 49–50 (Wash. 1996) (en banc) (explicitly recognizing legislative directive to construe Washington civil rights statute liberally); *Allison v. Hous. Auth. of Seattle,* 821 P.2d 34, 38 (Wash. 1981) (en banc) ("Title VII differs from [Washington civil rights law] in that Title VII does not contain a provision which requires liberal construction for the accomplishment of its purposes."); *Lodis v. Corbis Holdings, Inc.,* 292 P.3d 779, 787 (Wash. Ct. App. 2013) (Adopting federal precedent would "impermissibly narrow the protective language and purposes of [Washington's civil rights law], contrary to the liberal construction mandate of the act.").

A few state civil rights statutes passed prior to the ICRA also contained provisions directing courts to construe the statute broadly. *See, e.g.,* Del. Code Ann. tit. 6, § 4502 (1963) ("This chapter shall be liberally construed to the end that the rights herein provided for all people without regard to race, creed, color or national origin may be effectively safeguarded."); Wash. Rev. Code § 49.60.020 (1957) ("The provisions of this chapter shall be construed liberally for the accomplishment of the purposes thereof."); W. Va. Code § 5-11-265(161) (1961) ("The provisions of this article shall be liberally construed to accomplish its objectives and purposes."); Wis. Stat. § 111.31 (1961) ("All the provisions of this subchapter shall be liberally construed for the accomplishment of this purpose.").

Plainly, a narrow construction of the ICRA would be in defiance of the legislative mandate to broadly construe the statute to effectuate its purposes and would amount to a judicial recrafting of the statute.  As we stated in *Pippen*, an Iowa court "must keep in mind the legislative direction of broadly interpreting the Act when choosing among plausible legal alternatives."  854 N.W.2d at 28.

The legislative direction that we broadly interpret the ICRA makes federal authority that chooses narrow constructions among available options suspect.  Federal courts, and particularly the United States Supreme Court, have demonstrated a marked tendency to embrace a narrow construction of federal civil rights statutes in the face of more generous plausible alternatives.  As a result, Congress has repeatedly overridden by statute narrow interpretations of federal civil rights laws.  Seven important United States Supreme Court civil rights cases overridden by Congress include *General Electric Co. v. Gilbert*, 429 U.S. 125, 134, 97 S. Ct. 401, 407 (1976) (holding discrimination based on

pregnancy was not sex discrimination), *superseded by statute*, Pregnancy Discrimination Act of 1978, Pub. L. No. 95-555, 92 Stat. 2016 (codified as amended at 42 U.S.C. § 2000e(k) (2012)); *Price Waterhouse v. Hopkins*, 490 U.S. 228, 239–40, 109 S. Ct. 1775, 1785 (1989) (interpreting "because of" in the context of discrimination), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 2002e–2(m)); *Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 656–57, 109 S. Ct. 2115, 2124–25 (1989) (requiring proof of discriminatory intent in disparate impact cases), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 2000e–2(k)); *Patterson v. McLean Credit Union*, 491 U.S. 164, 176–77 109 S. Ct. 2363, 2372 (1989) (holding that conduct occurring after the formation of an employment contract could not be racial discrimination under § 1981), *superseded by statute*, Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified as amended at 42 U.S.C. § 1981(b)); *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 478, 119 S. Ct. 2139, 2144 (1999) (announcing a restrictive interpretation of "impairment" and "disability" under the ADA), *superseded by statute*, ADA Amendment Act of 2008, Pub. L. No. 110–325, 112 Stat. 3553 (codified as amended at 42 U.S.C. § 12102(3)); *Toyota Motor Mfg. of Ky., Inc. v. Williams*, 534 U.S. 184, 195, 122 S. Ct. 681, 690 (2002) (narrowing scope of protection under the ADA), *superseded by statute*, ADA Amendment Act of 2008, Pub. L. No. 110–325, 112 Stat. 3553 (codified as amended at 42 U.S.C. § 12102(3)); and *Ledbetter v. Goodyear Tire & Rubber Co.*, 550 U.S. 618, 621, 127 S. Ct. 2162, 2165 (2007) (holding statute of limitations for discriminatory pay practices begins when initial pay decision was made), *superseded by statute*, Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 123 Stat.

5 (codified as amended at 42 U.S.C. § 2000e–5(e)(3)). *See, e.g.,* Sandra F. Sperino, *Diminishing Deference: Learning Lessons from Recent Congressional Rejection of the Supreme Court's Interpretation of Discrimination Statutes*, 33 Rutgers L. Rec. 40, 40 (2009) (stating "blind adherence to federal interpretation of discrimination principles on state employment discrimination claims is not only often inappropriate, but also has seriously impacted the development of employment discrimination law"); Sandra F. Sperino, *Revitalizing State Employment Discrimination Law*, 20 Geo. Mason L. Rev. 545, 583 (2013) [hereinafter Sperino, *Revitalizing*] ("[T]he federal courts have repeatedly interpreted federal law narrowly in ways that drew a response from Congress."). Uncritical incorporation of the principles of these now superseded cases under the ICRA would run counter to the Iowa legislature's directive that the ICRA be "broadly interpreted to effectuate its purposes." Iowa Code § 216.18(1); *see also Goodpaster v. Schwan's Home Servs., Inc.*, 849 N.W.2d 1, 9–10 (Iowa 2014).

And these are only the cases that Congress managed to override. Whenever a highly divided United States Supreme Court chooses a narrow interpretive path under federal civil rights statutes, we must consider whether the dissenting opinion is more consistent with the legislative direction that the ICRA be broadly interpreted to achieve its goals.[22]

---

[22]It is sometimes asserted that we should follow federal precedent under Title VII to foster uniformity. When Congress enacted Title VII in 1964, approximately one-half of the states had some kind of antidiscrimination statute. *See* Susan Elizabeth Powley, *Exploring a Second Level of Parity: Suggestions for Developing an Analytical Framework for Forum Selection in Employment Discrimination Litigation*, 44 Vand. L. Rev. 641, 667 & n.184 (1991). Congress expressly considered the question of requiring uniformity when it declared that Title VII does not preempt state law. *See* 42 U.S.C. § 2000h-4; *Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 48–49, 94 S. Ct. 1011, 1019–20 (1974) ("[T]he legislative history of Title VII manifests a congressional intent to allow an

The directive to construe the ICRA broadly has had impact. For instance, in *Goodpaster*, we considered whether an intermittent or episodic impairment—multiple sclerosis—fell within the definition of "disability" under the ICRA. 849 N.W.2d at 6. We emphasized section 216.8(1)'s instruction to interpret the ICRA broadly in reaching the result that multiple sclerosis could be a disability under the ICRA. *Id.* at 9–10, 18. We noted that this difference with federal law rendered many federal cases inapposite in interpreting the ICRA. *Id.* at 10. We cited several of our cases in which section 216.18(1) had a "substantive impact on the outcome." *Id.*; *see, e.g., Polk Cty. Secondary Rds. v. Iowa Civil Rights Comm'n*, 468 N.W.2d 811, 815–16 (Iowa 1991).

In construing a provision of the ICRA, the legislative direction to broadly construe the statute to effectuate its purposes must be recognized. To ignore this provision is to rewrite the statute to achieve desired policy results.

**C. Textual Differences Between the ICRA and Federal Civil Rights Statutes.** When there are textual differences between the ICRA and federal civil rights statutes, we must be attentive to those differences. When there are textual differences, the modeled-after or mirror declarations have no application, and indeed an opposite

---

individual to pursue independently his rights under both Title VII and other applicable state and federal statutes. The clear inference is that Title VII was designed to supplement rather than supplant, existing laws and institutions relating to employment discrimination.") Further, it is doubtful that uniformity will be advanced by incorporation of federal law. The United States Supreme Court has resolved only a handful of cases in the civil rights area over the years. The literature is full of documentation of various splits in the federal circuits on numerous questions that the Supreme Court has not resolved. The stability of incorporating a handful of Supreme Court precedents is outweighed by dragging into Iowa law the many controversies in the federal caselaw that have not been resolved.

conclusion may be more appropriate, namely, that differences in text are deliberate and substantive.

A good example of the need to recognize textual differences between the ICRA and federal civil rights law is *Hulme v. Barrett* (*Hulme I*), 449 N.W.2d 629 (1990). In *Hulme I,* we considered whether the provision of the Federal Age Discrimination in Employment Act (ADEA) of 1967 limiting coverage to those forty years of age or older applied under the ICRA. *Id.* at 631. The district court, apparently following a version of the modeled-after or mirror theory, held that the limitation in the Federal ADEA also applied under the ICRA. *Id.* at 631.

We reversed. *Id.* at 632. We noted that while the federal statute had language explicitly limiting claims to persons above the age of forty, the ICRA had no such textual limitation. *Id.* at 631–32. In *Hulme I,* we correctly declined to follow federal precedent because the text of our statute was not modeled after and did not mirror federal law. As will be seen below, there are important textual and legislative history differences between the ICRA and Title VII as it relates to the causation element in retaliation claims.

**D. Structural Differences Between the ICRA and Federal Civil Rights Statutes.** As pointed out in *Pippen*, there is also an important structural difference between the ICRA and various civil rights statutes. *See* 854 N.W.2d at 28. The ICRA is a unified statute. In contrast, the federal civil rights regime is more fragmented. *See* Age Discrimination in Employment Act of 1967, 29 U.S.C. § 623; Civil Rights Act of 1964, 42 U.S.C. § 2000e–2 (Title VII); American with Disabilities Act of 1990, 42 U.S.C. § 12112. Thus, while the federal courts have developed different tests for different causes of action under different statutes, the Iowa statute generally calls out for a singular, unified approach. *See, e.g.,*

*Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176–78, 129 S. Ct. 2343, 2350–51 (2009) (holding that Title VII and ADEA causation standards are different). It would be very difficult to come to the same conclusion under the ICRA, a unified statute with one statutory provision establishing what constitutes status-based discrimination. The fractured nature of federal law compared to the unified approach of the ICRA makes wholesale importation of federal law questionable. *See* Sperino, *Revitalizing*, 20 Geo. Mason L. Rev. at 560 (contrasting unified state regimes with fractured federal law).

**E. Interpretation of Gaps and Ambiguous Phrases.** Civil rights statutes contain many notoriously open-ended or ambiguous phrases that cry out for interpretation. For ambiguous phrases, there is rarely only one plausible interpretation. *See Hack v. President & Fellows of Yale Coll.*, 237 F.3d 81, 95 (2d Cir. 2000) ("The Act's ambiguous language . . . has allowed a number of contradictory standards to emerge."). For example, the phrase "because of" sex, race, and other classifications has given rise to a wide number of potential interpretations. *See* David S. Schwartz, *When Is Sex Because of Sex? The Causation Problem in Sexual Harassment Law*, 150 U. Pa. L. Rev. 1697, 1708–09 (2002) [hereinafter Schwartz] (noting different approaches to ambiguous terms). There is simply no requirement that in construing ambiguous phrases we should follow the lead of the United States Supreme Court rather than that of another state court or where our own judgment would lead us.

Further, many legal structures developed by the United States Supreme Court are not found in the statutory text of Title VII and have been fashioned by the Supreme Court based on its policy perceptions. For example, the requirement that harassment be "pervasive and severe" in order to amount to actionable discrimination does not appear in the

text of Title VII. *See Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405–06 (1986). It is a judicial construct created by the United States Supreme Court. The complex architecture surrounding disparate impact also has no clear textual foundation. *Cf. Wards Cove*, 490 U.S. at 656–58, 109 S. Ct. at 2124–25; *Watson v. Ft. Worth Bank & Tr.*, 487 U.S. 977, 986–89, 108 S. Ct. 2777, 2784–86 (1988); *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S. Ct. 849, 853–54 (1970). The burden-shifting approach to causation found in various United States Supreme Court cases is without explicit textual support. *See Desert Palace, Inc. v. Costa*, 539 U.S. 90, 93–94, 123 S. Ct. 2148, 2150–51 (2003); *Price Waterhouse*, 490 U.S. at 244–45, 109 S. Ct. at 1787–88; *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). The notion that an "adverse action" is required to support a retaliation claim is not mentioned in Title VII. *Burlington N. & Santa Fe Ry. v. White*, 548 U.S. 53, 56–57, 126 S. Ct. 2405, 2408–09 (2006). And, the *Faragher–Ellerth* defense developed by the Supreme Court for cases involving vicarious liability of supervisors when there is no tangible adverse employment action has no explicit textual support in Title VII, but was crafted primarily as a result of the policy considerations of the Court. *See Faragher v. City of Boca Raton*, 524 U.S. 775, 804–05, 118 S. Ct. 2275, 2291–92 (1998); *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765, 118 S. Ct. 2257, 2270 (1998).

These judicially developed constructs are not textually guided, but instead reflect the views of a majority of the United States Supreme Court on the subject of discrimination. If one believes, for example, that discrimination in the workplace is a relatively rare occurrence, the development of demanding judicial standards through interpretation or construction may seem to make sense. On the other hand, if one

believes that discrimination is widespread and intractable, a different result might occur. Sperino, *Revitalizing*, 20 Geo. Mason L. Rev. at 575–77.

Because of the lack of textual support, it is not surprising that a number of courts have declined to create a *Faragher–Ellerth* defense for cases involving vicarious liability under state civil rights acts. *See, e.g.*, *Myrick v. GTE Main St. Inc.*, 73 F. Supp. 2d 94, 98 (D. Mass. 1999) (declining to apply *Faragher–Ellerth* defense on state law grounds); *Chambers v. Trettco, Inc.*, 614 N.W.2d 910, 918 (Mich. 1990) (rejecting *Faragher–Ellerth* under Michigan law); *Pollock v. Wetterau Food Distribution Grp.*, 11 S.W.3d 754, 767 (Mo. Ct. App. 1999) (refusing to add words to Missouri human rights statute to establish a *Faragher–Ellerth* defense).

In making choices regarding ambiguous phrases and determining whether and how to fill legislative gaps, Iowa courts are free to depart from what are often very narrow and cramped approaches of federal law.[23] For example, in *Goodpaster*, we rejected United States Supreme Court precedent that, contrary to the ICRA, declared the Americans with Disabilities Act must be "interpreted strictly to create a demanding standard for qualifying as disabled." 849 N.W.2d at 10 (quoting *Toyota*, 534 U.S. at 197, 122 S. Ct. at 691); *see Sutton*, 527 U.S. at 488, 119 S. Ct. at 2149. The Supreme Court's determination to strictly interpret

---

[23]No one would suggest, for instance, that if Iowa were to adopt a statute modeled after the statute of another state, we would be compelled to follow the interpretations of the supreme court of the other state in interpretation of Iowa law. *See Crosby v. Alton Ochsner Med. Found.*, 276 So. 2d 661, 665 (Miss. 1973) (holding that when Mississippi adopted a statute modeled after a Georgia enactment, decisions of the Georgia courts did not bind Mississippi courts in interpretation of the statute).

the statute flies in the face of the Iowa legislature's direction to construe the statute broadly. *See* Iowa Code § 216.18(1).[24]

Thus, in order to choose the best interpretive option on a statutory issue under the ICRA, it is not enough to simply cut and paste a version of federal law into the Northwest Reporter and call it a day.[25] We do not follow federal constitutional interpretations lockstep, even of parallel provisions, and there is no reason to follow federal statutory interpretation in a lockstep fashion in similar statutes.[26] Instead,

---

[24]For an interesting discussion, see Tyler S. Smith, Note, *A Mid-Life Crisis in the Interpretation of the Iowa Civil Rights Act of 1965: How Should State Courts Interpret Original State Antidiscrimination Statutes After Federal Counterpart Statutes Are Amended?*, 64 Drake L. Rev. 1117, 1141–49 (2016).

[25]Such a reaction has been referred to as a "Pavlovian response" to federal opinions. *Stone v. St. Joseph's Hosp. of Parkersburg*, 538 S.E.2d 389, 410 (W. Va. 2000) (McGraw, J., concurring in part and dissenting in part).

[26]Many state civil rights cases have declined to follow federal authorities. *See, e.g.*, *Smith v. Anchorage Sch. Dist.*, 240 P.2d 834, 842 (Alaska 2010) (rejecting Supreme Court but-for test for age discrimination under unified Alaska statute); *Reid v. Google, Inc.*, 235 P.3d 988, 991–92 (Cal. 2010) (departing from "stray remarks" precedent of Supreme Court); *Williams v. Dep't of Pub. Safety*, 369 P.3d 760, 774 (Colo. 2015) (rejecting Federal Title VII precedent that front pay is an available remedy under Colorado antidiscrimination act); *Vollemans v. Town of Wallingford*, 928 A.2d 586, 602 (Conn. App. Ct. 2007) (rejecting the *Ricks–Chardon* rule for filing requirements in discriminatory discharge cases under Connecticut law), *aff'd*, 956 A.2d 579 (2008) (adopting fully the "thoughtful and comprehensive" opinion of the appellate court); *Sangamon Cty. Sheriff's Dep't v. Ill. Human Rights Comm'n*, 908 N.E.2d 39, 45–47 (Ill. 2009) (rejecting Supreme Court precedent in holding employer strictly liable for sexual harassment of a supervisor when supervisor had no authority to affect terms and conditions of employment); *Loras Coll. v. Iowa Civil Rights Comm'n*, 285 N.W.2d 143, 147 (Iowa 1979) ("[W]e are not bound by federal cases construing a federal statute when we are called upon to construe our own Civil Rights Act."); *Ruffin Hotel Corp. of Md. v. Gasper*, 17 A.2d 676, 685 (Md. 2011) (finding that Title VII precedent "does not comport with Maryland law"); *City of New Bedford v. Mass. Comm'n Against Discrimination*, 799 N.E.2d 578, 589 (Mass. 2003) (noting the differences between Massachusetts disability act and federal counterpart in definition of "major life activity"); *Dahill v. Police Dep't of Boston*, 748 N.E.2d 956 (Mass. 2001) (rejecting *Sutton*); *Coll. Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination*, 508 N.E.2d 587, 592 (Mass. 1987) (rejecting *Faragher–Ellerth* under Massachusetts statute); *Chambers v. Tretteo, Inc.*, 614 N.W.2d 910, 918 (Mich. 2000) (declining to follow *Faragher–Ellerth*); *Van Den Berk v. Mo. Comm'n on Human Rights*, 26 S.W.3d 406, 411 (Mo. Ct. App. 2000) (announcing that Missouri cases will depart from federal civil rights law "where that law is not in accord with the thrust of our state's statute" (quoting *Wentz v. Industrial Automation*, 847

consistent with preservation principles,[27] we must first identify potential interpretive options that are available to the court. Ordinarily, this involves a survey of state as well as federal law. Once the potential alternative approaches are identified, we should proceed to select the interpretive option that we find most consistent with the ICRA, its underlying purposes, and the legislative direction that the text be "broadly construed to effectuate its purposes." Iowa Code § 216.18(1). We may, of course, rely on persuasive federal precedents, especially when the language of Title VII and the ICRA are, in fact, similar, the federal interpretation is consistent with the legislature's directive of broad interpretation, and the rationale of the federal caselaw persuades us that the best choice has been made. But we must look for persuasive reasoning that fits the Iowa statute. And, we should not mask our policy

---

S.W.2d 877, 879 (Mo. Ct. App. 1992))); *Laudert v. Richland Cty. Sheriff's Dep't*, 7 P.3d 386, 397 (Mont. 2000) (rejecting federal definition of prevailing plaintiff because such a reading would not further purpose of Montana Human Rights Act); *Alexander v. Seton Hall Univ.*, 204 N.J. 219, 234-36, 8 A.3d 198 (N.J. 2010) (declining to follow crabbed framework of analysis of statute of limitations under *Ledbetter*); *L.W. ex rel. L.G. v. Toms River Reg'l Sch. Bd. of Educ.*, 915 A.2d 535, 549 (N.J. 2007) (rejecting Title IX deliberate indifference standard in favor of analogous New Jersey precedent); *Lehrmann v. Toys 'R' Us, Inc.*, 626 A.2d 445 (N.J. 1993) (declining to follow *Meritor* majority and adopting position of concurrence); *Saffos v. Avaya Inc.*, 16 A.3d 1076, 1095 (N.J. Super. Ct. App. Div. 2011) (rejecting *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 130 S. Ct. 1662 (2010), observing that New Jersey courts are not reluctant to depart from federal precedent in appropriate circumstances); *Bennett v. Health Mgmt. Sys., Inc.*, 936 N.Y.S.2d 112, 116 (App. Div. 2011) (observing that the New York City civil rights act has "uniquely broad and remedial purposes" which go beyond its state and federal counterparts); *Vitale v. Rosina Food Prod., Inc.*, 727 N.Y.S. 215, 217 (App. Div. 2001) (differentiating state from federal sexual harassment law); *Coryell v. Bank One Trust Co. N.A.*, 803 N.E.2d 781, 785–86 (Ohio 2004) (declining to follow federal precedent in age discrimination matter); *Allison*, 821 P.2d at 35 (departing from federal but-for causation for a retaliation claim under the Washington Human Rights Act); *Putcino v. Fed. Express Corp.*, 9 P.3d 787 (Wash. 1990) (departing from federal precedent in defining "disability"); s*ee generally* Alex B. Long, *Viva State Employment Law! State Law Retaliation Claims in a Post-*Crawford/Burlington Northern *World*, 77 Tenn. L. Rev. 253, 268–76 (2010); Sperino, *Revitalizing*, 20 Geo. Mason L. Rev. at 545.

[27]*See Pippen*, 854 N.W.2d at 31.

choices in resolving ambiguities and filling statutory gaps through language suggesting that the choice was somehow inexorable or determined with a mathematical certainty that may be found in the scientific world but evades the law. We are in the business of judging, not calculating.

**F. Independent Interpretation of ICRA Consistent with Federalism and Congressional Intent Behind Title VII.** When Congress enacted Title VII, approximately one-half of the states had civil rights statutes already. Catania, 32 Am. U. L. Rev. at 782 n.24. Congress expressly determined not to preempt state law. 42 U.S.C. § 2000h-4. As noted by the United States Supreme Court, Congress intended Title VII "to supplement, rather than supplant, existing laws and institutions related to employment discrimination." *See Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 47–48, 94 S. Ct. 1011, 1019–20 (1974) (finding legislative history showed clear congressional intent to allow an individual to pursue state law remedies simultaneously with Title VII). Congress plainly did not intend to preempt state civil rights laws. *Id.* As noted by Professor Bonfield, "the federal act . . . recognizes the continued effectiveness of state fair employment laws and provides that they will retain a vital and perhaps dominant role in this area." Arthur E. Bonfield, *The Substance of American Fair Employment Practices Legislation I: Employers*, 61 Nw. U. L. Rev. 907, 919 (1967).

A conclusion that state courts should generally follow the twists and turns in federal law would be ironic in light of the congressional intent to allow, if not encourage, state experimentation.

**G. A Note on Law of the Case, Stare Decisis, and Dictum.** If one looks through our ICRA cases, federal cases are often simply cited for propositions of law without substantive discussion. Often times in

this setting, we were simply restating legal principles that the parties were not contesting in the case. When a legal principle is embraced by the parties by agreement and is not contested on appeal, the court's subsequent recitation of the legal principle is not a holding in the case that was a product of an adversary proceeding. *See Berger v. Gen. United Grp., Inc.*, 268 N.W.2d 630, 635 (Iowa 1978) (holding that because plaintiffs assumed Delaware law was properly pled and proven by defendants, we would consider Delaware law, but stressed that this case was not precedent for ignoring our rules of pleading and proof on foreign law); *see also United States v. Hemingway*, 734 F.3d 323, 335 (4th Cir. 2013) (finding a prior case to have no precedential value on a question because the issue was not contested in the earlier case); *Goldberger v. Integrated Res., Inc.*, 209 F.3d 43, 49 (2d Cir. 2000) (earlier case was not precedent because "that issue was neither contested by the parties, nor addressed by the panel"); *Fulton Found. v. Wis. Dep't of Taxation*, 108 N.W.2d 312, 316–17 (Wis. 1961) (holding previous case when no one challenged the issue could not be precedent on the issue); *Silver Lake Sanitary Dist. v. Wis. Dep't of Nat. Res.*, 607 N.W.2d 50, 54 (Wis. Ct. App. 1999) ("It is blackletter law that an opinion does not establish binding precedent for an issue if that issue was neither contested nor decided.").

An uncontested statement of law is not entitled to stare decisis. *See, e.g.*, *Hemingway*, 734 F.3d at 335; *Goldberg*, 209 F.3d at 49; *Berger*, 268 N.W.2d at 635; *Fulton*, 109 N.W.2d at 317. Instead, the agreed upon legal principle is law of the case binding on the parties in the event of retrial, but nothing more. *State v. Ragland*, 812 N.W.2d 654, 658 (Iowa 2012) (holding settled legal principles are binding on litigants throughout future progress of case); *accord State ex rel. Goettsch v. Diacite Distribs., Inc.,* 596 N.W.2d 532, 537 (Iowa 1999).

**III. Negligence Theory, Vicarious Liability, and the *Faragher–Ellerth* Defense.**

**A. Overview of the Issue.**   When an employee is sexually harassed by other employees, the question arises to what extent the employer may be held responsible for the actions of its employees under civil rights laws.   One question is whether it should matter that the harassment was committed by a coworker or by a supervisor.   If the harassment is by a supervisor, should the supervisor be considered an agent of the employer and thus provide a basis for vicarious liability?   If different legal consequences flow from harassment involving a supervisor compared to harassment by coworkers, how does the law handle situations when harassers include both coworkers and supervisors?

As with many similar issues, nothing in the ICRA or Title VII expressly answers these questions, and as a result, courts are left to resolve the issue through statutory interpretation.   Courts are required to fill the gaps in the statute in the crucible of an adversary proceeding.

**B. Challenged Trial Court Instruction.**   The starting place of our analysis is a review of the jury instructions on Haskenhoff's claim of negligence under the ICRA.   In Instruction No. 14, the marshalling instruction for sexual harassment, the jury was instructed Haskenhoff had to prove, among other things, that "6. Homeland Energy Solutions, L.L.C., knew or should have known of the occurrence of one or more sexually harassing incidents.   7. Homeland Energy Solutions, L.L.C., acted negligently in creating or continuing a hostile work environment."   The language in Instruction No. 14 is drawn nearly verbatim from the United States Supreme Court description of direct negligence claims under Title VII provided in *Vance v. Ball State University*, 570 U.S. ___, ___, 133 S. Ct. 2434, 2452 (2013), which stated "an employer will always

be liable when its negligence leads to the creation or continuation of a hostile work environment."

With respect to negligence, Instruction No. 17 instructed the jury that

> "Negligence" means failure to use ordinary care. Ordinary care is the care which a reasonably careful employer would use in similar circumstances. "Negligence" is doing something a reasonable careful employer would not do under similar circumstances, or failing to do something a reasonably careful; employer would do under similar circumstances.

Except for substituting the term "employer" for "person," Instruction No. 17 is a verbatim version of Iowa State Bar Association Jury Instruction 700.2 entitled "Ordinary Care—Common Law Negligence—Defined." This instruction has been used countless times in the courts of this state in negligence cases.

Finally, in Instruction No. 24, the jury was instructed that

> [o]nce an employer knows or should have known of sexual harassment, it must take prompt remedial action *reasonably calculated to end the conduct.* The employer has a duty to take this remedial action even if an employee asks the employer not to do anything.

(Emphasis added.) Instruction No. 24 is derived from the affirmative defense for vicarious liability claims from *Faragher–Ellerth.*

**C. Overview of Review of Jury Instructions**. In fashioning jury instructions, we have repeatedly stated that a trial court "need not instruct in a particular way so long as the subject of the applicable law is correctly covered when all the instructions are read together." *State v. Uthe,* 542 N.W.2d 810, 815 (Iowa 1996). A trial court "is free to draft jury instructions in its own language." *Hoekstra v. Farm Bureau Mut. Ins.,* 382 N.W.2d 100, 110 (Iowa 1986). We have emphasized that the court need not use terms suggested by the parties. *Bossuyt v. Osage Farmers*

*Nat'l Bank*, 360 N.W.2d 769, 772 (Iowa 1985). And, our instructions do not need to follow particular authorities. In *Bossuyt*, we emphasized that an instruction on fraud was sufficient even though it did not follow the exact phrasing of the Restatement (Second) of Contracts. *Id.* at 774.

Our well-established Iowa caselaw is consistent with federal precedent. As noted by one federal appellate court, review of jury instructions does not require "word-by-word hairsplitting." *Johnson v. Breeden*, 280 F.3d 1308, 1314 (11th Cir. 2002). As long as instructions "accurately reflect the law, the trial judge is given wide discretion as to the style and wording employed." *United States v. Starke*, 62 F.3d 1374, 1380 (11th Cir. 1995).

The question in considering the legal sufficiency of a jury instruction is whether relevant elements of a claim "may be adequately conveyed to the jury by the evidence and by argument of counsel under the instruction that the court gave." *Hillrichs v. Avco Corp.*, 478 N.W.2d 70, 74 (Iowa 1991), *abrogated on other grounds by Reed v. Chrysler Corp.*, 494 N.W.2d 224, 226 (Iowa 1992). What is important is that the instructions, considered as a whole, were sufficient "so that the jurors understood the issues and were not misled." *Johnson*, 280 F.3d at 1314 (quoting *Starke*, 62 F.3d at 1380). Generally understood terms which are in ordinary usage do not need to be defined. *State v. Kellogg*, 542 N.W.2d 514, 516 (Iowa 1996).

When error in a jury instruction is not of constitutional magnitude, "the test of prejudice is whether it sufficiently appears that the rights of the complaining party have been injuriously affected or that the party has suffered a miscarriage of justice." *State v. Gansz*, 376 N.W.2d 887, 891 (Iowa 1985). Reversal is required if the jury instructions misled the

jury or if the court materially misstates the law. *Rivera v. Woodward Res. Ctr.*, 865 N.W.2d 887, 892 (Iowa 2015).

### D. Positions of the Parties.

1. *Defendants.* HES maintains the district court erred in its jury instructions by "adopting a common law negligence standard" and denying HES's affirmative defense. Specifically, HES asserts that under the ICRA, HES was entitled to an instruction on the *Faragher–Ellerth* affirmative defense, which has been adopted by the United States Supreme Court. HES maintains that it is entitled to the *Faragher–Ellerth* defense in this case because the plaintiff's claims involve a supervisor and the alleged harassment did not culminate in a tangible employment action. Under *Faragher–Ellerth*, HES asserts entitlement to an affirmative defense that allows it to show "(a) [HES] exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that [Haskenhoff] unreasonably failed to take advantage of any preventative or corrective opportunities provided by [HES] or to avoid harm otherwise." *See Ellerth*, 524 U.S. at 765, 118 S. Ct. at 2270.

HES recognizes that in cases involving coworker harassment, a different framework applies. HES recognized that in *Vance*, the Supreme Court declared, "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." 570 U.S. at ___, 133 S. Ct. at 2439.

But HES claims that a plaintiff in a negligence case involving coworkers must prove more than the *Vance* formulation that the employer is liable only if it was negligent in controlling working conditions. *Id.* HES adds another element to the negligence claim. According to HES, in cases involving coworker harassment, the plaintiff is required to prove not only the presence of harassment that the

employer knew or should have known existed, but also that the employer "failed to take prompt and appropriate corrective action." *McCombs v. Meijer, Inc.*, 395 F.3d 346, 353 (6th Cir. 2005). An instruction that the plaintiff must prove the defendant acted negligently in creating or continuing a sexually hostile environment is not enough according to HES. It claims that the district court was obligated to include its additional verbal formulation. HES further asserts prejudice arose from the failure to so instruct. *Rivera*, 365 N.W.2d at 892.

2. *Haskenhoff.* Haskenhoff argues that under the ICRA, a plaintiff may choose to proceed under either a direct negligence or vicarious liability theory. She asserts that she elected to proceed under a negligence theory, and thus the law related to vicarious liability claims against an employer is irrelevant.

Haskenhoff supports her choice-of-theories approach by citing language of the Supreme Court in *Vance*, 570 U.S. at ___, 133 S. Ct. at 2434. In *Vance*, the United States Supreme Court stated "an employer will always be liable when its negligence leads to the *creation* or *continuation* of a hostile work environment." *Id.* at ___, 133 S. Ct. at 2452 (emphasis added). Haskenhoff further cites *Vance* for the proposition that a situation where some harassers are coworkers and others are supervisors "presents no problem for the negligence standard." *Id.* at ___, 133 S. Ct. at 2451–52; *see also Phelan v. Cook County*, 463 F.3d 773, 784 (7th Cir. 2006) (declining to sort out who were supervisors since sexual harassment claim survived summary judgment via negligence method); *Sharp v. Houston*, 164 F.3d 923, 928–29 (5th Cir. 1999) (allowing jury instruction on negligence theory even though harasser was top manager in plaintiff's unit).

Because at trial Haskenhoff proceeded only on a direct negligence theory, she claims that HES was not entitled to the *Faragher–Ellerth* defense, which may be utilized only in a vicarious liability case. *See Johnson v. Shinseki*, 811 F. Supp. 2d 336, 348 n.2 (D.C. Cir. 2011); *Curry v. District of Columbia*, 195 F.3d 654, 660 (D.C. Cir. 1999). According to Haskenhoff, the reason for the *Faragher–Ellerth* defense was to ensure that employers would not be held automatically liable for harassment involving supervisors. *Faragher*, 524 U.S. at 804, 118 S. Ct. at 2291; *Ellerth* 524 U.S. at 763, 118 S. Ct. at 2270. But when vicarious liability is not asserted, the *Faragher–Ellerth* framework is inapplicable. Direct negligence, according to Haskenhoff, is a tried and true method of litigating sexual-harassment cases. *See Boyle v. Alum-Line, Inc.*, 710 N.W.2d 741, 748 (Iowa 2006); *Farmland Foods, Inc. v. Dubuque Human Rights Comm'n*, 672 N.W.2d 733, 744 (Iowa 2003).

In addition, Haskenhoff maintains that HES was not prejudiced by the failure to give HES's requested *Faragher–Ellerth* defense instruction. Haskenhoff argues the plaintiff's burden under a negligence standard is higher than that under *Faragher–Ellerth*. In a negligence case, Haskenhoff asserts, the plaintiff must prove the employer was negligent. In a vicarious liability case, however, the plaintiff does not have to prove negligence, and the defense has the burden of showing "prompt and effective" remedial action under *Faragher–Ellerth*.

**E. The Distinction Between Direct Negligence Claims and Vicarious Liability Claims Under Federal and Civil Rights State Law.**

1. *Distinction between direct negligence and derivative liability.* The federal and state civil rights caselaw clearly distinguishes direct negligence claims from claims based on vicarious liability. A direct negligence approach is generally used in federal cases under Title VII by

plaintiffs who seek to thrust liability onto employers for the harassment they suffered at the hands of coworkers. The direct negligence cases stress that employer liability for coworkers "is direct liability for negligently allowing harassment, not vicarious liability for the harassing actions of employees." *Williamson v. Houston,* 148 F.3d 462, 465 (5th Cir. 1998); *Pierce v. Commonwealth Life Ins.,* 40 F.3d 796, 804 n.11 (6th Cir. 1994) ("The term 'respondeat superior'—which connotes derivative liability—is an incorrect label for co-worker harassment cases, where the employer is directly liable for its own negligence.").

2. *Two types of direct negligence: negligence in the creation and negligence in the continuation of harassment.* The Supreme Court explored some elements of a direct negligence claim in *Vance,* 570 U.S. at ___, 133 S. Ct. at 2434. *Vance* held a plaintiff could bring a derivative claim based on vicarious liability for acts of a supervisor if the plaintiff suffers tangible adverse consequences of the harassment, but that vicarious liability could not arise if the consequences were intangible. *Id.* at ___, 133 S. Ct. at 2439. In *Vance,* the Supreme Court recognized the two theories of direct negligence actions, observing that "an employer will always be liable when its negligence leads to *the creation or continuation* of a hostile work environment." *Id.* at ___, 133 S. Ct. at 2452 (emphasis added).

3. *Relevant evidence in fact-based direct negligence actions.* In discussing direct negligence actions as a distinct alternative to a derivative claim based on vicarious liability, the *Vance* Court observed, "Evidence that an employer did not monitor the workplace, failed to respond to complaints, failed to provide a system for registering complaints, or effectively discouraged complaints from being filed would be *relevant.*" *Id.* at ___, 133 S. Ct. at 2453 (emphasis added). These

evidentiary observations appear to be germane to direct negligence actions based on a failure to prevent and negligence related to the continuation of harassment.

4. *Combining coworkers and supervisors in direct negligence actions.* While a direct negligence theory is generally used to affix liability to the employer when the harassers are solely coworkers, the question arises as to whether a direct negligence claim can also be made when one or even all of the harassers are supervisors. A plaintiff may want to use such a strategy when it is not entirely clear whether the harassers would be considered coworkers or supervisors. By assuming the burden of proving direct negligence, rather than shifting the burden to the defendant under the derivative approach of vicarious liability, the plaintiff avoids the risk that the court could ultimately conclude a harasser was not a supervisor and thus an employer could not be held derivatively liable on a vicarious liability theory. Thus, plaintiffs are not forced to litigate harassment cases involving supervisors under a vicarious liability theory. They may choose to proceed under the more demanding direct negligence theory.

There is dicta in support of the notion that supervisors may be considered coworkers for purposes of a direct negligence claim brought under Title VII. In *Ellerth*, the Supreme Court observed that while a derivative claim based upon a vicarious liability might be available for claims against supervisors under certain circumstances, "an employer can be liable, nonetheless, where its own negligence is a cause of the harassment." 524 U.S. at 758–59, 118 S. Ct. at 2267. There is lower federal and state court authority consistent with the proposition that the conduct of supervisors may be considered part of a direct negligence claim brought by a Title VII plaintiff. *See, e.g., Rios Da Silva v. One, Inc.,*

980 F. Supp. 2d 148, 163 (D.P.R. 2013); *Nadeau v. Rainbow Rugs, Inc.*, 675 A.2d 973, 976–77 (Me. 1996); *Hoy v. Angelone*, 691 A.2d 476, 481 (Pa. Super. Ct. 1997).

**F. The Kaleidoscope of Federal Circuit Model Jury Instructions on Direct Negligence in Harassment Cases.** A survey of federal circuit court model jury instructions for harassment claims based on direct negligence demonstrates the kaleidoscope of verbal formulations that may be used in instructing juries on direct negligence claims. *See generally* 3C Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 171:23, at 262–77 (6th ed. 2014) [hereinafter O'Malley 2014] (providing model jury instructions from the federal circuits and collecting cases on those instructions). Some instructions are long, some are short. In describing the plaintiff's burden in showing the employer was negligent, some use language of reasonableness, some use the somewhat narrower language of prompt and appropriate or effective remedial action, and many use both.

The model instruction for the United States Court of Appeals for the Third Circuit is detailed and elaborate. According to the Third Circuit model instruction, in sexual harassment cases involving nonsupervisors, the plaintiff must show that management "knew, or should have known of the abusive conduct." *Id.* at 264. If the plaintiff proves its case, however, the defendant is allowed an affirmative defense. *Id.* at 265.

Interestingly, though, the affirmative defense, which the defendant has the burden of proving, is couched in terms of reasonableness. *See id.* According to the Third Circuit model instruction, in order to satisfy the requirements of the affirmative defense, the defendant must show (1) that it "exercised reasonable care" to prevent the harassment and to

promptly correct any harassing behavior, and (2) that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities." *Id.* On the first prong of reasonableness, the Third Circuit offers a further instruction that a defendant meets that burden by showing the defendant had an explicit policy against harassment, the policy was fully communicated to its employees, the policy provided a reasonable way for plaintiff to make a claim of harassment, and reasonable steps were taken to correct the problem. *Id.* The Third Circuit instruction for coworker harassment tends to mix and match concepts of direct negligence liability with concepts of derivative liability based on vicarious liability theory as outlined in *Faragher–Ellerth.* *See id.* at 264–65.

The Fifth Circuit takes a materially different tack in a lengthy model instruction on direct negligent-harassment claims by coworkers. 3C Kevin F. O'Malley et al., *Federal Jury Practice and Instructions* § 171:23 (6th ed.), Westlaw (database updated Aug. 2016). Under the Fifth Circuit instruction for a claim of a hostile work environment involving coworkers based on direct negligence, the plaintiff must show the defendant "knew, or in the exercise of reasonable care should have known, that [the plaintiff] was being [sexually harassed] because of the [Plaintiff's sex]." *Id.* The Fifth Circuit instruction states the plaintiff must show that the harassment was "known by or communicated to a person who had authority to receive, address, or report the complaint," or that the harassment was so "open and obvious" the defendant should have known of it. *Id.* In addition, the plaintiff must prove the defendant failed to take "prompt remedial action" to stop the harassment. *Id.* Interestingly, though, the instruction further defines "prompt remedial

action" as conduct "reasonably calculated to stop the harassment and remedy the situation." *Id.*

The Seventh Circuit model jury instruction eschews the arguably meandering instruction of the Fifth Circuit for a more direct approach. O'Malley 2014, at 270–71. In a harassment case involving negligence, a jury in the Seventh Circuit is instructed that when harassment has been proved, an employer is liable if it "knew or should have known about the conduct" and "did not take reasonable steps to [correct the situation]/[prevent harassment from recurring]." *Id.* at 271. That is it. The Seventh Circuit model instruction is quite similar to the marshalling instruction given by the district court in this case and, compared to the Fifth Circuit model instruction, has the advantage of simplicity.

The Eighth Circuit model instruction requires that the plaintiff show the defendant "knew or should have known" of the alleged conduct and "the defendant failed to take prompt and appropriate corrective action." *Id.* at 272. Although this instruction differs somewhat from the instruction in our case, "prompt and appropriate corrective action" does not seem to be a lesser standard than "reasonableness." An action that is not "prompt" might still be considered reasonable by a jury, while an action that is "appropriate" is surely also reasonable.

The Ninth Circuit has a longer model instruction for direct negligence claims, but it comes to essentially the same place as the Seventh Circuit's instruction. *Id.* at 274–75. Under the Ninth Circuit's instruction, a plaintiff who proves harassment and seeks to impose liability on the employer must show that "the defendant or a member of the defendant's management knew or should have known of the harassment and failed to take prompt, effective remedial action reasonably calculated to end the harassment." *Id.* at 274. The Ninth

Circuit instruction further defines who qualifies as management and states the defendant's remedial action "must be reasonable and adequate." *Id.* Although more detailed, there is no substantive difference between the Ninth Circuit instruction and the totality of the district court's instruction in this case.

What these diverse jury instructions demonstrate is that there is not one "correct" jury instruction in a direct negligence case. They can vary from the fairly complex instructions used by the Fifth and Ninth Circuits to the very simple instruction utilized by the Seventh Circuit. It is clear, however, that the model instructions in the Fifth, Seventh, Eighth, and Ninth Circuits are consistent with the trial court's instruction in this case.

**G. Iowa Caselaw on Negligence Claims.** In the pre-*Faragher–Ellerth* cases of *Chauffeurs, Teamsters & Helpers, Local Union No. 238 v. Iowa Civil Rights Commission*, 394 N.W.2d 375 (Iowa 1986), and *Lynch v. Des Moines*, 454 N.W.2d 827 (Iowa 1990), we considered cases in which the plaintiff claimed the defendants maintained hostile environments based on race and sex respectively. In describing one of the elements of a hostile-environment claim, we stated in *Lynch* that the plaintiff must prove "the employer knew or should have known of the harassment and failed to take *prompt and appropriate remedial action*." 454 N.W.2d at 833 (emphasis added). In *Chauffeurs*, we used a slightly different verbal formulation, indicating that the plaintiff needs to prove the defendant knew or should have known of the harassment and "failed to take *prompt remedial action*." 394 N.W.2d at 378 (emphasis added). The cases do not discuss a difference between "prompt remedial action" or "prompt and appropriate remedial action." In both cases, we held the evidence sufficient to support the plaintiff's claims.

In another pre-*Faragher–Ellerth* case, *Vaughn v. Ag Processing, Inc.*, we again were asked to consider a hostile-environment harassment claim, this time based on religion. 459 N.W.2d 627, 632 (Iowa 1990). We noted specifically the plaintiff did not assert that "Mueller, as supervisor, was acting as Ag or that Ag was strictly liable for Mueller's actions." *Id.* at 634. In other words, plaintiff was pursuing a direct negligence theory and not an agency theory that would give rise to strict liability against the employer.

Unlike in *Chauffeurs* and *Lynch*, however, we found in *Vaughn* that the defendant was entitled to prevail. *Id.* at 639. We found that while the defendant knew of the harassment, the employer took prompt remedial action to remedy the problem. *Id.* at 634. We explained "prompt remedial action" as placing "a *reasonable* duty on an employer who is aware of discrimination in the workplace to take *reasonable* steps to remedy it." *Id.* at 634 (emphasis added). We noted that whether an employer takes such reasonable steps to remedy the harassment is a question of fact. *Id.* We further noted in *Vaughn* that the employer's conduct was "especially reasonable" in light of the evidence which showed that the employer did not know the plaintiff was a victim of religious discrimination. *Id.* at 635. Under *Vaughn*, it seems that "prompt remedial action" and "reasonableness" are interchangeable concepts, much like the model instructions in the Fifth and Ninth Circuits.

Our first post-*Faragher–Ellerth* case involving a claim of a hostile environment was *Farmland Foods*, 672 N.W.2d 733. In *Farmland Foods*, we cited Eighth Circuit precedent for the proposition that in order to establish a hostile-environment claim, a plaintiff must show the employer "knew or should have known of the harassment and failed to

take proper remedial action." *Id.* at 744. We then added, as dictum, a sentence stating, "When a supervisor perpetrates the harassment, but no tangible employment action occurred, the employer may assert the *Faragher–Ellerth* affirmative defense to avoid liability."[28] *Id.* In *Farmland Foods*, we concluded the plaintiff failed, on the evidence presented, to show a hostile environment of racial harassment. *Id.* at 746. As a result, the question of whether the employer acted reasonably in response to the allegedly hostile environment was not considered.

In *Boyle*, 710 N.W.2d at 741, we considered whether a plaintiff established a hostile environment based on sex. The district court concluded the employer knew of the harassment but the employer "did take steps *reasonably* calculated to stop the sexual harassment." *Id.* at 747 (emphasis added). We also stated that in order to establish liability for a hostile environment, a plaintiff must show that "the employer knew or should have known of the harassment and failed to take *proper remedial action.*" *Id.* at 746 (emphasis added) (quoting *Farmland Foods*, 672 N.W.2d at 744). We equated the test, however, with "steps *reasonably* calculated to end the sexual harassment." *Id.* at 747 (emphasis added). After canvassing the record, we concluded the record did not support the trial court's conclusion that the employer took steps reasonably calculated to stop the harassment. *Id.* Because the employer did not show that it took steps "reasonably calculated to stop the sexual

---

[28]This dictum is correct as applied to a derivative claim based upon vicarious liability, but it does not apply to a claim based upon direct negligence. When a supervisor participates in the harassment, the plaintiff has a choice. The plaintiff may proceed directly against the employer under a negligence theory and bear the burden of showing that the employer knew or should have known of the harassment and failed to stop it, or she may proceed under a vicarious liability theory. If the plaintiff proceeds under a vicarious liability theory, then the employer is entitled to the *Faragher–Ellerth* defense.

harassment," we stated that the employer failed to "implement prompt and appropriate corrective action." *Id.* at 748. In *Boyle* as in *Vaughn,* the shorthand phrases "prompt remedial action" and "prompt and appropriate action" are equated with steps "reasonably calculated to stop the sexual harassment." *See id.*; *Vaughn,* 459 N.W.2d at 634.

**H. Discussion: Can the *Faragher–Ellerth* Defense "Jump the Track"?[29]** At the outset, there is no question under the current prevailing state and federal caselaw that a plaintiff in a sexual-harassment case may proceed against an employer on a direct negligence theory and that the direct negligence theory is distinct from a derivative claim based on vicarious liability. I would thus set aside the caselaw that might relate to derivative claims based on vicarious liability and focus solely on the law related to direct negligence.

In direct negligence cases, an employer is entitled to a jury instruction stating that the plaintiff has the burden of proving the employer's negligence "leads to the creation or the continuation of a hostile work environment." *Vance,* 570 U.S. ___, 133 S. Ct. at 2452. Under negligence theory, there is no *Faragher–Ellerth* affirmative defense. The *Faragher–Ellerth* affirmative defense, if it is available, applies only in cases based on vicarious liability. *Beckford v. Dep't of Corr.,* 605 F.3d 951, 960–61 (11th Cir. 2010) (finding a refusal to give a *Faragher* defense instruction proper when plaintiff did not argue vicarious liability).[30]

---

[29]*See generally* Alex B. Long, *"If the Train Should Jump the Track . . .": Divergent Interpretations of State and Federal Employment Discrimination Statutes*, 40 Ga. L. Rev. 469 (2006).

[30]Although the parties have assumed in our cases that the *Faragher–Ellerth* defense is available under the ICRA, we have not adjudicated the issue in a contested case. A number of state courts have declined to adopt the *Faragher–Ellerth* defense under their state civil rights acts. *See, e.g., Myrick,* 73 F. Supp. 2d at 98; *Chambers,* 614 N.W.2d at 918; *Pollock,* 11 S.W.3d at 767.

As a result, it is important to note that under a claim based on negligence, the second prong of the *Faragher–Ellerth* defense, namely, that the employer may prove the plaintiff failed to avail herself of an employer's internal remedy, has no application. Indeed, that is the main advantage of a negligence claim—specifically, that it can provide a basis for liability when the harassment victim never formally complained to his or her employer. *See Zayadeen v. Abbott Molecular, Inc.*, No. 10 C 4621, 2013 WL 361726, at *1 (N.D. Ill. Jan. 30, 2013); Andrew Freeman, *A Bright Line, But Where Exactly? A Closer Look at* Vance v. Ball State University *and Supervisor Status Under Title VII*, 19 Lewis & Clark L. Rev. 1153, 1161–62 (2013). The fact that a report to management is not required is an important feature of direct negligence liability, for many women are reluctant to step forward to report sexual harassment to superiors. *See* L. Camile Hebert, *Why Don't "Reasonable Women" Complain About Sexual Harassment?*, 82 Ind. L.J. 711, 724–29 (2007). For instance, some victims may not report harassment for fear of retaliation from coworkers. *See* Christopher M. Courts, Note, *An Adverse Employment Action—Not Just an Unfriendly Place to Work: Co-Worker Retaliatory Harassment Under Title VII*, 87 Iowa L. Rev. 235, 236 (2001).

As a result, HES's argument that it was entitled to an affirmative *Faragher–Ellerth* defense is without merit. Interestingly, however, the trial court did instruct the jury on the first prong of the *Faragher–Ellerth* affirmative defense in Instruction No. 24. That instruction stated that HES had the burden of showing that it took prompt and appropriate remedial action reasonably calculated to end the conduct. In a negligence action, however, HES does not have any burden. Rather, the burden is always on the plaintiff to prove negligence. But HES sought this instruction and does not object to it now. It may have been wrong,

but HES cannot complain about an instruction it sought and does not challenge on appeal.

I now turn to the question of whether the district court properly instructed the jury on what the plaintiff must show to affix liability to HES based upon direct negligence. The marshalling instruction required the plaintiff to prove that HES acted "negligently in the creation or continuance of a hostile work environment." These words are virtually lifted verbatim from *Vance* and are a correct statement of law.

So far so good. Next, the district court offered an instruction on negligence. The district court instructed the jury that "negligence" means "the failure to exercise ordinary care." Further, "ordinary care is the care which a reasonably careful employer would use under all the circumstances."

HES asserts the district court's formulation is inadequate. It insists the district court was required to instruct the jury that the plaintiff must show not that the employer failed to act reasonably, but instead that the employer failed to use "prompt and appropriate remedial action."

In short, HES insists on magic words. But not only does our law not require magic words for jury instructions, but such demanding word regimes are contrary to our declarations that the trial court "need not instruct in a particular way so long as the subject of the applicable law is correctly covered." *Uthe*, 542 N.W.2d at 815; *Hoekstra*, 382 N.W.2d at 110.

One can only wonder what the difference is between acting reasonably and acting appropriately. Federal cases refer to such arguments with disdain as "word-by-word hairsplitting." *See Johnson*, 280 F.3d at 1314. Certainly, the difference between the concept of

reasonability in the district court's negligence instruction and appropriateness in HES's formulation is not a basis for reversal here.

HES's formulation also uses the term "prompt" while the district court's instruction simply referred to reasonability. This is not the stuff of reversible error. Our caselaw has repeatedly equated prompt remedial action with action "reasonably calculated to stop the sexual harassment" or placing a "reasonable duty on an employer who is aware of discrimination in the workplace to take reasonable steps to remedy it." *Boyle*, 710 N.W.2d at 747; *Vaughn*, 459 N.W.2d at 634. If anything, the term "prompt" may be more demanding on the employer then the reasonability requirement as instructed by the district court. In any event, I would find that no reasonable jury would draw a distinction between reasonable action by an employer to stop the harassment and prompt and appropriate remedial action.

In considering the negligence instructions given in this case, the instructions accurately reflect the law. The instructions were very close to the model instruction in use in the Seventh Circuit and, in their totality, are certainly consistent with the model instructions in the Fifth and Ninth Circuits. The district court instructed the jury in the marshalling instruction that Haskenhoff had the burden to prove that HES "knew or should have known" of the harassment. The instruction further required Haskenhoff to prove that HES "acted negligently in creating or continuing a hostile work environment." The district court also gave a proper instruction to the jury regarding the meaning of negligence as a failure to use ordinary care "which a reasonably careful employer would use in a similar circumstance."

The fact the instruction was adequate is demonstrated by the record in this case. In her opening statement, Haskenhoff told the jury

that "an employer has a duty to . . . protect its employees insofar as they can reasonably do so from sexual harassment." Further, Haskenhoff told the jury "if an employer knows about sexual harassment and lets it continue for a month—let alone several months—and it violates the law . . . the employer must compensate the victim for whatever harm is caused."

In its opening statement, HES responded that "this is a case about a lab manager that failed for months or years to report prohibited conduct and, before HES could act on the information she reported, quit on the job." HES further asked the jury "will the evidence show that the plaintiff followed HES policy . . . and that HES was given a chance to promptly remedy the conduct that she did report?" Then in closing argument, Haskenhoff told the jury,

> Homeland acted negligently . . . . They did not monitor the workplace. They did nothing more to protect Tina going forward . . . . They did nothing to stop it. They allowed the environment to continue and caused great harm to Tina . . . . Once the employer knows or should have known about sexual harassment, *it must take prompt remedial action reasonably calculated to end the conduct.*

(Emphasis added.) Thus, in the closing statement, Haskenhoff's counsel told the jury that the obligation of the employer, once it knew or should have known about the harassment, was to take "prompt remedial action reasonably calculated to end the conduct."

In its closing statement, HES picked up on the plaintiff's closing argument. HES told the jury that "she needs to prove . . . that HES failed to act reasonably and responsibly in a way calculated to bring the conduct of which she complained to an end. That's the biggest question."

Further, HES told the jury that

> Instruction 17 and 24 go to the last element, if you will. What the plaintiff has to prove is that this employer was either not doing something a reasonable careful employer would do or failed to do something a reasonably careful employer would do.

HES further asked the jury "did the company put a plan together that was reasonably calculated to end the conduct?" According to HES, the company "wanted it to just stop," and cited "the evidence here that it did." In rebuttal, Haskenhoff told the jury, "You have to conduct prompt, thorough and impartial investigation into any potential sexual harassment, however you become aware of it, whether it is in a written complaint or not, whether you see or whether it's just a rumor."

What the opening and closing arguments demonstrate is that the instructions, though brief like the Seventh Circuit model instruction, were clearly and demonstrably sufficient to allow HES to make the argument which it claims on appeal it was foreclosed from making. *See Hillrichs*, 478 N.W.2d at 74 (finding instructions adequate in which they allowed consideration of evidence and arguments by counsel on legal elements). HES thus advances a battle not over principle, but over semantics. Under the instructions, Haskenhoff had the burden of proving negligence. As the model instructions of the various circuits indicate, "prompt and effective remedial action" is a another way of expressing reasonableness. *See also Lehmann v. Toys 'R' Us, Inc.*, 626 A.2d 445, 464 (N.J. 1993) ("Effective" remedial measures are those "reasonably calculated to end the harassment."); *Campbell v. Fla. Steel Corp.*, 919 S.W.2d 26, 33 (Tenn. 1996) (stating no precise definition of "prompt and appropriate remedial action" though in general employers are required to take steps "reasonably calculated" to terminate harassment); *Davis v. Modine Mfg., Co.*, 979 S.W.2d 602, 607 (Tenn. Ct. App. 1998) (equating "prompt and appropriate corrective action" with

action "reasonably calculated to terminate the alleged harassment"). If HES could convince a jury that it took prompt and effective remedial action, it would not be found to have acted unreasonably. There is no error in the instructions that were based on the language of *Vance* and the ISBA Model Jury Instruction defining negligence.

### IV. Causation Instruction on Retaliatory Discharge.

### A. Introduction.

1. *Ambiguity in "because" language.* Causation has been one of the most controversial aspects of employment law. The literature is chock-full of alternate causation standards, including "but for," "motivating factor," "substantial factor," "a motivating factor," and similar terms. There are arguments aplenty for each of them. *See generally* Kendall D. Isaac, *Is It "A" Or Is It "The"? Deciphering the Motivating-Factor Standard in Employment Discrimination and Retaliation Cases*, 1 Tex. A&M L. Rev. 55, 73–77 (2013); Schwartz, 150 U. Pa. L. Rev. at 1708 (citing various different approaches to causation requirement).

By using "because" in Iowa Code section 216.11(2), the section related to causation in retaliation cases, the Iowa legislature has left the causation question to the courts to determine as a matter of statutory construction. Because the statute is ambiguous, we have a number of plausible interpretive choices. In exercising our authority to construe the statute and choose among plausible interpretive choices, we must be cognizant of the text of the statute, its goals, and the legislative direction to construe the ICRA broadly to effectuate its underlying purposes. *Id.* § 216.18(1).

2. *Centrality of reporting requirements in Iowa civil rights law and linkage to substantive violations.* Some may regard a retaliation claim as a second-class claim under the ICRA compared to status-based

discrimination claims. Retaliation claims, however, are not second-class claims at all, but instead are claims that strike at the very heart of the enforcement regime of the ICRA. Under the ICRA, a claimant is required to file a timely claim with the Iowa Civil Rights Commission in order to present a claim. *McElroy v. State*, 703 N.W.2d 385, 391 (Iowa 2005). The requirement is mandatory. *See id.* Thus, being able to file a claim free from fear of workplace retaliation is directly linked to the ability of a claimant to vindicate his or her rights under the ICRA. A statute that forces workers to invoke an administrative process or to cooperate in subsequent investigations should protect workers who comply. Sandra F. Sperino, *Retaliation and the Reasonable Person*, 67 Fla. L. Rev. 2031, 2074 (2015) [hereinafter Sperino, *Retaliation*].

As a result, keeping the channels of reporting potential civil rights claims free, open, and unfettered is crucial to vindicating the substantive policies of the ICRA. And, closing the channels of reporting through retaliation does not only affect the party but harms the system itself. *See* Richard Moberly, *The Supreme Court's Antiretaliation Principle*, 61 Case W. Res. L. Rev. 375, 380 (2010) (citing law enforcement rationale). In addition to protecting the person claiming discrimination, coworkers participating in investigations need protection if the system is to function properly. A retaliation claim thus is not a satellite claim on the fringes of civil rights law. It is an essential claim, without which the ICRA could not fulfill its laudatory statutory purpose.

3. *Purpose of retaliation provision as affecting causation.* In considering whether the plaintiff has presented sufficient evidence to reach a jury on a retaliation claim, much debate has occurred on the level of causation—a motivating factor, a substantial factor, a but-for factor, etc. Aside from level of causation, however, there is another

issue. Causation is not a free radical floating around the employment law universe untethered to any other legal principle. There is a relational question, namely, causal connection in relation to what, exactly?

And that is a key question. In the retaliation context, the question is whether the causation is judged by whether the alleged retaliatory conduct would likely deter a plaintiff from making a complaint contemplated by our civil rights laws. Or, is it judged by whether it "affects a term, condition, or privilege" of employment? This relational question is just as important as the calibration of the "level" of causation required in determining whether a plaintiff has made a sufficient showing to support a retaliation claim.

4. *Difficulty of fact-finding in retaliation cases.* Finally, we should recognize the evidentiary challenges facing a plaintiff in proving a retaliation claim. In retaliation cases, we are necessarily probing into difficult factual issues involving the motivation of the defendant. The evidence related to motivation is almost always in the hands of the defendant. In addition, the evidence in the modern work place is often indirect, although "smoking guns" are still occasionally uncovered.

Further, to the extent causation involves whether a reasonable person in the position of the plaintiff would be deterred from utilizing appropriate reporting procedures, the question becomes highly contextual. Highly contextual factual issues are rarely amenable to summary judgment.

**B. Challenged Trial Court Instructions.** With respect to her retaliation claim, the jury was instructed that Haskenhoff need only prove that her report of sexual harassment "played a part" in HES's decision to take adverse employment action against her to prevail on her retaliation claim. The jury was further instructed that to "play a part"

the report need only have been "a factor" in HES's employment action but "need not be the only factor."

HES offered an instruction that Haskenhoff's report of sexual harassment must have been "a significant factor motivating the Defendant's decision to take materially adverse employment action against Plaintiff" in order for the jury to find in favor of Haskenhoff on her retaliation claim.

**C. Federal Caselaw on Causation Standard for Civil Rights Claims.**

1. *Causation standard for status-based discrimination.* Title VII of the Civil Rights Act of 1964 provides that it "is an unlawful employment practice for an employer . . . to discriminate against any individual . . . *because of* such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1)–(2) (emphasis added). Like prior state legislatures who used the term in their state civil rights acts, Congress provided no guidance as to the meaning of the ambiguous phrase "because of" in its status-based discrimination provision. The meaning of the phrase "because of" has been a major point of controversy in federal civil rights law.

Early federal caselaw struggling with the "because of" language came to mixed results. Many federal courts adopted a relaxed standard of proof close to a played-a-part standard. *See King v. N.H. Dep't of Res. & Econ. Dev.*, 420 F. Supp. 1317, 1327 (D. N.H. 1976). Others adopted something like a significant-factor test. *See Baldwin v. Birmingham Bd. of Educ.*, 648 F.2d 950, 956 (5th Cir. 1981); *Whiting v. Jackson State Univ.*, 616 F.2d 116, 121 (5th Cir. 1980). Some cases embraced a more

stringent determinative-factor or motivating-factor test. *See Womack v. Munson*, 619 F.2d 1292, 1297 (8th Cir. 1980).[31]

In *Price Waterhouse*, the United States Supreme Court considered the meaning of the term "because of" under the status-based classification provision of Title VII. 490 U.S. at 239–40, 109 S. Ct. at 1785. A majority of the court concluded the proper approach to the phrase "because of" was a motivating-factor test. *Id.* at 258, 109 S. Ct. at 1795 (plurality opinion); *id.* at 259, 109 S. Ct. at 1795 (White, J., concurring); *id.* at 276, 109 S. Ct. at 1804 (O'Connor, J., concurring). As Justice Brennan noted in his plurality opinion, Congress has specifically rejected an amendment to put the term "solely" in front of the "because of" language. *Id.* at 241, 109 S. Ct. at 1785 (plurality opinion). According to Justice Brennan, Congress intended to eliminate employment decisions in which discriminatory motivation "played a part" in an employment decision, even if it was not the sole basis for the decision. *Id.*

The *Price Waterhouse* Court, however, added an important caveat to its motivating-factor interpretation. In cases of mixed motive, the *Price Waterhouse* Court concluded that an employer was entitled to a "same decision" affirmative defense. *Id.* at 242, 109 S. Ct. at 1786. In other words, if an employer could show in a mixed-motive case that the same decision would have been made absent the discriminatory motivation, the employer could escape liability. *Id.*

In response to the same-decision aspect of *Price Waterhouse* and other Supreme Court civil rights decisions, Congress enacted the Civil

---

[31] *Womack* appears to have been subsequently modified by later cases. *See, e.g., Tuttle v. Henry J. Kaiser Co.*, 921 F.2d 183, 186 n.3 (8th Cir. 1990); *Balicao v. Univ. of Minn.*, 737 F.2d 747, 750 n.2 (8th Cir. 1984).

Rights Act of 1991. Civil Rights Act of 1991, Pub. L. No. 102-166, 105 Stat. 1071 (codified at 42 U.S.C. § 2000e-2(m)). The purpose of the 1991 Act, according to Congress, was to provide "additional protections against unlawful discrimination in employment." *Id.* The Civil Rights Act of 1991 added the following section to Title VII: "[A]n unlawful unemployment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice." 42 U.S.C. § 2000e-2(m) (emphasis added). This section plainly endorsed the motivating-factor approach of *Price Waterhouse.*

Congress further amended the statute, however, to limit the same-decision affirmative defense established in *Price Waterhouse.* Congress limited the same-decision defense by providing that if the employer demonstrates that it

> would have taken the same action in the absence of the impermissible motivating factor, the court . . . may grant declaratory relief, injunctive relief . . . and [limited] attorney's fees and costs . . . and . . . shall not award damages or issue an order requiring any admission, reinstatement, hiring, promotion, or payment.

42 U.S.C. § 2000e-5(g)(2)(B). The impact of this amendment provided employees with greater protection than allowed under the Supreme Court's decision in *Price Waterhouse.* The same-decision amendment was thus consistent with the underlying statutory purpose of the Civil Rights Act of 1991 to "provide additional protections" to employees suffering from impermissible discrimination.

Notably, however, the Civil Rights Act of 1991 did not amend the retaliation provision of Title VII, which also contains a because-of requirement of causation. What gloss should be put on the because-of

language in the retaliation in light of the *Price Waterhouse* and the Civil Rights Act of 1991?

There were a number of possible approaches. Several courts concluded that because Congress did not specifically amend the separate retaliation section in the Civil Rights Act of 1991, the causation standard existing before the passage of the Act announced in *Price Waterhouse* provided the proper approach to causation in retaliation claims. *See, e.g.*, *Medlock v. Ortho Biotech, Inc.*, 164 F.3d 545, 552 n.4 (10th Cir. 1999); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 934–35 (3d Cir. 1997); *Tanca v. Nordberg*, 98 F.3d 680, 683–84 (lst Cir. 1996). While recognizing that the Civil Rights Act of 1991 amendments did not extend to retaliation claims, these courts took the position that the Supreme Court's decision in *Price Waterhouse*, which involved a status-based claim, did extend to retaliation claims. These courts thus relied on the unique nature of the 1991 legislation to uncouple the causation standard of retaliation-based claims from status-based claims.

Other federal courts seem to have taken a different approach. Although short of an express holding, the Seventh Circuit in *Veprlinsky v. Fluor Daniel, Inc.*, cited the 1991 amendments establishing a motivating-factor causation test for status-based discrimination as also applying for treatment of retaliation claims. 87 F.3d 881, 886, 887 n.3 (7th Cir. 1996); *see also Hall v. City of Brawley*, 887 F. Supp. 1333, 1345 (S.D. Cal. 1995) (finding impermissible motivation, sustaining "same decision" defense, but affording statutory remedies permitted under Civil Rights Act of 1991 but not under *Price Waterhouse*). In *de Llano v. North Dakota State University*, the district court concluded that "it would be illogical and contrary to congressional intent to apply different standards of proof and accompanying relief provisions to retaliation claims as

opposed to discrimination claims."  951 F. Supp. 168, 170 (D. N.D. 1997).

The fighting issue in this split was whether the employer was entitled to a complete same-decision affirmative defense under *Price Waterhouse* for retaliation claims, or whether the limitations of the same-decision defense contained in the 1991 Act were applicable.  *See generally* Lawrence D. Rosenthal, *A Lack of "Motivation" or Sound Legal Reasoning? Why Most Courts Are Not Applying Either* Price Waterhouse*'s or the 1991 Civil Rights Act's Motivating-Factor Analysis to Title VII Retaliation Claims in a Post-*Gross *World (But Should)*, 64 Ala. L. Rev. 1067, 1070–73 (2013).

2. *Causation standard for claims under the Federal ADEA at variance with generally applicable federal status-based causation test.*  In *Gross*, the United States Supreme Court considered the question of causation in an age discrimination case brought under the ADEA.  557 U.S. at 169–70, 129 S. Ct. at 2346.  Unlike Iowa law, which has a unified statute, age discrimination in the federal regime is addressed in a separate statutory provision.

In *Gross*, the Court considered the meaning of an ADEA provision which stated,

> It shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because of* such individual's age.

*Id.* at 182, 129 S. Ct. at 2353 (quoting 29 U.S.C. § 623(a)(1) (emphasis added)).

The district court in *Gross* instructed the jury that liability could be based upon a determination that age was a motivating factor.  557

U.S. at 170–71, 129 S. Ct. at 2347. The jury returned a verdict in favor of the plaintiff. *Id.* at 171, 129 S. Ct. at 2347. On appeal, the Eighth Circuit reversed. *Id.* The Eighth Circuit ruled that because the plaintiff did not advance any direct evidence of age discrimination, the plaintiff was not entitled to a mixed-motive instruction under *Price Waterhouse*. *Id.* While the question presented focused on whether a plaintiff must present direct evidence of age discrimination to obtain a mixed-motive jury instruction under the ADEA, the Supreme Court instead decided to answer the question of whether a mixed-motive instruction is even allowed under the ADEA. *Id.* at 173, 129 S. Ct. at 2348.

In a 5–4 decision, the United States Supreme Court held that *Price Waterhouse*-type burden shifting did not apply to claims brought under the ADEA. *Id.* The reasoning of the *Gross* Court, however, is pertinent to this case. The Supreme Court stressed that in statutory interpretation, the court "must be careful not to apply rules applicable under one statute to a different statute without careful and critical examination." *Id.* at 174, 129 S. Ct. at 2349. The Supreme Court emphasized that Title VII, after the 1991 amendments, expressly authorized mixed-motive analysis, while no similar change was introduced into the ADEA. *Id.* Using dictionary definitions, the majority concluded that "because of" in the ADEA meant "but for" rather than the lesser standard in *Price Waterhouse*. *Id.* at 176–77, 129 S. Ct. at 2350.

Obviously, the analysis in *Gross* of "because of" in the ADEA was at odds with the similar analysis of the exact same term in Title VII in *Price Waterhouse*. There were now two competing approaches to "because of" in the United States Supreme Court precedents. With respect to retaliation claims under Title VII, the question after *Gross* was whether the motivating-factor approach to "because of" in *Price*

*Waterhouse* would apply to retaliation claims under Title VII, or would the new *Gross* but-for test for "because of" supplant it

3. *Causation standard for federal retaliatory claims.* In *University of Texas Southwestern Medical Center v. Nassar*, another bare 5–4 majority of the Supreme Court held that the proper causation test for a retaliation claim under Title VII is the but-for test. 570 U.S. ___, ___, 133 S. Ct. 2517, 2534 (2013). The *Nassar* majority focused on the language of the Civil Rights Act of 1991. *Id.* at ___, 133 S. Ct. at 2526. Specifically, the majority noted that in 1991, Congress required a motivating-factor causation test for status-discrimination claims, but did not expressly extend that standard to retaliation claims. *Id.* at ___, 133 S. Ct. at 2529. The majority characterized this as a structural choice. *Id.* The majority emphasized the importance of allowing Congress to choose its structure by differentiating between the status-discrimination and the retaliation provisions of Title VII. *Id.* The majority then compared the "because of" language in the ADEA with the "because of" language in the provision of Title VII. *Id.* at ___, 133 S. Ct. at 2528–29. Finding them similar, and finding the rationale of *Gross* equally applicable to the retaliation provision, the Supreme Court concluded that a but-for test for retaliation under Title VII was proper. *Id.* at ___, 133 S. Ct. at 2533. Interestingly, by its "structural" interpretation, the Supreme Court majority used the Civil Rights Act of 1991—which was designed to provide additional protections—to narrow protections under the retaliation provision of Title VII.

The majority also offered a pragmatic justification for the but-for test. Citing increases in the number of retaliation claims with the EEOC, the majority stated that it was of "central importance" to the judicial system to limit the number of claims. *Id.* at ___, 133 S. Ct. at 2531.

According to the majority, if the Court used a motivating-factor standard, frivolous claims would increase and judicial resources would be diverted from genuine efforts to combat discrimination. *Id.* at ___, 133 S. Ct. at 2531–32.

Justice Ginsburg—joined by Justices Breyer, Kagan, and Sotomoyor—dissented. *Id.* at ___, 133 S. Ct. at 2534 (Ginsburg, J., dissenting). Justice Ginsberg maintained that "retaliation for complaining about discrimination is tightly bonded to the core prohibition [of discrimination] and cannot be disassociated from it." *Id.* Justice Ginsburg noted with irony that the majority utilized a statutory revision designed to strengthen the Civil Rights Act to weaken it in retaliation claims. *Id.* at ___, 133 S. Ct. at 2540–41. Justice Ginsburg argued that the 1991 Amendment to the Civil Rights Act applied to "any employment practice," a phrase broad enough to include retaliation claims. *Id.* at ___, 133 S. Ct. at 2539. She rejected the conservation-of-resources argument, declaring that the majority was blinded by "a zeal to reduce the number of retaliation claims filed against employers." *Id.* at ___, 133 S. Ct. at 2547.

**D. State Caselaw on Causation Standard for Retaliation Claims.**

1. *Causation test on generally applicable discrimination.* The vast majority of state courts have generally adopted a version of *Price Waterhouse* for status-based discrimination claims. For instance, in *Harvard v. Bushberg Brothers, Inc.*, the New Jersey court emphasized that discrimination on the basis of sex is shown if sex played at least a part and was a causal factor in the failure of the complainant to be promoted. 350 A.2d 65, 67 (N.J. Super. Ct. 1975). In *Navy v. College of the Mainland,* a Texas court noted some division in the federal cases

about required causation, but ultimately adopted a motivating-factor test based on the plain meaning of Texas law. 407 S.W.3d 893, 899 & n.3 (Tex. App. 2013).

2. *Causation test regarding retaliation.* State courts have adopted a wide range of tests for claims based on retaliatory conduct by an employer. They range from the least demanding a-factor test to the most demanding but-for test.

In *VECO, Inc. v. Rosebrock*, the Alaska Supreme Court considered the standard for causation in a retaliation case. 970 P.2d 906, 920 (Alaska 1999). The Alaska court noted that under *Price Waterhouse*, "because" meant a "motivating part in an employment decision" and held that a plaintiff was required to meet the same test in a retaliation case under Alaska law. *Id.* In *Mole v. University of Massachusetts*, the Massachusetts court also considered causation in a retaliation case. 814 N.E.2d 329, 338 (Mass. 2004). The Massachusetts court stated the plaintiff must show that "a causal connection existed between the protected conduct and the adverse action." *Id.* at 339; *see also Hollins v. Federal Nat'l Mortg. Ass'n*, 760 A.2d 563, 579 (D.C. 2000).

In *Ruffin Hotel Corp. of Maryland, Inc. v. Gasper*, the Maryland court considered the proper causation test in a retaliatory discharge case. 17 A.3d 676, 686 (Md. Ct. App. 2011). The Maryland court adhered to a motivating-factor test in the retaliation context. *Id.* The Maryland court noted that in *Price Waterhouse*, the Supreme Court expressly rejected a but-for test for status discrimination, quoting *Price Waterhouse* for the proposition that to construe the words "because of" as a short hand for "but for" is "to misunderstand them." *Id.* at 685. The Maryland court cited the Supreme Court's handiwork in *Desert Palace* for the proposition that a motivating factor was sufficient to

establish causation in a Title VII status-classification claim. *Id.* (citing *Desert Palace*, 539 U.S. 90, 123 S. Ct. 2148).

Similarly, in *Mele v. Hartford*, the Connecticut Supreme Court considered the question of what a plaintiff must show in the context of a claim that the employer retaliated because of the plaintiff's assertion of his right to workers' compensation benefits. 855 A.2d 196, 206 (2004). The Connecticut court held the plaintiff must show that retaliatory motive "played a part" in the adverse employment action. *Id.* at 211. Consistent with *Mele,* a Connecticut trial court expressly declined to follow the *Nassar* and *Gross* cases. *Gonska v. Highland View Manor, Inc.*, No. CV126030032S, 2014 WL 3893100, at *7 (Conn. Super. Ct. June 26, 2014). Instead, the Connecticut court adopted the *McDonnell Douglas* burden-shifting approach, coupled with the more lenient motivating-factor standard, which only requires a showing that a retaliatory motive contributed or played a part in the adverse action. *Id.*

Missouri courts have developed a contributing-factor test for causation in retaliation cases. *See Turner v. Kan. City Pub. Sch.,* 488 S.W.3d 719, 723 (Mo. Ct. App. 2016); *Williams v. Trans States Airlines, Inc.,* 281 S.W.3d 854, 866 (Mo. Ct. App. 2009); *McBryde v. Tienour Sch. Dist.,* 207 S.W.3d 162, 170 (Mo. Ct. App. 2007). It is not entirely clear what "contributing" means or how it adds to the analysis.

Some states have adopted a substantial-factor test. For instance, in *Allison,* the Washington Supreme Court adopted a substantial-factor test for retaliation claims under the Washington Human Rights Act. 821 P.2d at 38. In rejecting the but-for test, the Washington Supreme Court emphasized the legislative instruction that Washington courts provide a liberal construction of the Act. *Id.* at 37. As a result, the Washington Supreme Court noted the local statute differed from Title VII, which did

not contain a liberal-construction directive. *Id.* at 38. The Washington Supreme Court concluded that a but-for causation standard would put an unrealistic burden on plaintiffs, limiting the ability of many plaintiffs to assert antidiscrimination claims. *Id.* at 42. On the other hand, the court rejected a "to any degree" standard advocated by the plaintiff. *Id.* According to the Washington court, even a slight retaliatory animus could be the basis of employer liability. *Id.* at 42. The Washington court characterized its substantial-factor test as an intermediate one. *Id.*; *see also Rymal v. Baergen,* 686 N.W.2d 241, 249 (Mich. Ct. App. 2004) (stating to establish causation in retaliation case, plaintiff must show illegal action was "a significant factor" in adverse action).

In the above substantial-factor cases, it is not entirely clear how stringent the test is. In *Lacasse v. Owen,* the Oregon court suggests that the substantial-factor test is about the same as a but-for test. 373 P.3d 1178, 1183 (Or. Ct. App. 2016). This view, of course, is in variance with the *Allison* court, which interpreted the substantial-factor test as falling well short of the but-for test. *See* 821 P.2d at 85.

The Supreme Court of California considered the standard for retaliation claims in *Harris v. Santa Monica,* 294 P.3d 49, 66 (Cal. 2013). The *Harris* court developed a substantial-motivating-factor or -reason test. *Id.* The court drew a distinction between a substantial-motivating factor and a motivating factor. *Id.* According to the court, the substantial-motivating-factor test ensured that liability would not be imposed "on evidence of mere thoughts or passing statements unrelated to the disputed employment decision." *Id.*; *see Alamo v. Practice Mgmt. Info. Corp.,* 161 Cal. Rptr. 3d 758, 769 (Ct. App. 2013) (reversing trial court judgment when instruction required a motivating factor instead of a substantial-motivating factor). The court further decided that if an

employer demonstrated the decision would have been made in any event, that would not be a complete defense, but the plaintiff would still be entitled to injunctive relief and attorney's fees. 294 P.3d at 68. In other words, the court adopted, through judicial decision, the approach in the Civil Rights Act of 1991 modifying *Price Waterhouse*. *See also King v. Cowboy Dodge, Inc.*, 357 P.3d 755 (Wyo. 2015) (rejecting *Nassar* and adopting a "substantial and motivating" test, borrowed largely from workers' compensation retaliation cases).

Some state courts, however, have adopted the very stringent but-for test for retaliation claims. For example, in *Ashbury University v. Powell*, the Kentucky Supreme Court summarized the majority argument in *Nassar* and accepted it under Kentucky law. 486 S.W. 3d 240, 254–55 (Ky. 2016). Similarly, in *Navy*, the court declared, with little analysis, that there must be a substantial factor, and not just a causal link, supporting any retaliation claim. 407 S.W.3d at 899; *see also Wholf v. Tremco Inc.*, 26 N.E.3d 902, 908 (Ohio Ct. App. 2015) (noting Ohio civil rights statute "modeled after Title VII" and embracing the reasoning of the *Nassar* majority). In *Gorree v. United Parcel Service, Inc.*, a Tennessee appellate court applied the but-for test of *Nasser* in a retaliation case, noting the legislature in Tennessee intended Tennessee law "to be coextensive with federal law." 490 S.W.3d 413, 439 (2015). None of these cases discussed the impact of the 1991 Civil Rights Act nor the unique legislative history behind Title VII compared to state civil rights statutes.

### E. Iowa Caselaw on Causation Under ICRA.

1. *Generally applicable causation standard for status-based discrimination.* Our most recent exploration of causation in a claim of status-based discrimination was *DeBoom v. Raining Rose, Inc.*, 772

N.W.2d 1, 13 (Iowa 2009). In *DeBoom*, we emphasized the causation test for status-based discrimination under the ICRA was not "*the* determining factor" test but rather "*a* determining factor" test. *Id.* at 13–14 (emphasis added). We further noted it was sufficient to show that status-based discrimination "played a part in the Defendant's later actions toward Plaintiff." *Id.* at 13.

2. *Causation in retaliation cases.* In *Hulme v. Barrett* (*Hulme II*), 480 N.W.2d 40, 42 (1992), we briefly considered the question of proof in a retaliatory discharge case. In *Hulme II*, we declared in a brief paragraph that the causation standard for retaliation claims under the ICRA was a "high one." *Id.* Citing one case from the Sixth Circuit but offering no analysis, we declared the "causal connection" required for a retaliation claim must be a "significant factor" motivating the adverse employment decision. *Id.* Notably, we used both the term "significant" and the term "motivating" to describe the causation requirement. *Id.* After having stated that causation must be a significant factor motivating the adverse employment decision, we then cited another case from the Eighth Circuit applying a substantial-factor test. *Id.*; *see Womack*, 619 F.2d at 1297.

We returned to the causation question for retaliation claims in *City of Hampton v. Iowa Civil Rights Commission*, 554 N.W.2d 532 (Iowa 1996). The brief discussion of causation in *City of Hampton* was dicta as no argument regarding level of causation was presented to the Iowa Civil Rights Commission. *See id.* at 535–36. In *City of Hampton*, we cited *Hulme II* for the proposition that in retaliation cases, causation is established by a "significant factor" motivating the adverse employment decision. *Id.* We did not cite the motivating-factor language in *Hulme II*. We again cited the *Womack* case, but this time for the proposition that

the Eighth Circuit had established a but-for test and not a substantial-factor test as suggested in *Hulme II*. *Id.* We also cited, without elaboration, a Sixth Circuit case under Michigan law supporting a significant-factor standard. *Id.* (citing *Polk v. Yellow Freight Sys., Inc.*, 801 F.2d 190 (6th Cir. 1986)).

In *Hulme II* and *City of Hampton*, we did not review the underlying statutory text of the ICRA. We did not engage in a reasoned discussion of the available interpretative options. We did not consider the impact of Iowa Code section 216.18(1) requiring that we "broadly interpret the act to effectuate its purposes." In fact, there is no analysis at all, only ambiguous and inconsistent declarations regarding a substantial-factor test and a motivating-factor test.

**F. Analysis.** I begin the discussion of causation with consideration of the proper level of causation required to sustain a retaliation claim. Under the unified ICRA, the legislature has used the same term for causation for both status-based discrimination and retaliation claims, namely, the familiar "because" and "because of" language. Iowa Code §§ 216.6(1)(*a*), .11(2). Two conclusions may be drawn from the use of the "because" and "because of" causation language in both the status-based and the retaliation sections of the ICRA.

First, there is a strong textual argument that the level of causation for status-based claims and retaliation claims should be the same. We have frequently said that when the same term appears multiple times in the same statute, it should have the same meaning. *State v. Paye*, 866 N.W.2d 1, 7 (Iowa 2015); *accord Carson v. Roediger*, 513 N.W.2d 713, 716 (Iowa 1994); *State v. Johnson*, 604 N.W.2d 669, 672 (Iowa Ct. App. 1999). This familiar rule has been applied repeatedly in the context of

civil rights statutes. *See, e.g., EEOC v. Fry's Elecs., Inc.*, 770 F. Supp. 2d 1168, 1171 (W.D. Wash. 2011); *Patino v. Birken Mfg. Co.*, 41 A.3d 1031, 1041 (Conn. 2012); *San Antonio v. Baer,* 100 S.W.3d 249, 253 (Tex. App. 2001); *see generally* 3B Norman J. Singer & Shambie Singer, *Statutes and Statutory Construction* § 76.9, at 205 & n. 11 (7th ed. 2011).

Further, there is no policy reason to question the legislative judgment to use nearly identical causation language, thereby implying the same level of causation for retaliation claims as well as for status-based discrimination. As indicated above, retaliation claims are not second-class citizens, but are critical to effective enforcement of the ICRA. Policy reasons do not provide a basis for overriding the legislature's textual choice.

Indeed, status-based discrimination and retaliation claims are two halves of the same walnut. The success of each depends upon the efficacy of the other. *Nassar,* 570 U.S. at ___, 133 S. Ct. at 2531. Retaliation for complaining about discrimination is tightly bonded to the core prohibition and cannot be disassociated from it. *Id.* Thus, in addition to the textual argument based upon common use of the because-of causation standard in both status-based discrimination claims and retaliation provisions under the ICRA, there is also a strong functional argument for utilizing the same legal standard. Indeed, the United States Supreme Court, prior to its innovation in *Nassar,* repeatedly held that retaliation was a type of status discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174, 125 S. Ct. 1497, 1504 (2005).

This approach represents a refinement, perhaps, of the standard for retaliation claims under the ICRA used in *Hulme II* and *City of Hampton.* In these cases, we applied a substantial-factor test for

retaliation claims under the ICRA. *City of Hampton*, 554 N.W.2d at 535–36; *Hulme II*, 480 N.W.2d at 43. I do not believe there is a great difference between the substantial-factor test in *Hulme II* and *City of Hampton* and the motivating-factor or played-a-part test in *DeBoom*. But to the extent there is any distance between the two standards, this case presents an opportunity to close that distance.

By adopting a unified approach to status-based and retaliation causation, we would avoid juror confusion. We would avoid what Justice Ginsberg noted would be the result in *Nassar*, namely, that different causation standards would cause jurors to "puzzle over the rhyme or reason for the dual standards." 570 U.S. at ___, 133 S. Ct. at 2535. Such a double standard would be "virtually certain to sow confusion" in its practical application. *Id.* at ___, 133 S. Ct. at 2546. The different standards are made even more problematic by the fact that the status-based and retaliatory conduct will have an overlapping or "symbiotic relationship," as Justice Ginsberg suggested. *Id.* at ___, 133 S. Ct. at 2535. Retaliation is simply another form of sex discrimination. *Jackson*, 544 U.S. at 174, 125 S. Ct. at 1504. I would thus conclude the motivating-factor or played-a-part test that applies for status-based discrimination should also apply in retaliation claims under the ICRA.

In reaching this conclusion, I note the *Nassar* case has no bearing in the interpretation of the ICRA. The legislative history behind the status-classification and retaliation provisions of Title VII discussed in *Nassar* is fundamentally different than the legislative history behind the ICRA. *Nassar* relied extensively on the difference in congressional language between causation for status-based claims and causation for retaliation claims that arose after the enactment of the Civil Rights Act of 1991. 570 U.S. at ___, 133 S. Ct. at 2529 (majority opinion).

In light of the Civil Rights Act of 1991, the text of Title VII is now fundamentally different than the text of the ICRA with respect to the causation requirements in status-based and retaliation cases. Under Title VII, the motivating-factor test was explicitly incorporated into status-based discrimination, but the same change was not introduced into the retaliation section of Title VII. Here, our caselaw has defined causation in the status-based discrimination clause as being a motivating factor and the same causation language is used in the retaliation section of the ICRA. The reasoning of *Nassar* is thus completely inapplicable here.

Aside from the markedly different legislative history, I would reject *Nassar* for other reasons. In particular, I am unpersuaded by the notion that higher standards for a retaliation claim are required in light of the number of complaints filed with the EEOC. At the outset, it is odd that a provision of substantive law should be affected by the number of administrative complaints made to an agency responsible under a statute to adjust such claims. If the number of claims decreases to a trickle, does that provide a basis for lessening the substantive standards? Can it be that a substantive legal standard expands and contracts based upon its use?

Further, it makes no sense to limit relief for very substantial and powerful claims, like those in *Nassar*, in order to also limit frivolous claims. Other tools are available. A charge of discrimination may be filed under the ICRA only under penalty of perjury. A court may award attorneys' fees as a sanction for claims brought in bad faith. Attorneys who file false claims are subject to ethical sanctions. *See generally* Sandra F. Sperino & Suja A. Thomas, *Fakers and Floodgates*, 10 Stan. J. C.R. & C.L. 223, 228 (2014). Further, there is no evidence that a

heightened standard of causation would deter false claims. A person willing to file a false claim is not likely to be affected by a higher substantive causation standard.

Further, the mere existence of an increase in EEOC claims is not a powerful empirical tool. The executive branch, through an amicus brief filed by the United States Department of Justice, did not advance the argument and supported the lower motivating-factor standard for discrimination claims. *See* Brief for the United States as Amicus Curiae Supporting Respondent at 7, *Nassar*, 570 U.S. ___, 133 S. Ct. 2517 (No. 12-484), 2013 WL 1462056, at *7. Further, the EEOC—through its guidelines—advocated a motivating-factor standard. U.S. Equal Emp't Opportunity Comm'n, *EEOC Compliance Manual: EEOC Directives Transmittal No. 915.003* (May 20, 1998), https://web.archive.org/web/20040109231351/https://www.eeoc.gov/policy/docs/retal.html [hereinafter *EEOC Manual 1998 Update*] (replacing section 614 in the 1991 Manual); *see also* 2 U.S. Equal Emp't Opportunity Comm'n, *EEOC Compliance Manual* § 614.3(e), at 614–10 (Dec. 1, 1991) (stating the protected action must be "at least a factor" in the retaliation). Thus, the agency principally responsible for dealing with workplace discrimination, the EEOC, did not raise the argument itself about filing of frivolous claims and siphoning of its resources.[32]

The majority in *Nassar* believed it was in a better position to judge the administrative impact of substantive retaliation law on filings. *See*

---

[32] *See also* U.S. Equal Emp't Opportunity Comm'n, *Theories of Discrimination: Intentional and Unintentional Employment Discrimination* A–19 (May 1995) ("The retaliation provisions [of the EPA, ADA, and ADEA] provide exceptionally broad protection to individuals who file charges or otherwise aid the EEOC's enforcement function. It is the EEOC's policy to expedite the investigation of retaliation charges and seek injunctive relief, since it has the unique interest of preserving the integrity of its investigative process and preventing a chilling effect on the willingness of individuals to protest discriminatory conduct.").

570 U.S. at ___, 133 S. Ct. at 2531–32. Yet, the *Nassar* Court had no evidence of the reasons for the increase in retaliation claims. The increase in claims may reflect an increased awareness of the availability of remedies. And, the failure to report civil rights claims for fear of retaliation may well continue to be an intractable problem that should not be exacerbated by imposing a higher substantive law standard on causation. *See* Deborah L. Brake & Joanna L. Grossman, *The Failure of Title VII as a Rights-Claiming System*, 86 N.C. L. Rev. 859, 897–900 (2008); Deborah L. Brake, *Retaliation*, 90 Minn. L. Rev. 18, 25–26 (2005) [hereinafter Brake*, Retaliation*]; Laura Beth Nelson & Robert L. Nelson, *Rights Realized? An Empirical Analysis of Employment Discrimination Litigation as a Claiming System*, 2005 Wis. L. Rev. 663, 673–75 (2005). As noted in *Crawford v. Metropolitan Government of Nashville & Davidson County*, "[f]ear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination." 555 U.S. 271, 279, 129 S. Ct. 846, 852 (2009) (quoting Brake, *Retaliation*, 90 Minn. L. Rev. at 20). The higher standard is inconsistent with the unfettered access to the remedial system espoused in *Smith v. Jackson*, 544 U.S. 228, 233, 125 S. Ct. 1536, 1540–41 (2005).

In the end, once the *Nassar* rhetoric is examined, the majority appears to have been motivated by "zeal to reduce the number of retaliation claims filed against employers." 570 U.S. at ___, 133 S. Ct. at 2547 (Ginsberg, J., dissenting). The lowered protection from retaliation will tend to defeat the early reporting of harassment claim and their prompt adjustment. Ernest F. Lidge, III, *The Necessity of Expanding Protection from Retaliation for Employees Who Complain About Hostile Environment Harassment*, 453 U. Louisville L. Rev. 39, 56 (2014). The approach in *Nassar* is inconsistent with the observation in *Burlington*

*Northern* that "[i]nterpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends." 548 U.S. at 67, 126 S. Ct. at 2414. And certainly the flavor of the majority opinion in *Nassar* does not reflect the command of Iowa Code section 218.1(2) to broadly construe provisions of the ICRA.

Based on the above reasoning, we conclude the reasoning of *Nassar* should be rejected under the ICRA. The "because of" language in the status-based discrimination provision of the ICRA should be interpreted the same as the "because of" language for retaliation claims.

We have not used identical language in our past cases dealing with causation in retaliation cases. In *Hulme II,* 480 N.W.2d at 43, and *City of Hampton,* 554 N.W.2d at 535, we used the substantial-factor language, but in *DeBoom,* 772 N.W.2d at 13, we employed the motivating-factor or played-a-part test.

There are two ways to address the apparent difference in the language of our cases. One is to simply state that the difference in language in the cases inconsequential and that the instruction in this case was sufficient on the law. That is the position taken by a commentator after review of the disparate federal caselaw of retaliation causation. Martin J. Katz, *The Fundamental Incoherence of Title VII: Making Sense of Causation in Disparate Treatment Law,* 94 Geo L.J. 489, at 507–10 (2006) (indicating there is no difference between "substantial factor" and "motivating factor" formulations but, as between the two, endorsing an "a factor," "a role," or "a motivating factor" formulation.). To the extent there is a difference, however, we would go with our more recent formulation in *DeBoom,* 772 N.W.2d at 13, where the issue of level of causation was a contested issue, and not with the older approach in

*Hulme II*, 480 N.W.2d at 43, and *City of Hampton*, 554 N.W.2d at 535, where the question of level of causation was not disputed by the parties. The *DeBoom* causation test, to the extent it is different than the approach in *Hulme II* and *City of Hampton*, is more protective of the channels of communication that are so essential to the effective enforcement of the ICRA.

**V. Instructions Regarding "Materially Adverse Action" in Retaliation Cases.**

**A. Overview of Issue.** Neither the ICRA nor federal statute requires a plaintiff make a showing of a "materially adverse action" in order to support a retaliation claim. Nonetheless, the United States Supreme Court has grafted such a requirement onto Title VII and many courts have followed the Supreme Court's lead. *See Burlington Northern*, 548 U.S. at 68, 126 S. Ct. at 2415 ("In our view, a plaintiff must show that a reasonable employee would have found the challenged action materially adverse . . . ."); Rachel K. Alexander, *Taking the Detour Around Defending Protected Activity: How* Burlington Northern v. Santa Fe Railway Co. v. White *Unnecessarily Complicates Litigation of Retaliation Claims*, 27 Rev. Litig. 333, 350–52 (2008) (describing that the materially-adverse-action standard has been read into state antidiscrimination statutes by courts).

The parties in this case do not contest the basic proposition that a plaintiff in a retaliation case must show materially adverse action. The question is, instead, whether the trial court's instructions accurately described adverse action necessary to support a retaliation claim under the ICRA.

**B. Challenged Trial Court Instructions.** The district court's instruction defined "adverse actions" required to support a retaliation claim under the ICRA as follows:

> [A]ny action which has material consequences to an employee. It is anything that might dissuade a reasonable person from making or supporting an allegation of discrimination or harassment.
>
> It includes but is not limited to such employment actions as constructive discharge, *reprimands or other threats of reprimands*, a change in opportunities, *false accusations or complaints, being investigated, being placed on performance improvement plan, being placed on probation or other actions which adversely affect or undermine the position of the employee.* It also includes an employer *seeking out negative feedback* on an employee or *condoning or encouraging other employees to complain about her.* You should judge whether an action is sufficiently adverse from the point of view of a reasonable person in the plaintiff's positions.

(Emphases added.)

HES had offered the following instruction on adverse action:

> [A]n "adverse employment action" is an action that detrimentally affects the terms, conditions, or privileges or employment. Changes in duties or working conditions that cause no materially significant disadvantage to the employee are not adverse employment actions. It includes, but is not limited to, employment actions such as termination of employment, failure to promote, or any action that would discourage a reasonable employee from making a complaint of harassment. Giving an employee a performance improvement plan or negative employment review is not "adverse employment action" unless they are later used as a basis to alter the employee's terms or conditions of employment in a detrimental way. Both the action and its context must be examined.

**C. Positions of the Parties.** HES asserts the district court's instruction was inaccurate because it includes actions which do not "materially significantly disadvantage" the employee. According to HES,

no court has ever found the actions italicized in the instructions to amount to an adverse employment action.

Haskenhoff notes the first paragraph of the instruction provides that in order to be an adverse action, the action must have "material consequences" for the employee. Further, the jury found Haskenhoff was constructively discharged. Thus, the jury plainly found there was a legally sufficient adverse action by the employer. As a result, to the extent the instruction is flawed, Haskenhoff argues it is harmless.

**D. Federal Caselaw and EEOC Authority on Scope of "Materially Adverse Action" in the Context of Retaliation Claims.**

1. *Introduction.* With respect to retaliation, Title VII states that it is an unlawful employment practice for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation proceeding or hearing under this subchapter." 42 U.S.C. § 2000e-3(a). The phrase "to discriminate" is not defined by the statute. Congress left that question for the courts. Unlike the status-discrimination provision of Title VII, however, the retaliation provision does not contain the phrase "terms, conditions, or privileges of employment." 42 U.S.C. § 2000e-2(a). The presence of the phrase "terms, conditions, or privileges of employment" in the status-discrimination section of Title VII, when it is excluded in the retaliation provision, gives rise to the inference that Congress has made a deliberate choice.

2. *EEOC 1998 guidelines.* The EEOC has confronted the question of what constitutes adverse action sufficient to support a retaliation claim under Title VII in revisions to its compliance manual issued in

1998. *See EEOC Manual 1998 Update.* According to the EEOC, while the "most obvious types of retaliation are denial of promotion, refusal to hire, denial of job benefits, demotion, suspension, and discharge" retaliation can also include "threats, reprimands, negative evaluations, harassment, or other adverse treatment." *Id.*; *see EEOC v. Bd. of Governors of State Colls. & Univs.*, 957 F.2d 424 (7th Cir. 1992); *Christopher v. Strouder Mem'l Hosp.*, 936 F.2d 870, 873–74 (6th Cir. 1991); *Johnson v. Palma*, 931 F.2d 203 (2d Cir. 1991).

The EEOC, however, rejected the "ultimate employment action" test adopted by the Eighth Circuit in *Ledergerber v. Strangler*, 122 F.3d 1142 (8th Cir. 1997), and the "terms and conditions of employment" test embraced by the Fourth Circuit in *Munday v. Waste Management of North America*, 126 F.3d 239 (4th Cir. 1997). *EEOC Manual 1998 Update.* According to the EEOC, such tests were "unduly restrictive." *Id.* While the EEOC recognized that "petty slights and trivial annoyances are not actionable," it stressed the degree of harm suffered by the individual "goes to the issue of damages, not liability." *Id.* (quoting *Hashimoto v. Dalton*, 118 F.3d 671, 676 (9th Cir. 1997)).

The EEOC justified its approach based on text and policy. On text, the EEOC emphasized that while the status discrimination of Title VII states it is unlawful to discriminate against a person with respect to "terms, conditions, or privileges of employment," the retaliation provision of Title VII has no such limitation. *EEOC Manual 1998 Update*; *see* 42 U.S.C. § 2000e-2.

On policy, the EEOC emphasized the primary purpose of the antiretaliation provisions is to "maintain[ ]unfettered access to the statute's remedial mechanisms." *EEOC Manual 1998 Update*; *see also Robinson v. Shell Oil Co.*, 519 U.S. 337, 345, 117 S. Ct. 843, 848 (1997).

According to the EEOC, an interpretation of Title VII "that permits some forms of retaliation to go unpunished would undermine the effectiveness of the EEOC statutes and conflict with the language and purpose of the anti-retaliation provisions." *EEOC Manual 1998 Update*; *see generally* Joel A. Kravetz, *Deterrence v. Material Harm: Finding the Appropriate Standard to Define an "Adverse Action" in Retaliation Claims Brought Under the Applicable Equal Employment Opportunity Statutes*, 4 U. Pa. J. Lab. & Emp. L. 315, 355–65 (2002).

3. *The* Burlington Northern *case.* Prior to the seminal United States Supreme Court case of *Burlington Northern*, the federal courts splintered on the question of what a plaintiff must show to support a retaliation claim under Title VII.

In *Ray v. Henderson*, the Ninth Circuit outlined the differing approaches to retaliation claims in the various circuits. 217 F.3d 1234, 1241–42 (9th Cir. 2000). According to *Ray*, the First, Seventh, Tenth, Eleventh, and D.C. Circuits all "take an expansive view" of the type of actions that can be considered adverse employment actions. *Id.* at 1241; *see Wideman v. Wal-Mart Stores*, 141 F.3d 1453, 1456 (11th Cir. 1998); *Knox v. Indiana*, 93 F.3d 1327, 1334 (7th Cir. 1996); *Corneveaux v. CUNA Mut. Ins. Grp.*, 76 F.3d 1498, 1507 (10th Cir. 1996); *Wyatt v. Boston*, 35 F.3d 13, 15–16 (1st Cir. 1994); *Passer v. Am. Chem. Soc.*, 935 F.2d 322, 330–31 (D.C. Cir. 1991). In contrast, *Ray* cited the Second and Third Circuits as holding adverse action is something that "materially affects the terms and conditions of employment." 217 F.3d at 1242; *see Robinson v. Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1977); *Torres v. Pisano*, 116 F.3d 625, 640 (2d Cir. 1997). Finally, the *Ray* court noted the Fifth and Eighth Circuits had adopted the most restrictive test, namely, the "ultimate employment action" test which

required actions such as hiring, firing, promoting, and demoting to support a retaliation claim. 217 F.3d at 1242; *see Mattern v. Eastman Kodak Co.*, 104 F.3d 702, 707 (5th Cir. 1997); *Ledergerber*, 122 F.3d at 1144.

In 2006, the Supreme Court entered the fray in *Burlington Northern*, 548 U.S. at 53, 126 S. Ct. at 2405. Under *Burlington Northern*, a plaintiff must show an employment action is materially adverse, "which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 68, 126 S. Ct. at 2415. In so concluding, the court rejected the "terms, conditions, or benefits" and the "ultimate employment decision" standards percolating through the federal courts in the Second, Third, Fifth, and Eighth Circuits. *Id.* at 61–63, 126 S. Ct. at 2411–12.

In *Burlington Northern*, the Supreme Court adopted a general, functional approach to the retaliation provision of Title VII. *See id.* at 68, 126 S. Ct. at 2415. The *Burlington Northern* Court tied material adversity directly to the purpose of the retaliation provision of Title VII— encouraging unfettered access to Title VII. *Id.* at 62–63, 126 S. Ct. at 2411–12. In determining whether the employer's action "might well have dissuaded a reasonable worker from making or supporting a charge of discrimination," the Court instructed that the question be determined from "the perspective of a reasonable person in the plaintiff's position under all the circumstances." *Id.* at 71, 126 S. Ct. at 2417. Under *Burlington Northern*, trial courts are required to examine the specific facts from someone in the plaintiff's position, a highly individualized inquiry. *See id.*

Thus, as the *Burlington Northern* Court repeatedly emphasized, "context matters" because an "act that would be immaterial in some

situations is material in others." *Id.* at 69, 126 S. Ct. at 2416. The Supreme Court emphasized "the significance of any given act of retaliation will often depend upon the particular circumstances." *Id.* The inquiry is fact specific to the workplace and to the individual pressing the retaliation claim. *Id.* The plain implication is that except in the most marginal of cases, because of their fact intensive nature, retaliation claims should survive summary judgment.

4. *Post-*Burlington Northern *federal caselaw.* *Burlington Northern* was something of a bombshell in the employment law world. As a general matter, there seemed to be little question that under *Burlington Northern,* more retaliation cases would survive summary judgment. Further, most of the post-*Burlington Northern* federal caselaw recognized that in determining whether a plaintiff has suffered disparate treatment, the "terms, conditions, and privileges of employment" test was not applicable in retaliation cases. The lower federal courts widely came to recognize that in retaliation cases, a lesser standard applies. *See Powell v. Lockhart*, 629 F. Supp. 2d 23, 41 (D.D.C. 2009) (holding that placing employee on performance improvement plan was insufficient to support disparate treatment claim, but could support retaliation claim because of lesser standard).

*Burlington Northern* emphasized the proper test for a retaliation case was "material adverse action" which "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." 548 U.S. at 68, 126 S. Ct. at 2415. This feature of *Burlington Northern* appears to be lost in some of the cases, which seem to require tangible impact on "terms, conditions, and privileges of employment." *See Sutherland v. Mo. Dep't of Corrs.*, 580 F.3d 748, 752 (8th Cir. 2009) (rejecting adverse employment action when plaintiff "had

no reductions in pay, salary, benefits, or prestige"). And, in other cases, the test applied by the courts seems to be too high. For example, in *Deleon v. Kalamazoo County Road Commission*, the Sixth Circuit suggested in a retaliation case that the question was whether a reassignment without loss of pay was "objectively intolerable" to a reasonable person. 739 F.3d 914, 919 (6th Cir. 2014). This formulation seems to be more demanding than a *Burlington Northern* standard where the plaintiff must show that a reasonable person "might well have been deterred" from supporting or filing a charge.

Many post-*Burlington Northern* cases recognize that the totality of the circumstances must be considered when the "might well have deterred" standard is applied and bright-line declarations about whether certain actions were sufficient or insufficient were generally inappropriate under *Burlington Northern*. For example, following *Burlington Northern*, the Fifth Circuit in *Thompson v. Waco*, held that a change in job responsibilities did not automatically qualify as an adverse impact, but it could be adverse action depending upon a jury's view of the facts. 764 F.3d 500, 504–05 (5th Cir. 2014).

A related concept is that certain actions individually might not be sufficient, but cumulatively such actions may arise to adverse action for purposes of supporting a retaliation claim. For example, in *Sanford v. Main Street Baptist Church Manor, Inc.*, the Sixth Circuit recognized that although some of the incidents might not rise to the level of adverse action, "the incidents taken together might dissuade a reasonable worker from making or supporting a discrimination charge." 327 F. App'x 587, 599 (6th Cir. 2009); *see also Vega v. Hempsted Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015) (finding combination of being assigned absent students, temporary paycheck reduction, and failure to notify of

curriculum claim cumulatively amount to "material adverse action"); *Alvarado v. Fed. Express Corp.*, 384 F. App'x 585, 589 (9th Cir. 2010) (holding delayed paychecks, denial of personal time, criticism of work performance, and shift change were adverse actions); *Shannon v. Bellsouth Telecomm., Inc.*, 292 F.3d 712, 715–16 (11th Cir. 2002) (stating reassignment alone is not adverse action, but reassignment, together with denial of overtime and allocation of a more difficult assignment in an unairconditioned van, amounted to adverse action); *Ridley v. Costco Wholesale Corp.*, 217 F. App'x 130, 135 (3d Cir. 2007) (holding while jury verdict finding demotion was not retaliatory, combination of other events after demotion, including transfer to warehouse, counseling notices for minor incidents, and failure to investigate these incidents satisfied *Burlington Northern* test); *see generally* Joan M. Savage, *Adopting the EEOC Deterrence Approach to the Adverse Employment Action Prong in Prima Facie Case for Title VII Retaliation*, 46 B.C. L. Rev. 215, 235–36 (advocating broad case-by-case approach).

*Burlington Northern* recognized that petty slights, minor annoyances, and simple lack of good manners is not enough to establish *material* adverse action to support a retaliation claim. Some federal courts have regarded this declaration as an invitation to take a laundry-list approach and declare, as a matter of law, that certain types of actions never amount to material adverse actions. Other federal cases, however, are more sensitive to context.

5. *EEOC August 2016 enforcement guidelines on retaliation and related issues.* In August 2016, the Equal Employment Opportunities Commission issued its "Enforcement Guidelines on Retaliation and Related Issues," superseding its previous guidance in 1998. *See EEOC Enforcement Guidance on Retaliation and Related Issues* (Aug. 25, 2016),

https://www.eeoc.gov/laws/guidance/retaliation-guidance.cfm [hereinafter *EEOC Enforcement Guidance*]. The new guidelines generally embraced *Burlington Northern* and provided the commission's view of retaliation claims in a post-*Burlington Northern* world. *Id.* II.B.1.

Among other things, the EEOC emphasized that combinations of incidents could cumulatively amount to a material adverse action even if the individual incidents, considered alone, might not qualify. *Id.* The EEOC further emphasized that under *Burlington Northern,* potential retaliatory incidents must be considered in context and not in isolation. *Id.*

The EEOC addressed the question of what type of actions might rise to the level of a material adverse action. *Id.* II.B.2. According to the EEOC, "[t]he most obvious types of adverse actions are denial of promotion, refusal to hire, denial of job benefits, demotion, suspension, and discharge." *Id.* But the EEOC went on to say,

> Other types of adverse actions may include work-related threats, warnings, reprimands, transfers, negative or lowered evaluations, transfers to less prestigious or desirable work or work locations, and any other types of adverse treatment that in the circumstances might well dissuade a reasonable person from engaging in protected activity.

*Id.*

The EEOC concluded the determination of whether a plaintiff has made the necessary showing of material adverse action to support a retaliation claim was fact driven. *Id.* According to the EEOC,

> A fact–driven analysis applies to determine if the challenged employer action(s) in question would be likely to deter participation or opposition. To the extent some lower courts applying *Burlington Northern* have found that some of the above-listed actions can never be significant enough to deter protected activity, the Commission concludes that such a categorical view is contrary to the context-specific analysis,

broad reasoning, and specific examples endorsed by the Supreme Court.

*Id.*

The EEOC also addressed the question of whether a materially adverse action required harm to the employee. *Id.* The EEOC concluded it did not. *Id.* According to the EEOC, the degree of harm suffered by the individual "goes to the issue of damages, not liability." *Id.* (quoting *Hashimoto v. Dalton*, 118 F.3d 671, 675 (9th Cir. 1997)).

Finally, the EEOC distinguished between the standard required to prove a hostile environment claim and the standard to show retaliation. *Id.* As noted by the EEOC, "[t]he threshold for establishing retaliatory harassment is different than for discriminatory hostile environment." *Id.* II.B.3.

According to the EEOC, harassment sufficient to support a retaliation claim does not need to be severe or pervasive enough to alter the terms and conditions of employment. *Id.*

**E. State Caselaw on Retaliation Requirements.** Neither party cited any state caselaw on the question of what constituted adverse action sufficient to support a retaliation claim. We have been able to discern no clear pattern in the state caselaw.

Some state cases recognize the impact of *Burlington Northern.* For instance, in *Donovan v. Broward County Board of Commissioners*, a Florida court of appeals recognized that *Burlington Northern* found the ordinary approach to discrimination cases too limiting in the context of retaliation claims. 974 So. 2d 458, 461 (Fla. Dist. Ct. App. 2008). The *Donovan* court applied the broadened *Burlington Northern* standard. *Id.*

Another case that employs *Burlington Northern* contextualization is *Ellis v. Jungle Jim's Market, Inc.*, 44 N.E.3d 1034 (Ohio Ct. App. 2013).

In *Ellis*, an employee was transferred from the seafood department into a bagging position after reporting workplace harassment. *Id.* at 1052. The plaintiff produced evidence that the transfer significantly diminished her job responsibilities and that she would learn fewer skills in the bagging position. *Id.* at 1053–54. The Ohio court held that she raised an issue of fact with respect to whether the transfer amounted to a "material adverse action" by her employer. *Id.* at 1054.

Similarly, in *Hoffelt v. Illinois Department of Human Rights*, a plaintiff claiming retaliation offered evidence that she was called names and treated in a demeaning manner, was assigned to a position known as "a punishment post," and had her requests for compensatory leave denied under circumstances in which they were granted in the past. 867 N.E.2d 14, 21 (Ill. Ct. App. 2006). Citing *Burlington Northern*, the Illinois court concluded that under the circumstances, she "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Id.* at 20.

Another state court has emphasized the need to broadly construe the retaliation provision in its civil rights legislation. In *Albunio v. City of New York*, the court emphasized the retaliation provision would be construed "broadly in favor of discrimination plaintiffs, to the extent such a construction is possible." 847 N.E.2d 135, 137 (N.Y. 2011); *see also Roa v. Roa*, 955 A.2d 930, 938 (N.J. Super. Ct. App. Div. 2008) (adopting *Burlington Northern* approach). At least one state court, however, has characterized the *Burlington Northern* inquiries as ordinarily posing questions of law. In *Montgomery County v. Park*, the Texas Supreme Court held that changes in a job position did not support a retaliation claim. 246 S.W.3d 610, 615–16 (Tex. 2007).

**F.  Iowa Caselaw on "Adverse Employment Action."**  We have considered the meaning of "adverse employment action"[33] in a limited number of cases.  In most of them we have indicated what the vague term "adverse employment action" might include, not what it excludes.  In the pre-*Burlington Northern* case of *Channon v. United Parcel Service, Inc.*, we noted that "[a] wide variety of actions, some blatant, some subtle," can qualify as "adverse employment actions."  629 N.W.2d 835, 863 (Iowa 2001).  Indeed, we have indicated that whether an adverse employment action occurred "will normally depend on the facts of each situation."  *Id.* at 862.  This fact-specific language is consistent with the strain in the federal law that recognizes, as did *Burlington Northern*, that the determination is to be made under all of the facts and circumstances.  *See* 548 U.S. at 71, 126 S. Ct. at 2417.  We cited with approval cases that found loss of title and committee assignments, transfers, and reduction of supervisor status as amounting to "adverse employment actions."  *Channon*, 629 N.W.2d at 863–64.

Yet, we have indicated that "[c]hanges in duties or working conditions that cause no materially significant disadvantages to the employee are not adverse employment actions."  *Id.* at 862.  Of course, the *Channon* formulation that an "adverse employment action" must be a "materially significant disadvantage," *id.*, is somewhat circular and not very helpful.  And, it is inconsistent with the *Burlington Northern* standard.  In *Channon*, however, we concluded when the plaintiff offered evidence tending to show she faced ridicule, a constructive demotion,

---

[33]*Burlington Northern* makes it clear that the adverse action might not be employment related and thus the plaintiff in a retaliation case must show "adverse action" rather than "adverse employment action."  *See* 548 U.S. at 57, 126 S. Ct. at 2408.  Nonetheless, I will use the nomenclature used by our pre-*Burlington Northern* precedents.

and open hostility about her lawsuit, the record was sufficient to support a finding of adverse employment action. *Id.* at 866.

The next pre-*Burlington Northern* Iowa retaliation case is *Estate of Harris*, 679 N.W2d 673. In that case, the district court rather remarkably concluded that a punch to the chest delivered by a supervisor that ultimately killed the employee was not an "adverse employment action" sufficient to support a retaliation claim. *Id.* at 676. We reversed, noting it was for the jury to determine whether the action was simply an act of machismo or should be considered something more sinister. *Id.* at 679.

In our analysis in *Estate of Harris*, we favorably cited a federal district court case for the proposition that moving an employee to an isolated corner might be sufficient to support a retaliation claim. *Id.* at 678; *see Harris v. Richards Mfg. Co.*, 511 F. Supp. 1193, 1203 (W.D. Tenn. 1981), *aff'd in part and rev'd in part*, 675 F.2d 811 (6th Cir. 1982). We further cited *Ray*, 217 F.3d 1234, for the proposition that federal circuit courts were split on how broadly to determine adverse employment action.[34] *Estate of Harris*, 679 N.W2d at 679. Nowhere in *Estate of Harris*, however, did we describe precisely what the appropriate standard was for determining an "adverse employment action" for purposes of a retaliation claim.

---

[34]We also cited *Farmland Foods* for the proposition that materially adverse employment action embraces a wide variety of facts. 672 N.W.2d at 742. *Farmland Foods* involved a claim of a hostile environment, not a retaliation claim. *Id.* The substantive standard for establishing a hostile-environment claim is not the same as that for establishing a retaliation claim. For example, under Title VII, the focus on a hostile-environment claim is "terms and conditions of employment," while the focus on a retaliation claim is whether the action might well reasonably deter an employee from pursuing a civil rights claim. *Burlington Northern*, 548 U.S. at 69, 126 S. Ct. at 2415–16. Yet, the application of both standards generally involve factual inquiries. *See McElroy*, 637 N.W.2d at 498–500.

Our last retaliatory discharge case is the pre-*Burlington Northern* case of *Boyle*, 710 N.W.2d 741. In *Boyle*, the district court found against the plaintiff on the underlying harassment claim and appeared to believe this resolution rendered the plaintiff's alternative claim that she was discharged in retaliation for making her complaint moot. *Id.* at 750. We reversed. *Id.* at 752. In *Boyle*, however, we did not have occasion to explore the requirements of retaliatory discharge other than to emphasize that a retaliatory discharge claim did not depend upon the merits of the underlying complaint. *Id.*

On balance, we should recognize that our pre-*Burlington Northern* adverse-employment-action cases did not have the benefit of *Burlington Northern*'s key insight that the test for material adverse action in the context of retaliation claim was whether a reasonable person would likely be deterred from utilizing complaint procedures, and not the familiar terms, conditions, and privileges of employment test that applies to disparate treatment cases. *See* 548 U.S. at 73, 126 S. Ct. at 2417. Thus, cases like *Channon* embraced what federal law now recognizes is the wrong test.

Although our cases reflect superseded federal law, they still generally recognized the subtlety of the workplace and the need to consider factual issues related to employment claims in light of the totality of facts and circumstances. *See Channon*, 629 N.W.2d at 862. Our cases further reflect the desirability of jury determinations of disputed factual issues in the retaliation context. *See Estate of Harris*, 679 N.W.2d at 678.

**G. Discussion.** At the outset, we are obliged to construe the ICRA broadly to effectuate its purposes. Iowa Code § 216.18(1). As has already been noted, maintaining clear channels for pursuing complaints

is critical to the regime established by the ICRA. *Cf. Robinson*, 519 U.S. at 346, 117 S. Ct. at 848 (stating purpose of retaliation provision to maintain "unfettered access to statutory remedial mechanisms").

The parties both accept the notion that we must determine what is a material adverse action for purposes of a retaliation claim under the ICRA. I have little hesitance in embracing the approach of *Burlington Northern*, the EEOC, and the better reasoned caselaw that the test is whether a reasonable employer might be deterred from filing a complaint by the conduct in question. The purpose of a retaliation claim is to keep the access to the channels of civil rights law clear and open. The test for retaliation should be tied to its fundamental purpose.

The test for material adverse action for purposes of retaliation is thus distinct from the test for an adverse employment action for purposes of a disparate-treatment claim. As stated by the EEOC, the question of tangible harm goes to damages, not to liability, for retaliatory conduct. To the extent our prior cases suggest otherwise, they should be overruled. I would thus specifically reject the approach of the mostly pre-*Burlington Northern* Eighth Circuit cases that indicate a material adverse action must include tangible employment action or must affect terms and conditions of employment. *See* Scott Rosenberg & Jeffrey Lipman, *Developing a Consistent Standard for Evaluating a Retaliation Case Under Federal and State Civil Rights Statutes and State Common Law Claims: An Iowa Model for the Nation*, 53 Drake L. Rev. 359, 384–85 (2005) (urging adoption of Ninth Circuit standard in *Ray*). As stated by the EEOC, in addition to the most obvious adverse actions such as denial of promotion, refusal to hire, denial of job benefits, demotion, suspension and discharge,

[o]ther types of adverse action may include work-related threats, warnings, reprimands, transfers, negative or lowered evaluations, transfers to less prestigious or desirable work or work locations, and any other types of adverse treatment that in the circumstances might well dissuade a reasonable person from engaging in protected activity.

*EEOC Enforcement Guidance* II B.2.

I would also agree with *Burlington Northern*, the EEOC, and the better reasoned caselaw that the determination of whether a plaintiff has introduced evidence sufficient to establish a material adverse action is fact specific and will, in most cases, generate a jury question. Of course, petty incidents in isolation do not suffice to show a materially adverse impact, but determining what is so petty that it would not deter a reasonable person from utilizing complaint procedures is usually best decided by a diverse jury with a mix of real world experience rather than by the court. *Cf. Bell v. Johnson*, 308 F.3d 594, 603–05 (6th Cir. 2002) (holding unless claimed retaliatory action is truly inconsequential, the plaintiff's First Amendment claim should go to the jury); *Gallagher v. Delaney*, 139 F.3d 338, 342 (2d Cir. 1988) (noting that federal judges usually live "in a narrow segment of the enormously broad American socio-economic spectrum" and generally lack "the current real-life experience required in interpreting subtle sexual dynamics of the workplace, based on nuances, subtle perception, and implicit communications").

We should embrace the notion that while each individual act might not provide sufficient evidence of a material adverse action, a combination of relatively petty slights poses a different issue. Ordinarily, the cumulative weight of multiple or repetitive actions will generate a fact question for the jury to determine. *Sanford*, 327 F. App'x at 599; *Vega*, 801 F.2d at 90; *Ridley*, 217 F. App'x at 135.

Finally, I would reject the laundry-list notion that various employment actions such as reprimands or negative job evaluations, transfers without loss of pay, or "snubbing" may be categorically regarded as never arising to the level of material adverse action. Take the negative job evaluation. In some setting, a negative job evaluation might not matter at all. A negative job evaluation for an employee approaching retirement might produce a cynical grunt, but not much more. On the other hand, a negative job evaluation for an economically struggling head of household who is anxious to climb the work ladder to provide a better life for his or her family might reasonably feel quite different.[35] *See, e.g., Walker v. Johnston,* 798 F.3d 1085, 1095 (D.C. Cir. 2015) (holding denial of deserved rise in performance rating may be actionable); *Porter v. Shah,* 606 F.3d 809, 817–18 (D.C. Cir. 2010) (stating interim performance of "borderline unacceptable" not materially adverse when delivered orally, no written record was made, and was superseded by end of the year review); *see generally EEOC Manual* 1998 Update § 5.B.2 n.113. This is precisely the kind of contextualization called for in *Burlington Northern,* which noted that a transfer to a night shift would be inconsequential for some, but not for others.[36] Of course, an insistence on contextualization is a two-way street. It applies to plaintiffs as well as defendants.

---

[35]In one study, ninety-five laws students at the University of Cincinnati were surveyed about what kind of job actions would dissuade them from filing a civil rights complaint. *See* Sperino, *Retaliation,* 67 Fla. L. Rev. at 2045. In the survey, eighty percent indicated that a negative evaluation either would or might dissuade them from pursuing a potential claim. *Id.*

[36]Depending on the context, "snubbing" could easily be regarded by a factfinder as something that might well have dissuaded a reasonable worker from making or supporting a charge of discrimination. *See* B. Glenn George, *Revenge,* 83 Tul. L. Rev. 439, 443 (2008).

In general, the first paragraph of the instruction accurately captures the test of material adverse action in the retaliation context. It emphasizes that material adverse action is action that is likely to deter a reasonable person from filing a complaint. That is the legal standard I would adopt under the ICRA.

The second paragraph of the instruction, however, is problematic. It offers the unqualified statement that material adverse action includes a list of actions. A reasonable jury could interpret the instruction to mean that if one of the listed actions is present, material adverse action is necessarily present as a matter of law, end of story. But, as stated above, the test is whether a reasonable person in the shoes of the plaintiff might well be deterred from pursuing a civil rights claim. In considering this question, as *Burlington Northern* teaches us, "context matters." *Id.* at 69, 126 S. Ct. at 2416. Though each of the listed actions, in context, separately or cumulatively, might rise to an "adverse material action" if it met the *Burlington Northern* test that it "might well deter" a reasonable person in the shoes of the plaintiff from engaging in protected activity, a jury is not compelled to make that finding as the trial court's instruction might suggest. *Id.*

Ordinarily, this instructional error would be prejudicial and require vacation of the verdict and remand for a new trial. Haskenhoff argues, however, that any error is cured by the jury's verdict finding that Haskenhoff was constructively discharged by HES. Plainly, a constructive discharge amounts to a material adverse action. 1 Andrew J. Ruzicho et al., *Employment Practices Manual* § 6B:7, Westlaw (database updated Mar. 2017) ("An actual or constructive discharge remains the clearest example of an adverse action.").

But, as pointed out in Chief Justice Cady's concurrence, there is a problem with Haskenhoff's theory that the jury's verdict on constructive discharge remedies any potential flaw in the instructions on retaliation. On questions number one and two, the jury answered in the affirmative that Haskenhoff proved her case of sexual harassment and retaliation respectively. On question number three, the jury answered in the affirmative the question of whether Haskenhoff was subject to constructive discharge. In response to question number four, the jury returned a general damage verdict of $100,000 for lost wages and benefits, $300,000 for emotional distress, and $1,000,000 for the present value of emotional distress.

While the jury did find a constructive discharge, it is not clear from the verdict form whether the jury's constructive-discharge verdict was based upon the plaintiff's claim of sexual harassment found in question one or whether it was based on the plaintiff's claim of retaliation in question two. In order to cure the defect in the retaliation instruction, we must be able to conclude the jury found a causal relationship-protected activity giving rise to the retaliation claim and the constructive discharge.

From the jury verdict form, however, it is possible the jury believed sexual harassment in question one, and not retaliation in question two, was causally related to the constructive discharge. If so, the jury could have awarded part of the general award damages in this case based upon the faulty retaliation instruction. *See Farmers' Nat'l Bank of Oskaloosa v. Stanton,* 191 Iowa 433, 438–39, 182 N.W.647, 650 (1924). Further, we cannot say as a matter of law that Haskenhoff established a material adverse action which we have declared ordinarily involves a fact-based

determination. As a result, I agree the judgment of the district court must be reversed and the matter remanded for a new trial.

### VI. Instructions Regarding Constructive Discharge.

**A. Overview of Constructive Discharge.** The application of the constructive discharge doctrine to civil rights claims has been controversial. *See* Mark S. Kende, *Deconstructing Constructive Discharge: The Misapplication of Constructive Discharge Standards in Employment Discrimination Remedies*, 71 Notre Dame L. Rev. 39, 41–45 (1995) [hereinafter Kende] ("[B]y forcing discrimination victims to endure continuing discrimination, the constructive discharge approach [of a majority of federal courts] contravenes Title VII's purposes.").

In this case, however, the parties do not contest whether the doctrine of constructive discharge applies but instead battle over the substantive contours of constructive discharge. In exploring constructive discharge, we recognized that while constructive discharge is generally a demanding doctrine, a too stringent constructive discharge test may simply be "a sophisticated means of providing undeserved protection to employers who discriminate." *Id.* at 78.

**B. Challenged Instructions on Constructive Discharge.** The jury was instructed on constructive discharge as follows: "The employer need not really want the employee to quit. . . . The employee must show that she was subjected to sexual harassment or retaliation which made her believe there was no chance for fair treatment at Homeland."

HES had sought to instruct the jury that Haskenhoff had to show "the Defendant acted with the intent of forcing the Plaintiff to quit, or the Plaintiff's resignation was a reasonably foreseeable result of the Defendant's actions." Additionally, HES sought to instruct the jury as follows:

An employee cannot "quit and sue" and then claim to have been constructively discharged. Rather, the conditions giving rise to the resignation must be sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer. In order to amount to a constructive discharge, adverse working conditions must be unusually "aggravated" or amount to a "continuous pattern" before the situation will be deemed intolerable. Generally speaking, a single, trivial or isolate act is insufficient to support a constructive discharge claim. Finally, conditions cannot be considered intolerable unless the employer has been given a reasonable chance to resolve the problem.

### C. Positions of the Parties.

1. *HES.* HES asserts the constructive discharge instruction was erroneous because of the assertion that the employer "need not really want the employee to quit." Further, HES claims the instruction improperly injected the subjective views of Haskenkoff into the issue. Further, HES, citing *Van Meter Industrial v. Mason City Human Rights Commission*, 675 N.W.2d 503, 511 (Iowa 2004), argues the district court erred in failing to instruct that "conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem." Finally, in a footnote, HES challenges the repeated reference to "fairness" in the instruction.

2. *Haskenhoff.* With respect to the instruction regarding the fact that "the employer need not really want the employee to quit," Haskenhoff argues that this language is supported by *Van Meter*, 675 N.W.2d at 512. While the instruction did refer to fairness, Haskenhoff states the *Van Meter* case repeatedly referred to the concept of fair treatment. *Id.* at 511–12.

With respect to the question of whether the instruction was erroneous because of reference to her subjective feelings, Haskenhoff notes the instructions, taken as a whole, repeatedly referred to the

objective standard for constructive discharge. According to Haskenhoff, Instruction Nos. 33 and 34 dealing with constructive discharge contained no less than seven references to the reasonableness standard.

Haskenhoff also asserts that HES's proposed instruction that "conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem" was presented in the instructions. Haskenhoff notes the instructions stated that the "conditions . . . must be sufficiently extraordinary and egregious" that "adverse working conditions must be unusually 'aggravated' or amount to a 'continuous pattern' before the situation will be deemed intolerable," and "a single, trivial, or isolated act is insufficient to support a constructive discharge claim." In any event, Haskenhoff suggests that in light of the evidence the jury would not have found that the employer did not have a reasonable chance to resolve the issue under the evidence adduced at trial.

### D. Federal Caselaw on Constructive Discharge.

1. *Introduction.* When applying the law of constructive discharge, it appears almost universally accepted that the test of whether there is a constructive discharge is whether working conditions are sufficiently intolerable that a reasonable person in the position of the employee would have felt compelled to resign. *See* 2 Christopher Bello, *Litigating Wrongful Discharge Claims* § 7.62 n.3, at 7–260 (2013–2014 Cumulative Supp.) (collecting cases). The reasonable-person test is generally an objective test, but it is qualified by the notion that the reasonable person must be one "in the position of the employee." *Id.*

2. *Intent to create hostile environment.* The federal cases under Title VII are split on the question of whether a plaintiff in a constructive discharge case must prove employer intent. The majority view is that

constructive discharge occurs even if the employer did not intend to create the intolerable working conditions.  *See, e.g., Ramsey v. City & Cty. of Denver*, 907 F.2d 1004, 1010 (10th Cir. 1990); *Watson v. Nationwide Ins.*, 823 F.2d 360, 361 (9th Cir. 1987); *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 119 (lst Cir. 1977).  On the other hand, some cases hold that employer intent must be proved.  *See, e.g., Martin v. Cavalier Hotel Corp.*, 48 F.3d 1343, 1354 (4th Cir. 1995); *Yates v. Avco Corp.*, 819 F.2d 630, 636 (6th Cir. 1987); *Junior v. Texaco, Inc.*, 688 F.2d 377, 379 (5th Cir. 1982).

3.  *Reasonable chance to work out the problem.*  The Eighth Circuit has stated that an employee who quits without giving his or her employer a reasonable chance to work out a problem is not constructively discharged.  *Trierweiler v. Wells Fargo Bank*, 639 F.3d 456, 460 (8th Cir. 2011); *Vajdl v. Mesabi Acad. of KidsPeace, Inc.*, 484 F.3d 546, 553 (8th Cir. 2007).  A similar approach has been embraced by the Fifth and Eleventh Circuits.  *Kilgore v. Thompson & Brook Mgt., Inc.*, 93 F.3d 752, 754 (11th Cir. 1996); *Bozé v. Branstetter*, 912 F.2d 801, 805 (5th Cir. 1990).

In *Suders v. Easton*, the Third Circuit held it was *relevant* whether the employee explored alternative avenues to resolve the alleged discrimination before resigning, but that "a failure to do so will not defeat a claim of constructive discharge."  325 F.3d 432, 445–46 (3rd Cir. 2003), *vacated on other grounds sub nom Pa. State Police v. Suders*, 542 U.S. 129, 124 S. Ct. 2343 (2004).  Other federal circuits have found that the failure to attempt to resolve the problem prior to quitting as only a factor to be considered by the fact finder in determining whether a constructive discharge is present.  *Lindale v. Tokheim Corp.*, 145 F.3d 953, 956 (7th Cir. 1998); *Levendos v. Stern Entm't, Inc.*, 909 F.2d 747,

753 (3d Cir. 1991). A case out of the First Circuit took yet another position, indicating that staying on the job while seeking redress is required except in exceptional cases, *Lee-Crespo v. Schering-Plough Del Caribe Inc.*, 354 F.3d 34, 35 (1st Cir. 2003). One court found such an exceptional case when an employee correctly believed her termination was imminent. *EEOC v. Univ. of Chi. Hosps.*, 276 F.3d 326, 331–32 (7th Cir. 2002).

One federal court noted the potential tightrope that a plaintiff must show in proving a constructive discharge claim. In *Bristow v. Daily Press, Inc.*, the Fourth Circuit noted that while an employee must show his working conditions are intolerable, his "desire for reinstatement to his position belies the claim that intolerable conditions underlay his resignation." 770 F.2d 1251, 1256 (4th Cir. 1975). It is surely true that a requirement an employee remain employed in an intolerable employment environment is a concept in tension with itself.

**E. State Caselaw on Constructive Discharge.** A number of state courts have expressly considered whether an employer must have a reasonable chance to remedy the situation before a finder of fact may find that an employee was constructively discharged. In *Pollock*, the court held there was no legal requirement that an employee must complain of harassment and wait and see what happens in all circumstances. 11 S.W.3d at 761. The *Pollock* court reasoned that a failure to complain may show the employee was not constructively discharged, but not in all cases. *Id.* at 765. In some cases, according to the court, a failure to complain may indicate that other factors were at play other than the tolerability of the working conditions. *Id.* The court concluded that courts must consider the totality of the circumstances in determining whether working conditions were, in fact, intolerable. *Id.*

Later Missouri appellate court cases, however, seemed to abandon the *Pollock* approach in favor of a reasonable-chance-to-resolve requirement. *See DeWalt v. Davidson Serv./Air, Inc.*, 398 S.W.3d 491, 501 (Mo. Ct. App. 2013); *Gamber v. Mo. Dep't of Health & Senior Servs.*, 225 S.W.3d 470, 475 (Mo. Ct. App. 2010).  Other state courts, however, have followed the general approach in *Pollock.  See, e.g., Charles v. Regents of N.M. State Univ.*, 256 P.3d 29, 34–35 (N.M. Ct. App. 2010); *Ballinger v. Klamath Pacific Corp.*, 898 P.2d 232, 238 (Or. Ct. App. 1995); *see also Binkley v City of Tacoma*, 787 P.2d 1366, 1376 (Wash 1990).

A final case of interest is *Marten Transportation, Ltd. v. Department of Industry, Labor, & Human Relations*, 491 N.W.2d 96 (Wis. Ct. App. 1992), *rev'd*, 501 N.W.2d 391 (Wis. 1993).  The Wisconsin court, in a case noted by commentators, declared that "requiring a discrimination victim to stay put to mitigate damages [is] like requiring 'victims' of legal malpractice to continue being serviced by their negligent lawyer in order to give the lawyer the chance to improve his or her skills." *Id.* at 199; *see Arthur Young & Co. v. Sutherland*, 631 A.2d 354, 362 (D.C. 1993) (explaining that when working conditions are intolerable, an employee need not remain in them and attempt to resolve them in order to recover for constructive discharge); *see also* Kende, 71 Notre Dame L. Rev. at 53 n.78.  The *Marten Transportation* case, however, was overruled by the Wisconsin Supreme Court in a divided opinion.  *Marten Transp., Ltd. v. Dep't of Indus., Labor, & Human Relations*, 501 N.W.2d 391, 399 (Wis. 1993).

**F.  Iowa Caselaw on Constructive Discharge.**  In the pre-*Suders* case of *Van Meter Industrial,* we considered constructive discharge under a local human rights ordinance.  675 N.W.2d at 505.  We presented a basic outline of the legal parameters of a constructive discharge claim,

which appear to have been uncontested. *Id.* at 510–12. Citing an Eighth Circuit case, we stated that "conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem." *Id.* at 511. But we balanced this observation with the contrapuntal declaration in the next sentence, stating, "On the other hand, an employee need not stay if he or she reasonably believes there is no possibility the employer will respond fairly." *Id.* Thus, *Van Meter* is ambiguous on the question of whether an employee suffering intolerable discrimination must remain on the job while the employer investigates. In any event, *Van Meter* is not entitled to stare decisis because the parties agreed on the elements of constructive discharge in their briefs before the court. *See, e.g., Hemingway*, 734 F.3d at 335 (holding a prior case was not precedent on an issue when the issue was not contested); *Goldberger*, 209 F.3d at 49 (finding certain cases did not support an issue when the issue was not contested by the parties nor addressed by the panel); *Fulton Found.*, 108 N.W.2d at 316–17 (stating a case was not efficacious on an issue which was not challenged by the parties). In any event, it remains to be seen whether this conclusion remains good Iowa law after law *Suders*.

### G. Discussion.

1. *No requirement of wanting employee to quit.* As seen above, the caselaw is divided on the question of whether an employer must desire the employee to quit before a plaintiff may prove constructive discharge. I agree with the majority approach, however, that there is no such subjective legal requirement. I do so for several reasons. The focus on constructive discharge should be on the perceptions of a reasonable employee in light of the remedial purposes of the ICRA. I do not think subjective protestations on the part of the employer should be a defense

if the objective evidence demonstrates working conditions would be considered intolerable by a reasonable person in the shoes of the plaintiff. *See Ramsey*, 907 F.2d at 1010; *Watson*, 823 F.2d at 361; *Alicea Rosado*, 562 F.2d at 119.

2. *Objective test.* In *Van Meter*, 675 N.W.2d at 511, we stated that the standard was objective and most courts, including the United States Supreme Court in *Suders*, have made similar statements. 542 U.S. at 141, 124 S. Ct. at 2351. And, no party here contests the objective nature of a constructive discharge claim.

Therefore, the suggestion in the instruction that constructive discharge may be shown if the employee subjectively believes conditions are intolerable is not in accord with the law as agreed upon by the parties in this case. Although the instruction was imperfect, taken as a whole, any error was harmless on this point in light of the repeated reference to reasonability throughout the instructions. On retrial, however, the district court might want to eliminate any confusion by consistently referencing the objective nature of the inquiry.

3. *Reasonable chance to resolve the problem: Can* Faragher-Ellerth *jump the track (again)?* The last issue is the district court's refusal to instruct that the "conditions will not be considered intolerable unless the employer has been given a reasonable chance to resolve the problem." At its core, this is another effort to transplant the thrust of the *Farragher-Ellerth* affirmative defense outside the context of vicarious liability. *See* Sara Kagay, *Applying the* Ellerth *Defense to Constructive Discharge: An Affirmative Answer*, 85 Iowa L. Rev. 1035, 1050–51 (2000). This approach appears to have been embraced by the Eighth and Eleventh Circuits, but not in the Seventh Circuit. *Trierweiler*, 639 F.3d at 460; *Lindale*, 145 F.3d at 956; *Bozé*, 912 F.2d at 805. As seen above, there is

state caselaw from Missouri, New Mexico, and Oregon to the contrary. *Pollock*, 11 S.W.3d at 761, *Charles*, 256 P.3d at 34–35; *Ballinger*, 898 P.2d at 238. The caselaw thus presents us with an important interpretive choice.

Based on our review of the possible approaches, I think the better view is not to impose a legal requirement that an employee *must* give the employer a reasonable period of time to remedy the problem in *all* constructive discharge cases. As pointed out in the caselaw and in the commentary, this requirement is a Catch-22 in that the plaintiff must prove conditions are so intolerable that any reasonable person would quit, while remaining patiently in the workplace to see if an employer can change its behavior and come up with a remedy. *See Gormley v. Coca-Cola Enters.*, 109 P.3d 280, 285 (N.M. 2005) (finding fact that employee gave employer one-month notice before quitting a factor in the employer's favor in considering summary judgment on constructive discharge claim). In addition, requiring a plaintiff to remain in a situation that is objectively intolerable based upon the employer's discriminatory conduct has a cynical if not brutal quality. There seems little point to require an employee to stay and fight when the employment relationship has been seriously damaged by discriminatory conduct of the employer. Martha Chamallas, *Title VII's Midlife Crisis: The Case for Constructive Discharge*, 77 S. Cal. L. Rev. 307, 372 (2004) [hereinafter Chamallas].

Empirical sources confirm that very few victims of sexual harassment pursue complaints through internal grievance procedures. Although now somewhat dated, scholarly literature suggests that workers who suffer harassment who utilize internal channels range from 2.5%–12%. *See* Chamallas, 77 S. Cal. L. Rev. at 373. Remarkably, even among persons who ultimately sued their employer for workplace

harassment, nearly half did not report the harassment and only fifteen percent did so in a timely manner. *Id.* The question thus arises as to whether a court evaluating reasonable employee behavior in a constructive discharge context should require atypical behavior. *See id.* And, courts should be cautious in assuming as a matter of law that an assertive approach which judges on an appellate bench with relative job security might think reasonable might not be regarded as reasonable by a jury of lay persons with wide experience in a diverse labor market.

Finally, forcing persons into internal processes tends to privatize civil rights enforcement in an environment where sexual harassment may be considered to be a personal problem for individual women rather than a systemic issue. *Id.* Internal complaint procedures are thus often unappealing because of a lack of empathy from decision-makers and the perceived risks of retaliation. The end result may be for victims to simply suffer in silence and then quit when conditions get bad. *Id.* at 379.

I would thus conclude there is no legal requirement to prevail on a hostile environment claim that an employer had an opportunity to resolve the problem. *Pollock,* 11 S.W.3d at 761; *Charles,* 256 P.3d at 37; *Ballinger,* 898 P.2d at 238. That said, the failure of an employee to pursue available remedies with the employer may be evidence for the fact finder to consider in determining whether a work environment was truly so intolerable as to satisfy the requirements of a constructive discharge. *See Lindale,* 145 F.3d at 955–56; *Levendos,* 909 F.2d at 1230. It is not, however, dispositive. Whether conditions were so intolerable that a reasonable person would have no choice but to leave employment is "a heavily fact-driven determination." *Levendos,* 909 F.2d at 1230. As a result, the constructive discharge instruction was not flawed because of its failure to require as a matter of law that the plaintiff remain in the

intolerably hostile workplace to allow the employer to attempt to remedy the problem.

**VII.  Conclusion.**

For the above reasons, I would generally conclude the approach of the district court comported with Iowa law except with respect to the instruction regarding materially adverse conditions required to support retaliation.   For this reason, I too would reverse the judgment of the district court and remand for a new trial.

Wiggins and Hecht, JJ., join this concurrence in part and dissent in part.  Cady, C.J., joins in part.